**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |  |
|---|---|---|
| MARC J. STOUT, ROBERT B. STOUT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cv-559 (CMH/TCB) |
| | ) | |
| JEFFREY KEENEN, Unit Chief, Drug Enforcement Administration's Headquarters Security & Identification Unit; DHS AGENT KALENICH, | ) | |
| | ) | |
| Defendants. | ) | |

## CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF FEDERAL DEFENDANTS' MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Federal Defendants submit this consolidated memorandum of law in support of their motion to dismiss.

## INTRODUCTION

*Pro se* Plaintiffs Marc and Robert Stout are serial litigants who attempt to goad public officials into taking actions that Plaintiffs believe violate their civil rights so that they can then sue the officials in their individual capacities for damages.[1] In the iteration giving rise to the instant action, Plaintiffs entered the Drug Enforcement Administration's ("DEA") federal facility in early 2020, insisting they had the absolute right to film the lobby; refusing to identify themselves to the security officers or otherwise undergo the requisite security screening; becoming (in their words)

---

[1]    *E.g., Stout v. Mischou*, 1:20-cv-147 (alleging First and Fourteenth Amendment violations; dismissed); *Stout v. Mischou*, 1:21-cv-172 (same); *Stout v. Duplessis*, 1:21-cv-868 (alleging First and Fourth Amendment violations; dismissed); *Stout v. Reyes*, 1:21-cv-896 (alleging First, Fourth, and Fourteenth Amendment violations; pending decision on motion to dismiss); *Stout v. Baroody*, 3:21-cv-476 (same); *Stout v. Barrow*, 3:21-cv-654 (alleging First and Fourteenth Amendment violations; pending response to complaint); *Stout v. Harris*, 3:21-cv-468 (similar); *Stout v. Spotsylvania Cty. Sheriff's Dep't*, 3:21-cv-468 (similar); *Stout v. Jeffries*, 3:21-cv-575 (similar).

"incited, impassioned, and overzealous"; "yell[ing] out 'Fuck the DEA'" and other expletives many dozens of times at passing employees; causing security to have to redirect and usher traffic through the lobby; and making clear they had no business at the DEA other than to "exercise [their rights] however [they] damn well please." In response, Defendant Keenen from DEA's Headquarters Security & Identification Unit and Defendant Kalenich from Federal Protective Service explained that the facility was not a public space and Plaintiffs were loitering and being disruptive on federal property in violation of federal regulation. At no point did either individual order Plaintiffs to stop filming, seize the film, order it deleted, or even cite (much less arrest) Plaintiffs for violating federal regulation.

From this, Plaintiffs bring the instant action pursuant to the limited implied remedy that the Supreme Court created in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), contending generically that Defendants Keenen and Kalenich violated their "First Amendment Right to Freedom of the Press" and "Fourteenth Amendment Right to Liberty and Due Process."

Plaintiffs' claims must be dismissed. First, their cause of action would require this Court to extend the limited *Bivens* remedy beyond any recognizable application by the Supreme Court to date, and to do so notwithstanding numerous "special factors" that, under Supreme Court precedent, counsel hesitation against an expansion of *Bivens*. This reason alone warrants dismissal.

Furthermore, even if the Court were to recognize a *Bivens* cause of action in this novel and manufactured context, Defendants Keenen and Kalenich are entitled to qualified immunity for the actions that form the basis of Plaintiffs' claims. Fundamentally, Plaintiffs fail to understand that the DEA lobby is federal property subject to reasonable regulation of First Amendment activity, and they simply did not have the absolute, unrestrained right to do whatever they wanted, however they wanted, in that space. And, unable to plead any constitutional violation, Plaintiffs also cannot show any violation of a "clearly established" constitutional right. Defendants Keenen and Kalenich are

therefore entitled to qualified immunity, and Plaintiffs' claims should be dismissed.

## BACKGROUND

**I.   Factual Background**

According to the Complaint, on January 7, 2020, Plaintiffs entered the DEA facility in Arlington, Virginia, purportedly to film the DEA lobby for "news purposes." Dkt. No. 1 ("Compl.") at p. 4 § III(A)-(B) & p. 7 ¶ 1.

Immediately after entering the facility, however, Plaintiffs refused to identify themselves to the security desk and to submit to security screening, notwithstanding prominent signage stating that all persons entering or leaving the facility would need to consent to inspection. Compl. at p. 9 ¶ 10; *see also* "$350,000 Lawsuit Against DEA, DHS Agents for Trespassing Us for Filming in DEA Lobby, Link Below," https://www.youtube.com/watch?v=tVbYwMdE19M at 00:48-1:20 (hereinafter "Pls.' Video").[2] Plaintiffs attempted to record the contents of the security desk's computer monitors, *id.* at 3:04-3:13, and further insisted to the security guards that they "want[ed] the DEA to come down here and tell [us] to leave," *id.* at 2:16-2:30.

Defendant Keenen (referenced in the Complaint as "John Doe"), the Unit Chief for the DEA's Headquarters Security & Identification Unit, arrived a few minutes later and asked if Plaintiffs were there to see anyone. Compl. at p. 9 ¶¶ 13, 14; Pls.' Video at 5:25-5:45. Plaintiffs made clear they were not and requested that the Federal Protective Service ("FPS") be called "to educate"

---

[2]   Plaintiffs also took a second video of the encounter. *See* "D.E.A. Building, Arlington, VA – Verbally-Charged Stand-Off Over Policy (Policy in Description)," https://www.youtube.com/watch?v=CS5hmxbv65s. The Court may consider both videos, posted to Plaintiffs' YouTube channel, in resolving the instant motion to dismiss because they have been incorporated into and are integral to the Complaint. *See Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004). The videos depict the precise encounter alleged in the Complaint, and Plaintiffs even attach photographs from the videos to the pleading. *See* Dkt. Nos. 1-3, 1-4. Nor can Plaintiffs contest the authenticity of the videos, as they uploaded the videos to their own YouTube channel.

Defendant Keenen on whether they could be there. Pls.' Video at 5:30-6:18.

During this exchange, Plaintiffs became increasingly aggressive and began yelling obscenities—in their own words, "feel[ing] incited, impassioned, and overzealous." Compl. at p. 9 ¶ 15; Pls.' Video at 5:30-6:18. Plaintiffs repeatedly yelled out "fuck the DEA" dozens of times as employees entered and exited the building, resulting in security guards needing to redirect and usher employees through the lobby and to ask Plaintiffs to keep the entryway clear. Compl. at p. 9 ¶ 16; *e.g.*, Pls.' Video at 7:20-8:10, 8:32-9:00, 9:15-9:33, 10:30-10:50, 11:32-11:38, 14:57-15:05, 17:42-18:00. Thus, Defendant Keenen explained several times that Plaintiffs were being disorderly, that the building was not a public space, and that "it's not about what you're videotaping; it's about your purpose here. You have no purpose here." Compl. at p. 9-10 ¶¶ 14, 23; Pls.' Video at 6:25-7:00, 14:02-14:12, 15:30-15:43. He also told Plaintiffs that, because they had no business at the agency and had been asked to leave, they were trespassing on federal property. Compl. at 9-10 ¶¶ 14, 23: Pls.' Video at 7:28-7:45. Other DEA employees similarly asked Plaintiffs not to yell profanities and told them they were creating a disturbance by yelling and using foul language, to which Plaintiffs responded, "don't tell me what I can do, fuck fuck fuck, fuck the DEA." Pls.' Video at 15:20-15:30, 16:13-16:40.

Plaintiffs then left the DEA building of their own accord to speak with Arlington County police officers outside.[3] Compl. at p. 9 ¶ 18; Pls.' Video at 18:00.

Defendant Kalenich, an FPS Inspector, arrived and again informed Plaintiffs that they were on federal property, not public property, and that they had been told by the property manager

---

[3]     Plaintiffs allege that DEA agents then formed a "human chain" to prevent them from reentering the building. Compl. at p. 10 ¶ 19. They do not allege that Defendant Keenen participated in that activity. *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (in a *Bivens* action, requiring plausible allegations that a defendant's *own, individual* actions violated the Constitution). Nor would such an action violate any clearly established constitutional right, as there is no absolute right to access federal property. *See supra*, Part II.

(Defendant Keenen) that they were not allowed on the property, making them subject to potential arrest for trespass if they remained. Compl. at p. 10 ¶ 22; Pls.' Video at 28:42-29:03. When Plaintiffs again asked why they were not allowed on the property, Defendant Keenen once again explained that it was because they did not have official business with the DEA. Compl. at p. 10 ¶ 23; Pls.' Video at 28:42-29:40, 30:21-30:25.

At that point, Plaintiffs said, "that's all we need to hear; alright, we're out of here," and left, but not before giving the middle finger and again exclaiming "fuck the DEA." Compl. at p. 11 ¶ 25; Pls.' Video at 30:30, 32:36.

## II.     Procedural Background

Plaintiffs filed the instant action in May 2021, asserting a *Bivens* cause of action against "DEA Agent John Doe" (Defendant Keenen) and "DHS Agent Kalenich" in their individual capacities for purported violations of Plaintiffs' "First Amendment Right to Freedom of the Press and Fourteenth Amendment Right to Liberty and Due Process." Compl. at pp. 2-4. They allege that Defendants Keenen and Kalenich interfered with their effort "to film the interior of the DEA's publicly-accessible lobby for news purposes" and "to practice their Constitutional rights to liberty, freedom of the press, and protest." *Id.* at p. 7 ¶ 1, p. 8 ¶ 9.

## <u>STANDARD OF REVIEW</u>

A complaint is subject to dismissal if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A plaintiff must plead factual allegations plausibly suggesting entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Legal statements, conclusory assertions, and threadbare recitals of a cause of action's elements are insufficient to state a claim. *Iqbal*, 556 U.S. at 678, 681.

## ARGUMENT

I.   **The Court Should Decline to Recognize a *Bivens* Remedy in This New Context**

A.   The Legal Framework Set Forth by the Supreme Court for Considering Whether to Imply a *Bivens* Claim

Because a *Bivens* action is a judicially created remedy, as opposed to one created by Congress, the first question this Court must confront is whether it should create a *Bivens* remedy for the particular context in which the allegedly unconstitutional conduct arose. For the last thirty years, the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001); *see also Lebron v. Rumsfeld*, 670 F.3d 540, 547 (4th Cir. 2012). In the words of the Fourth Circuit: "It is clear that expansion of a *Bivens*-based cause of action . . . is the exception, not the rule." *Cioca v. Rumsfeld*, 720 F.3d 505, 510 (4th Cir. 2013). Accordingly, the Fourth Circuit has directed that whenever a party seeks to extend a *Bivens* remedy to a new context or new category of defendants, a court "must approach [that] invitation to imply a *Bivens* action here with skepticism." *Lebron*, 670 F.3d at 548.

In 2017, the Supreme Court went even further, holding in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), that courts *may not* expand the *Bivens* remedy substantially beyond those instances in which *the Supreme Court* (as opposed to federal courts generally) has already recognized the implied right of action. On that score, the Supreme Court explained that in its entire history, it had approved an implied *Bivens* action against federal employees in their individual capacities on just three occasions, *id.* at 1854-55: (1) in *Bivens* itself, which was a Fourth Amendment violation related to the use of unreasonable force during a warrantless search and seizure in the plaintiff's own home; (2) in *Davis v. Passman*, 442 U.S. 228 (1979), which was a Fifth Amendment equal protection claim alleging gender discrimination in congressional staff employment; and (3) in *Carlson v. Green*, 446 U.S. 14 (1980), which was an Eighth Amendment cruel and unusual punishment claim related to medical care in the prison setting that caused the inmate's death. *Abbasi*, 137 S. Ct. at 1860. The Court notably remarked

that those three decisions were issued during an "*ancien regime*" in which the judicial creation of an implied cause of action was deemed appropriate; however, in more modern times, the Court's jurisdiction has evolved to significantly disfavor such implied claims. *Id.* at 1855-56. In fact, the Court openly questioned whether those three historical *Bivens* decisions "might have been different if they were decided today." *Id.* at 1856; *see also Earle v. Shreves*, 990 F.3d 775, 778 (4th Cir. 2021) (explaining that "the Supreme Court's approach to implied damage remedies has changed dramatically"). Indeed, "for almost 40 years, [the Court has] consistently rebuffed requests to add to the claims allowed under *Bivens*." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (collecting cases).

Going forward, therefore, the Supreme Court in *Abbasi* admonished that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." 137 S. Ct. at 1857. It required courts to recognize that "separation-of-powers principles are or should be central to" whether to create an implied damages remedy akin to *Bivens*, and noted that "most often," the answer to this inquiry will be that Congress—not the courts—should be responsible for deciding whether to create a private right of action. *Id.* This is because "[c]laims against federal officials often create substantial costs," including an "impact on government operations systemwide," especially where "the tort and monetary liability mechanisms of the legal system are [being] used to bring about the proper formulation and implementation of public policies." *Id.* at 1857-58. As such, the *Abbasi* Court emphasized that "[i]n most instances" courts should defer to Congress on the question of whether to extend a cause of action for damages in a given context. *Id.* at 1857.

Consistent with these principles, the *Abbasi* Court provided a new analytical framework for courts to follow when addressing claims asserted under *Bivens*. First, the court must determine "whether a case presents a new *Bivens* context." *Id.* at 1859. If yes, then the court must consider whether "special factors counsel[] hesitation" before finding an implied cause of action. *Id.* at 1857. In sum:

> if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III.

*Id.* at 1858. In conducting this inquiry, "our watchword is caution." *Hernandez*, 140 S. Ct. at 742. If the court has any "reason to pause before applying *Bivens*," then it must "reject the request" to infer a new cause of action. *Id.* at 743. Thus, this framework "places significant obstacles in the path to recognition of an implied cause of action," *Earle*, 990 F.3d at 778, and militates against implying a *Bivens* remedy under the circumstances alleged here.

B.      This Case Presents a New *Bivens* Context

The Supreme Court in *Abbasi* explained that a case "presents a new context" whenever "the case is different in a meaningful way from previous *Bivens* cases decided by this Court" (*i.e.*, *Bivens*, *Davis*, and *Carlson*). 137 S. Ct. at 1859. Such "meaningful differences" include, but are not limited to:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruption by the Judiciary into the functioning of other branches; or the presence of special factors that previous *Bivens* cases did not consider.

*Id.* at 1860. Critically, there does not need to be a wide gap between the Supreme Court's prior three *Bivens* decisions and the case at hand; "even a modest extension is still an extension." *Id.* at 1864. For example, just earlier this year, the Fourth Circuit held that a Fourth Amendment claim arose under a new context—even though *Bivens* itself was a Fourth Amendment case—because the cases involved different factual and legal issues. *Annappareddy v. Pascale*, 996 F.3d 120, 135 (4th Cir. 2021). In short, the Supreme Court has explained that a "meaningful" difference may still be "small, at least in practical terms," and thus this part of the analysis "is easily satisfied." *Abbasi*, 137 S. Ct. at 1865.

Here, Plaintiffs allege that Federal Defendants violated their "First Amendment right to freedom of the press" and "Fourteenth Amendment right to liberty and due process" in interfering

with their filming of and re-entry to the DEA lobby. Compl. at p. 4 § II.C, p. 9-11 ¶¶ 14-16, 21-23. These claims "easily satisf[y]" the new-context analysis. As the Fourth Circuit very recently explained, "[t]he Supreme Court has never recognized a First Amendment based *Bivens* remedy in any context." *Earle*, 990 F.3d at 779; *see also Doe v. Meron*, 929 F.3d 153, 169 (4th Cir. 2019) ("The Supreme Court has not recognized a *Bivens* remedy for an alleged violation of the First Amendment."). Thus, "the constitutional right at issue"—not to mention the challenged conduct and the authority under which the Federal Defendants were operating—is all fundamentally different from any of the issues in the *Bivens*, *Davis*, and *Carlson* cases.

Likewise, Plaintiffs' due process claim regarding filming at and access to a federal facility bears no resemblance to the only three instances in which the Supreme Court has recognized a *Bivens* remedy.[4] *See Abbasi*, 137 S. Ct. at 1860. The constitutional right at issue does not arise under the Fourth or Eighth Amendments, as in *Bivens* and *Carlson*. Nor is it even the same constitutional right as in *Davis*, which—although a Fifth Amendment case—dealt with an equal protection claim (not a due process claim) challenging a gender-discriminatory termination (not a disagreement over filming and access to a federal facility). *Davis*, 442 U.S. at 245; *see also Annaparreddy*, 996 F.3d at 135 (finding new context where plaintiff's claims implicated a different clause of the Fourth Amendment than that at issue in *Bivens*). Accordingly, there can be little doubt that this case presents a "new context" pursuant to the *Abbasi* Court's definition.

C.   Special Factors Counsel Against Implying a *Bivens* Remedy in This New Context

The next step of the *Abbasi* framework, an analysis of any "special factors" implicated by

---

[4]   Although Plaintiffs assert a Fourteenth Amendment claim, "actions of the Federal Government and its officers are beyond the purview of the [Fourteenth] Amendment." *Dist. of Columbia v. Carter*, 409 U.S. 418, 424-25 (1973); *see also United States v. Hornsby*, 666 F.3d 296, 310 (4th Cir. 2012) ("[T]he Fourteenth Amendment's Due Process Clause is a limitation on state conduct, and thus Hornsby's due process protections against the federal government are found in the Fifth Amendment.").

Plaintiffs' claims, yields the inescapable conclusion "that whether a damages action should be allowed is a decision for the Congress to make, not the courts." *Abbasi*, 137 S. Ct. at 1860.

Among the special factors here are that Plaintiffs' complaints are plainly to the routine application of federal policies to them, such as policies requiring visitors to a federal facility to submit to screening and prohibiting loitering and disorderly conduct. Such challenges to the implementation of a general policy are ill-suited for the judiciary, as they would "require courts to interfere in an intrusive way with sensitive functions of the Executive Branch." *See Abbasi*, 137 S. Ct. at 1860-61 (noting "the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties"); *Attkisson v. Holder*, 2017 WL 5013230, at *7 (E.D. Va. Nov. 1, 2017) (dismissing *Bivens* claims based on "essentially policy-level decisions"), *aff'd*, 925 F.3d 606 (4th Cir. 2019). This is particularly so here, where Defendants Keenen and Kalenich did nothing more than enforce existing federal policy.[5]

The significant impact on government operations system-wide that would result from an expansion of a *Bivens* remedy in these circumstances presents another special factor counseling hesitation. *See Abbasi*, 137 S. Ct. at 1848 ("[T]he decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide."). Such an expansion would necessarily imply that any individual can enter any federal building with a camera and disregard security screening applicable to all visitors; can loiter in the lobbies of federal agencies for however long they wanted, irrespective of having no business at that agency; can yell obscenities, disrupt daily operations at the agency, disrupt employees' access to and from their own workplace, and do

---

[5]     If Plaintiffs are unhappy with those federal policies, the fact that they can challenge the policies themselves and seek injunctive relief is yet another special factor. *See Abbasi*, 137 S. Ct. at 1858 (holding that available alternative relief "alone may limit the power of the Judiciary to infer a new *Bivens* cause of action"); *Oliva v. Nivar*, 973 F.3d 438, 444 (5th Cir. 2020) ("The Supreme Court has been clear that the alternative relief necessary to limit *Bivens* need not provide the exact same kind of relief *Bivens* would.").

whatever they "damn well please," Pls.' Video at 4:17-4:20—all in violation of numerous federal policies that exist to protect the security of federal facilities and federal employees. Such an unprecedented expansion would not only be contrary to long-established authority that "the government as a property owner must have the flexibility to respond to disruptive situations as they arise." *Willis v. Town of Marshall*, 426 F.3d 251, 261 (4th Cir. 2005). It would also significantly hamper the on-the-ground ability to secure a federal facility against such disruptions to everyday government operations, not to mention erode the will of the employees tasked with such responsibilities. *See also Greer v. Spock*, 424 U.S. 828, 836 (1976) ("The [government], no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."); *Jangjoo v. Sieg*, 319 F. Supp. 3d 207, 225 (D.D.C. 2018) (finding special factor in the need for agencies to have discretion to respond appropriately to potential security dangers). These system-wide impacts, and the associated costs to the government and accompanying burdens on individual employees in defending against such manufactured claims, counsel against an expansion of *Bivens* to the claims here. *See Quinones-Cedeno v. Rickard*, 2019 WL 6869351, at *8 (S.D.W. Va. June 26, 2019) (declining to recognize First Amendment *Bivens* claim in the prison setting due to the impact on governmental operations systemwide).

Another special factor here, like in *Abbasi*, is that Plaintiffs' claims challenge more than standard "law enforcement operations." 137 S. Ct. at 1861. Although the setting of Plaintiffs' Complaint was a DEA facility, the actual actions challenged and claims advanced here are about routine security responses to disruptive individuals at a federal facility. As Plaintiffs themselves told Defendant Keenen upon learning his affiliation with DEA security: "I want the DEA that carries a sidearm. I don't want no fucking administrative DEA. . . . Get the field agents down here." Pls.' Video at 12:26-12:42. Were their claims permitted to proceed, the same challenge could be brought at any federal facility, even one without any connection to law enforcement whatsoever, exposing

any manner of federal officials to an influx of manufactured claims. Thus, were that sort of inquiry to be allowed in a private suit for damages, then "the *Bivens* action would assume dimensions far greater than those present in *Bivens* itself, or in either of its two follow-on cases, or indeed in any putative *Bivens* case yet to come before the [Supreme] Court." *Abbasi*, 137 S. Ct. at 1861.

Similarly, the fact that Plaintiffs' claims would "[w]iden[] the scope of government employees amenable to suit for their official acts" presents another special factor counseling against recognition of a *Bivens* remedy here. *Haley v. Under Sec'y of Com. for Intell. Prop.*, 129 F. Supp. 3d 377, 384 (E.D. Va. 2015). Unlike in the primary cases in which the Supreme Court extended *Bivens* liability (*Bivens* and *Carlson*), Defendant Keenen simply is not a law enforcement officer. His job is not one that requires him to interact with the public regularly, nor is it even in a building where members of the public frequent on a regular basis. Exposing such an individual to potential liability for his official acts could dissuade future individuals from seeking positions to serve that role. *Id.*

The above factors are just some of the special factors that all counsel hesitation in expanding the *Bivens* remedy to the circumstances here. As such, the Supreme Court's admonition that *Bivens* is a "disfavored judicial activity" rings especially true, and the Court should dismiss Plaintiffs' claims.[6]

---

[6] Another jurist in the Richmond Division of this District recently recognized a *Bivens* cause of action in a case alleging First and Fourth Amendment violations when TSA agents prevented the plaintiff from recording, from a distance, a pat-down search of his husband and ordered the plaintiff to delete the video. *Dyer v. Smith*, 2021 WL 694811 (E.D. Va. Feb. 23, 2021). The court there found no special factors counseling hesitation. *Id.* at *4, *6. The decision is currently on appeal, with the United States having submitted an *amicus* brief in support of reversal, and argument scheduled in December 2021. *Dyer v. Smith*, No. 21-1508 (4th Cir.).

For the reasons set forth in the United States' *amicus* brief in the appeal, Federal Defendants here believe the district court in *Dyer* decided the case incorrectly. *See Dyer v. Smith*, No. 21-1508, Dkt. No. 17. But in all events, *Dyer* is also easily distinguishable. Unlike in *Dyer*, the Federal Defendants here did not prevent Plaintiffs from filming, order them to stop filming, or seize or order Plaintiffs to delete their film; Plaintiffs undisputedly continued filming the entire encounter and retained their video. Also unlike in *Dyer*, Plaintiffs here were in violation of federal regulation prohibiting loitering and disorderly behavior, resulting in Federal Defendants asking them to leave. And unlike the airport in *Dyer*, Plaintiffs here chose to enter a federal workplace, which members of the public do not frequent unless they have actual business with the agency. These significant

## II.      Federal Defendants Are Entitled to Qualified Immunity

Even if the Court were to expand the *Bivens* cause of action here (and it should not), Federal Defendants are entitled to qualified immunity on Plaintiff's claims.

The Supreme Court has repeatedly held that federal officials enjoy qualified immunity from suit unless their actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Behrens v. Pelletier*, 516 U.S. 299, 305 (1999). As the Court explained: "permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liabilities and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). Accordingly, qualified immunity ensures that government officials are not subject to suit for their official actions unless they were on clear notice that their conduct was unlawful. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002). At bottom, qualified immunity applies to "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The determination into whether a particular officer enjoys qualified immunity follows a two-pronged analysis. One prong is whether the facts, viewed in the light most favorable to the plaintiff, demonstrate a constitutional violation. *See Saucier v. Katz*, 533 U.S. 194, 199 (2001); *Pike v. Osbourne*, 301 F.3d 182, 184 (4th Cir. 2002). If so, then the second prong asks "whether the contours of the right were clearly established such that a reasonable official would understand that what he [was] doing violated that right." *Pike*, 301 F.3d at 185. A court "may exercise [its] sound discretion" to address the prongs in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, irrespective of the order in which the Court addresses the prongs of the qualified-

---

differences give rise to various special factors here that the district court in *Dyer* did not consider.

immunity analysis, Plaintiffs cannot satisfy either prong.

A.   Plaintiffs Do Not Plausibly Allege That Defendants Keenen or Kalenich Committed a Constitutional Violation

As an initial matter, Plaintiffs allege no facts in support of any Fourteenth Amendment claim (or Fifth Amendment claim, with respect to the federal government, *see Hornsby*, 666 F.3d at 310). *See also, e.g.*, *Williams v. Town of Greenburgh*, 535 F.3d 71, 75-76 (2d Cir. 2008) (access to public facilities is not a constitutionally protected interest); *Royer v. City of Oak Grove*, 374 F.3d 685, 689 (8th Cir. 2004) (same). Instead, the entire Complaint focuses on the purported First Amendment violation. The Fourteenth Amendment claim should therefore be dismissed, and the remainder of this brief addresses the First Amendment claim.[7]

It is well settled that "a plaintiff must plead that each Government-official defendant, through the official's *own individual actions*, has violated the Constitution." *Iqbal*, 556 U.S. at 676 (emphasis added); *see also Abbasi*, 137 S. Ct. at 1860; *Danser v. Stansberry*, 772 F.3d 340, 349 (4th Cir. 2014). This requisite focus on an individual's *personal* actions is an integral part of the qualified immunity doctrine, as an individual may not be held personally liable for another individual's actions. *See Iqbal*, 556 U.S. at 676. Thus, Plaintiffs' claims here can only be measured against the specific actions that they allege Defendants Keenen and Kalenich each took individually. In other words, Plaintiffs may *not* rely on allegations of conduct by other "DEA agents" or "security guards" (*see* Compl. ¶¶ 5-11, 18-20) in their effort to state a claim against *Defendant Keenen* or *Defendant Kalenich*. *Iqbal*, 556 U.S. at 676.

1.   With respect to the allegations against Defendant Keenen, Plaintiffs' claims boil down to the premise that they were entitled to do whatever they wanted in the DEA lobby—to film,

---

[7]   Insofar as Plaintiffs attempt to assert a Fourteenth/Fifth Amendment claim based on a supposed First Amendment violation, such a claim necessarily fails for the reasons discussed below.

loiter, yell obscenities, and generally create a disturbance and nuisance—because, in their view, the space was "publicly-accessible." This is incorrect for several reasons.

With respect to activities on government property, the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981); *see also Cornelius v. NAACP Legal Def.*, 473 U.S. 788, 799-800 (1985) ("Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."). The Supreme Court has identified three types of fora for purposes of First Amendment activity, each of which is subject to different standards. Regulation of activity on government property that has been traditionally open to the public for expressive activity, such as public streets, sidewalks, and parks, is subject to strict scrutiny. *United States v. Kokinda*, 497 U.S. 720, 726 (1990). So is regulation of activity on property that the government has expressly dedicated to expressive activity. *Id.* at 726-27. But "regulation of activity where the Government has not dedicated its property to First Amendment activity is examined only for reasonableness." *Id.* at 727. Thus, the government may reserve a nonpublic forum "for its intended purposes," or otherwise impose "time, place, and manner regulations," "so long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

That forum analysis does not turn on whether the public can physically access the area at issue, or—in Plaintiffs' words—whether the area is "publicly-accessible." *See* Compl. at p. 7 ¶ 1, p. 8 ¶¶ 6-8. As the Supreme Court has explained, "[t]he mere physical characteristics of the property cannot dictate forum analysis." *Kokinda*, 497 U.S. at 727; *see also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680 (1992) ("Nor is a public forum created 'whenever members of the public

are permitted freely to visit a place owned or operated by the Government.'"). Instead, the relevant

inquiry is whether the area "has been traditionally open to the public for expressive activity" or has

been "expressly dedicated" by the government for First Amendment activity. *Kokinda*, 497 U.S. at

726-27; *see also Krishna*, 505 U.S. at 680 (explaining that the decision to create a public forum must be

made "by intentionally opening a nontraditional forum for public discourse").

  On this score, Plaintiffs' Complaint comes up woefully short. There are no allegations that

the DEA lobby has traditionally been open to the public for First Amendment activity or that the

DEA has expressly dedicated it to First Amendment activity. Nor could Plaintiffs offer such

allegations. The purpose of the DEA lobby (as depicted in Plaintiffs' own video) is to facilitate entry

and exit from the DEA workplace, whether by DEA employees or by individuals who have business

with the DEA. *See, e.g.*, Pls.' Video at 14:55-15:03. Persons entering the lobby immediately encounter

a security desk, flanked by security turnstiles and a body scanner. *Id.* at 00:10-1:50. As another court

in the Fourth Circuit has explained, such a space "is entirely unsuitable for any expressive activity

which would attract a crowd, generate noise, or incite disruptive behavior, as any of these factors

would seriously interfere with maintenance of security in the building." *Claudio v. United States*, 836 F.

Supp. 1219, 1224-25 (E.D.N.C. 1993) (concluding that the lobby to the Raleigh federal building is a

non-public forum, where it is devoted primarily to maintaining the security of the building and

facilitating entry to and exit from the building). *Accord Sefick v. Gardner*, 164 F.3d 370, 372 (7th Cir.

1998) (holding that the lobby of a federal courthouse is a nonpublic forum); *United States v. Murtari*,

120 F. App'x 378, 380 (2d Cir. 2004) (same, regarding corridors of federal building). As such,

regulation of First Amendment activity in the DEA lobby is "examined only for reasonableness."

*Kokinda*, 497 U.S. at 727; *see also Griffin v. Dep't of Veterans Affairs*, 274 F.3d 818, 820 (4th Cir. 2001).

  There can be no doubt that Defendant Keenen's actions satisfied this deferential test. *See*

*Cornelius*, 473 U.S. at 808 (the "decision to restrict access to a nonpublic forum need only be

reasonable; it need not be the most reasonable or the only reasonable limitation"). Pursuant to federal policy, he inquired whether Plaintiffs were there to see a DEA employee. *See* 41 C.F.R. § 102-74.390 ("All persons entering in or on Federal property are prohibited from loitering . . . ."). When he learned Plaintiffs had no such business at DEA, and that they refused to undergo routine screening and instead intended to loiter on the premises—in violation of federal policy, *see id.* §§ 102-74.370, 102-74.390—he told them they could not remain in the building. And when Plaintiffs became even more disruptive—by their own admission repeatedly yelling "Fuck the DEA" at employees, "attempt[ing] to antagonize" Defendant Keenen, and overall becoming "incited, impassioned, and overzealous," *see* Compl. at p. 9 ¶¶ 15-16—Defendant Keenen calmly informed them they were being disruptive and asked them to keep the entryway clear for employees. *See* 41 C.F.R. § 102-74.390 (prohibiting "disorderly conduct" or other conduct that "creates loud or unusual noise or a nuisance," "unreasonably obstructs the use of entrances, foyers, lobbies," or "otherwise impedes or disrupts the performance of official duties by Government employees"); *see also United States v. Cassiagnol*, 420 F.2d 868, 872-75 (4th Cir. 1970) (holding that the federal regulation prohibiting loitering and disorderly conduct on government property does not violate the First Amendment); *United States v. Bader*, 698 F.2d 553, 554, 556-57 (1st Cir. 1983) (same).

Notably, throughout the entire exchange, Defendant Keenen *did not* do any of the following: prevent Plaintiffs from filming or order them to stop filming; force or request Plaintiffs to delete their video; confiscate Plaintiffs' equipment or video; or even remove Plaintiffs from the lobby. *See generally* Compl.; *see also id.* ¶ 18 ("Marc and Robert exited the building to speak with the Arlington County officers . . . ."). Indeed, Plaintiffs continued filming throughout the interaction and plainly retained their video, as they later posted it to the internet. *See* Pls.' Video. Nor is there any allegation (and the video does not show) that Defendant Keenen permitted *anyone else* to loiter, yell obscenities, and remain in the DEA lobby despite such disruptive behavior. He simply requested that Plaintiffs

leave the building since they had no business there and were undisputedly being disruptive, and even told them that they could continue "to film anywhere outside on the property." Compl. ¶ 21. That is not an infringement on Plaintiffs' First Amendment rights. *See, e.g., Griffin*, 274 F.3d at 823 (holding that the VA's decision not to allow plaintiff to fly the Confederate flag daily at a national cemetery, a nonpublic forum, was reasonable based on the potential controversy undermining the VA's goal of keeping its cemeteries free from partisan conflict); *Vega v. Chicago Bd. of Educ.*, 338 F. Supp. 3d 806, 811-14 (N.D. Ill. 2018) (even in a "designated public forum"—an area subject to greater scrutiny than the non-public forum here—removal of plaintiff from a board meeting after she rushed up to the dais, yelled "COWARD!" at a board member, shook her fist, interrupted another speaker, and overall violated public participation guidelines did not violate her First Amendment rights).

      2.      Likewise, Defendant Kalenich's actions easily pass constitutional muster. The only allegations of supposedly unconstitutional conduct by Defendant Kalenich are that he told Plaintiffs they could not reenter the DEA building and would be trespassing if they did so on account of having no business with the DEA and despite having been asked by the property manager to leave. Compl. ¶ 22. As the Supreme Court has explained, the "decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808. And Defendant Kalenich's decision here not to permit Plaintiffs to reenter the building is more than reasonable, considering that Plaintiffs had already shown themselves to have no business in the DEA building, to have been highly disruptive and harassing to employees attempting to go about their normal workday, and to have refused the security screening required of all visitors to a federal facility. Compl. ¶¶ 15-16; *e.g., Vega*, 338 F. Supp. 3d at 811-14 (decision to remove a disruptive plaintiff even from a designated public forum was consistent with the First Amendment). After all, as Plaintiffs themselves allege, FPS policy— consistent with federal regulation—provides that the right to photograph a federal lobby

> *does not* authorize a photographer to . . . create loud or unusual noises or cause a nuisance, obstruct the usual use of entrances, lobbies and other commonly accessible space, [or] impede or disrupt the performance of official duties by government employees or federal contractors, including the PSOs [Protective Security Officers] . . . .

Compl. ¶ 3 (emphasis added); *see also* 41 C.F.R. § 102-74.390. Tellingly, Plaintiffs do not allege that Defendant Kalenich ever instructed them to stop filming, prevented them from filming, ordered them to surrender or delete their video, took their equipment, or even cited them for violating federal regulation (much less arrest them). Nor is there any allegation that Defendant Kalenich permitted anyone else who had been asked by the property manager to leave to reenter the building. Instead, Defendant Kalenich simply enforced a federal regulation—one the Fourth Circuit has upheld against a First Amendment challenge—imposing a reasonable restriction on First Amendment activity in a nonpublic forum. *Cassiagnol*, 420 F.2d at 872-75.

> 3.      To the extent Plaintiffs try to contend that Defendants Keenen and Kalenich somehow interfered with newsgathering efforts specifically, that argument lacks merit for a variety of reasons. Setting aside, first, that Plaintiffs' only allegation in the Complaint regarding applicability of the First Amendment's freedom of the press clause is the conclusory statement that they sought to film the DEA lobby "for news purposes," *see* Compl. ¶ 1, the freedom of the press guarantee has traditionally focused on the right to *publish* information without governmental restraint, rather than on the acquisition of that information in the first place, *see Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965).[8] And while there certainly is some First Amendment protection for newsgathering, that protection does not extend to "the unrestrained right to gather information." *Id.* at 17; *see also Branzburg v. Hayes*, 408 U.S. 665, 682-85 (1972). As such, it is axiomatic that members of the press have "no special immunity from the application of general laws," *Associated Press v. NLRB*, 301 U.S. 103, 132 (1937),

---

[8]      Of course, Defendants Keenen and Kalenich placed no restraints on Plaintiffs' publication of their videos; Plaintiffs freely posted the videos on the internet, where they remain.

and that the First Amendment does not grant the media any "special right of access to [government buildings or information] different from or greater than that accorded the public generally," *Houchins v. KQED, Inc.*, 438 U.S. 1, 15-16 (1978). *See also, e.g., Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 520 (4th Cir. 1999). Here, the federal regulation prohibiting loitering and disorderly conduct on government property applies to all individuals. *See* 41 C.F.R. § 102-74.365 ("The rules in this subpart apply to all property under the authority of GSA and *to all persons entering in or on such property*." (emphasis added)). Members of the press are no exception. Thus, Plaintiffs' reflexive reliance on their "newsgathering" does not further their claims; they were still subject to the same regulations as everyone else on federal property. And under those regulations, Plaintiffs' self-admitted disruptive conduct (becoming "incited, impassioned, and overzealous," yelling "Fuck the DEA" at employees, and having no business with the DEA, Compl. ¶¶ 15-16) warranted Defendants Keenen and Kalenich's decision not to allow their re-entry to the building.

4.      Finally, although not articulated in the Complaint, Plaintiffs may claim that Defendants Keenen and Kalenich interfered with their right to record public officials. Even if there is a First Amendment right to record police activity in public,[9] that general right does not help Plaintiffs here. For one, they were not recording police activity in public. *See, e.g., Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011) (recognizing right to film police officers in the Boston Common, "the oldest city park in the United States and the apotheosis of a public forum"). Rather, Plaintiffs entered a federal workplace that by purpose and design is a *nonpublic* forum, and admitted on their video that there was no police activity to record there. *See* Pls.' Video at 12:26-12:42 (telling

---

[9]      Although various district courts in the Circuit have recognized such a right, the Fourth Circuit itself has not. *See Szymecki v. Houck*, 353 F. App'x 852 (4th Cir. 2009); *Sharpe v. Ellis*, 2021 WL 2907883, at *4 (E.D.N.C. July 9, 2021). Some other Circuits have recognized the right to varying degrees, and the Tenth Circuit has declined to recognize it. *See Mocek v. City of Albuquerque*, 813 F.3d 912, 931 (10th Cir. 2015).

Defendant Keenen: "I want the DEA that carries a sidearm. I don't want no fucking administrative DEA. . . . Get the field agents down here."). Moreover, the fact that Federal Defendants did not prevent Plaintiffs from filming—and even told them they could continue to film mere feet outside, *see* Compl. at p. 10 ¶ 21—undermines any claim Plaintiffs might try to advance in this respect.

But perhaps the most fundamental defect is that there is no absolute right to record government officials of every kind, in a space designed for security screening and entry/exit of federal employees and their visitors, irrespective of conduct that violates federal regulation prohibiting loitering and disruptive conduct. *See Willis*, 426 F.3d at 261 (4th Cir.) ("[T]he government as a property owner must have the flexibility to respond to disruptive situations as they arise."); *Sharpe*, 2021 WL 2907883, at *4 (finding no First Amendment right to livestream video of a traffic stop from inside the stopped car). As even the courts that have recognized a right to record policy activity in public have clarified: "the right to film is not without limitations. It may be subject to reasonable time, place, and manner restrictions." *Glik*, 655 F.3d at 84; *see also Benzing v. North Carolina*, 2020 WL 3439558, at *5 (W.D.N.C. June 23, 2020) (finding "no absolute First Amendment right to record public officials"); *Mocek v. City of Albuquerque*, 3 F. Supp. 3d 1002, 1071-73 (D.N.M. 2014) (dismissing claims that TSA agents unlawfully ordered plaintiff to stop recording their screening procedures and summoned law enforcement when he did not comply), *aff'd*, 813 F.3d 912 (10th Cir. 2015). The federal regulation Defendants Keenen and Kalenich enforced here is just such a reasonable restriction.

In sum, under ample authority, the Complaint does not plausibly plead any constitutional violation by Defendants Keenen or Kalenich, who are therefore entitled to qualified immunity for this reason alone.

B.  Plaintiffs Cannot Identify Any "Clearly Established" Right That Federal Defendants Violated

As demonstrated above, Plaintiffs have not plausibly pled any constitutional violation by

either Defendant Keenen or Defendant Kalenich. But even if they had, Federal Defendants still would be entitled to qualified immunity because Plaintiffs cannot show that any such violation was clearly established. A "clearly established" right is one whose contours "have been so conclusively drawn as to leave no doubt that the challenged action was unconstitutional." *Swanson v. Powers*, 937 F.2d 965, 969 (4th Cir. 1991). In other words, "existing precedent must have placed the [] constitutional question beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)

To start, "clearly established law" cannot be defined "at a high level of generality," *id.* at 742, but must be "particularized to the facts of the case," *White v. Pauly*, 137 S. Ct. 548, 552 (2017). In determining whether a right was clearly established at the time of the alleged violation, the court "need not look beyond the decisions of the Supreme Court, this court of appeals [the Fourth Circuit], and the highest court of the state in which the case arose." *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999). "If a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense." *Id.*; *see also Szymecki*, 353 F. App'x at 852.

Here, for Plaintiffs to overcome the qualified immunity defense, they would need to demonstrate that as of January 2020, "clearly established law" conclusively allowed individuals to loiter and film in a nonpublic forum (such as the lobby of a federal building that facilitates security screening and entry/exit to federal offices), all the while yelling, cursing, refusing security screening, and disrupting employees coming and going from their own workplaces, in violation of federal regulation. But there is no such authority. Instead, the "clearly established law" falls in the opposite direction: the Supreme Court and Fourth Circuit have repeatedly and unequivocally held that First Amendment activity in nonpublic fora is subject to reasonable restrictions. *See supra*, Part II.A (citing extensive caselaw); *see also, e.g.*, *Szymecki*, 353 F. App'x at 852-53 (concluding, in the only Fourth Circuit opinion on the issue, that the "right to record police activities on public property was not clearly established in this circuit at the time of the alleged conduct"); *Maliki v. City of Parkersburg*,

2020 WL 4929025, at *4 (S.D.W. Va. June 29, 2020) (alleged violation in seizing cellphone used to record police at an intersection was not clearly established).[10] The Fourth Circuit has even upheld the constitutionality of the regulation prohibiting loitering and disorderly conduct, *i.e.*, the restriction applied here. *See Cassiagnol*, 420 F.3d at 872-75. With the explicit support of this authority, Federal Defendants' conduct here cannot demonstrate any "clearly established" violation of a constitutional right, and they are entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint.

Dated:  October 29, 2021

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____/s/_____
CATHERINE M. YANG
Assistant United States Attorney
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3799
Fax:    (703) 299-3983
Email:  catherine.yang@usdoj.gov
*Counsel for Federal Defendants*

---

[10]    In *Dyer*, Judge Gibney held that TSA agents prohibiting the plaintiff from recording the pat-down search of his husband and ordering him to delete the video violated the plaintiff's clearly established right to engage in "peaceful nondisruptive speech in an airport." 2021 WL 694811, at *8. Federal Defendants believe this holding was error, including because the court failed to define the right at the appropriate level of specificity as required by Supreme Court and Circuit precedent, and even acknowledged that "neither the Supreme Court nor the Fourth Circuit has recognized a right to record government officials performing their duties." *Id.*

Regardless, *Dyer* is also inapposite for the simple reason that the court there relied on the "peaceful nondisruptive speech" performed "from a distance." *Id.* at *4, 8. Plaintiffs here openly admit that they were "incited, impassioned, and overzealous," "antagoni[stic]," and repeatedly "yelled out 'Fuck the DEA'" at passing employees. Compl. at p. 9 ¶¶ 15-16. Their own video further depicts just how disruptive their conduct was, including the need for security to reroute and usher employees through the space. *See* Pls.' Video. Such conduct is a far cry from that at issue in *Dyer*.

23

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2021, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system, and caused a copy to be served by first-class mail on the

following *pro se* plaintiffs:

Marc J. Stout
Robert B. Stout
30 Willow Branch Place
Fredericksburg, VA 22405

_____/s/_____
Catherine M. Yang
Assistant United States Attorney
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3799
Fax:    (703) 299-3983
Email:  catherine.yang@usdoj.gov