Attkisson v. Holder, Not Reported in Fed. Supp. (2017)

2017 WL 5013230, 46 Media L. Rep. 1397

2017 WL 5013230
United States District Court, E.D. Virginia.

Sharyl Thompson ATTKISSON, et al., Plaintiffs,
v.
Eric Himpton HOLDER, Jr., et al., Defendants.

No. 1:17–cv–364 (LMB/JFA)
|
Signed 11/01/2017

**Attorneys and Law Firms**

David W. Thomas, Edward Kyle McNew, Pro Hac
Vice, John Gregory Webb, Pro Hac Vice, MichieHamlett,
Charlottesville, VA, C. Tab Turner, Turner & Associates, PA,
North Little Rock, AR, for Plaintiffs.

MEMORANDUM OPINION

Leonie M. Brinkema, United States District Judge

**\*1** Before the Court is defendants Eric Holder
("Holder") and Patrick Donahoe's ("Donahoe") (collectively,
"defendants") Motion to Dismiss, in which they argue that all
eight counts in the Complaint should be dismissed under Fed.
R. Civ. P. 12(b)(1) or 12(b)(6) or, in the alternative, on the
basis of qualified immunity. For the reasons that follow, Count
4 will be dismissed under Rule 12(b)(6) as to all defendants,
Counts 7 and 8 will be dismissed under Rule 12(b)(1) as to all
defendants, and Counts 1–3 and 5–6 will be dismissed under
Rule 12(b)(6) only as to defendants Holder and Donahoe.
Because the Court finds that the Rule 12(b)(1) and 12(b)(6)
grounds provide a sufficient basis for dismissal, the Court
declines to address defendants' immunity arguments.

I. BACKGROUND

In this civil action, plaintiffs Sharyl Attkisson ("Attkisson"),
James Attkisson, and Sarah Attkisson (collectively,
"plaintiffs") claim that defendants Holder, Donahoe, and
Unknown Named Agents of the Department of Justice, United
States Postal Service, and the United States ("John Does" or
"John Doe agents")[1] violated a variety of their constitutional,
statutory, and common law rights by conducting unauthorized

electronic surveillance of plaintiffs' home and electronic
devices. See Compl.[2] ¶¶ 1–2.

[1]     It is unclear from the Complaint exactly how the
        John Does are being sued. In the caption, all
        defendants are specifically described as being sued
        "Individually" or "in their individual capacities,"
        Compl. [Dkt. No. 117] 1, and Counts 1 and 2
        are brought "against Defendants in their individual
        capacity and not their official capacity," id. ¶ 1;
        however, the Complaint does not specify whether
        Counts 3 through 8 are brought against defendants
        individually or in their official capacities, see
        id. ¶ 2. The Complaint alleges that plaintiffs
        "are unaware of the true names and capacities,
        whether individual or otherwise, of the Unknown
        Federal Agents referenced in the caption." Id. ¶ 11.
        Because defendants' attorneys have only noticed
        an appearance on behalf of Donahoe and Holder
        (and the United States of America, although it
        is no longer a defendant), the present Motion to
        Dismiss applies only to the claims against Holder
        and Donahoe.

[2]     All references to the "Complaint" and citations
        to "Compl." are to plaintiffs' "Consolidated
        Complaint," filed on September 15, 2017 [Dkt. No.
        117], which is the only operative complaint in this
        civil action.

During the time relevant to this action, Attkisson was an
investigative reporter for CBS News who covered, among
other stories, the federal gun-trafficking investigation known
as "Fast and Furious" and the attack on the American
diplomatic compound in Benghazi. Id. ¶ 6. Plaintiffs James
and Sarah Attkisson, both of whom live with Attkisson, are
Attkisson's husband and daughter, respectively. Id. ¶¶ 7–8.
Defendants Holder and Donahoe were, at the relevant time,
the Attorney General and Postmaster General of the United
States. Id. ¶¶ 9–10. In those positions, Holder oversaw the
Department of Justice ("DOJ"), including the Federal Bureau
of Investigation ("FBI") and the Bureau of Alcohol, Tobacco,
Firearms, and Explosives ("ATF"), and Donahoe oversaw the
United States Postal Service ("USPS").

**\*2** In 2011, Attkisson, who had been a reporter with
CBS for twenty years, began investigating a story about
the ATF allowing firearms dealers to sell weapons to straw
purchasers to enable the ATF to track the firearms back to
higher-up figures in Mexican drug cartels. See id. ¶ 14 &

**Attkisson v. Holder, Not Reported in Fed. Supp. (2017)**

2017 WL 5013230, 46 Media L. Rep. 1397

n.2. Attkisson's first report on this story, which eventually became known as the "Fast and Furious" story, aired on CBS on February 22, 2011. Id. ¶ 15. The story relied on a variety of confidential sources critical of the program. Id. Throughout 2011, Attkisson continued reporting on the program, allegedly in the face of considerable efforts from the ATF, FBI, and DOJ to stymie her reporting. [3] Over the year, the story expanded to include apparent discrepancies in the FBI's accounting of evidence in a related murder of a Border Patrol agent, id. ¶¶ 18–21, alleged problems with Holder's "sworn testimony" (presumably before Congress), id. ¶ 22, and the DOJ's retraction of a letter it had previously sent to Congress that contained misinformation about the program, id. ¶ 24.

[3]    Attkisson alleges that the ATF "instigated an orchestrated campaign against" her initial report, although the news story about this "campaign" to which Attkisson cites just describes an internal ATF memorandum saying the ATF should look to "proactively push positive stories" to "preempt some negative reporting" or "lessen the coverage of such stories." See Compl. ¶ 16 & n.3. She also alleges that DOJ officials "persisted in their denial of the allegations" when contacted for comment, id. ¶ 17, and that her sources told her that the ATF was "actively seeking to identify government insiders who were providing information or 'leaking' to her," id. Similarly, with respect to her later reporting on Benghazi, Attkisson alleges that her confidential sources told her that "efforts were being made by the Executive Branch to clamp down on leaks and to track the leaking of information to specific reporters regarding the Benghazi affair." Id. ¶ 35. In general, Attkisson alleges that "several sources with close ties to the intelligence community approached [her] privately and informed her that the government would likely be monitoring her electronically in an effort to identify her confidential sources." Id. ¶ 38.

In October 2012, Attkisson began reporting on the attacks in Benghazi that resulted in the deaths of Ambassador Christopher Stevens and three other American officials. Id. ¶ 34. Attkisson's reports on the situation were generally critical of the Executive Branch and included information derived from a variety of confidential sources within the federal government or with links to intelligence agencies, including a public interview with whistleblower Colonel Andrew Wood. Id. ¶¶ 34–35.

In "mid-to-late 2011," plaintiffs "began to notice anomalies in numerous electronic devices at their home," including a laptop and desktop "turning on and off at night," the "house alarm chirping daily at different times, often indicating 'phone line trouble,'" and television interference. Id. ¶ 23. These various devices all used the Verizon FiOS line installed in the home, and Verizon was unable to cure the problems. Id. In January 2012, plaintiffs noticed problems with their Internet service; although Verizon installed a new router, the problems continued. Id. ¶ 25. In March 2012, Verizon replaced the router again and, this time, also replaced the entire FiOS service box; this too failed to resolve the issues. Id. ¶ 29. By November 2012, plaintiffs' phone line was "nearly unusable because of anomalies and interruptions," problems which also extended to Attkisson's mobile phones. Id. ¶ 40. In December 2012, Attkisson began discussing these problems with friends and contacts and decided to log the dates and times that the computers in her house turned on. Id. ¶ 41. Soon thereafter, the "computer nighttime activity stopped." Id.

Also in December 2012, plaintiffs asked a contact "with U.S. government intelligence experience" to examine their home. Id. ¶ 43. During this examination, the consultant discovered an extra fiber optics line dangling from plaintiffs' Verizon FiOS box. Id. Attkisson contacted Verizon to ask about this line. Verizon disclaimed any knowledge of the line and suggested Attkisson contact law enforcement. Id. Soon thereafter, a person called Attkisson, identified herself as a Verizon supervisor, and said she would dispatch a technician to the house. Id. The next day, which happened to be New Year's Day, a person "represented to be a Verizon technician" removed the cable. Id. ¶ 44. Attkisson asked the technician to leave the cable by the box and he did so; however, when Attkisson's husband arrived home later, the cable was missing. Id. Attkisson then "repeatedly" attempted to contact the technician to ask about the now-missing cable; he never returned her calls. Id. ¶ 45. In addition, throughout January and February 2013, plaintiffs continued to experience phone and internet issues; although Verizon was notified about these problems, it was unable to fix them. Id. ¶ 46

**\*3** These various anomalies convinced Attkisson to have an expert conduct a forensic analysis of her laptop. Id. ¶ 47. After the expert found evidence of sustained intrusions (including using "sophisticated software" whose "fingerprint indicated the software was proprietary to the federal government"),

Case 1:21-cv-00559-CMH-TCB  Document 19-1  Filed 10/29/21  Page 3 of 54 PageID# 102

Attkisson v. Holder, Not Reported in Fed. Supp. (2017)

2017 WL 5013230, 46 Media L. Rep. 1397

Attkisson reported this finding to CBS, which retained an expert to examine the laptop and desktop computers. Id. ¶¶ 48–49. Plaintiffs allege, based on the expert analysis, that their computers were the "targets of unauthorized surveillance efforts" beginning as early as June 2011 and that both plaintiffs' desktop and Attkisson's work laptop, as well as plaintiffs' Blackberry, were targeted, giving the intruder "complete control of the system." Id. ¶ 27. The forensic analysis also revealed that somebody "installed sophisticated surveillance software" on Attkisson's work laptop some time in February 2012 and "remotely 'refreshed' the ongoing surveillance" in July 2012. Id. ¶¶ 27, 32. Then, in December, the intruders "executed remote actions" to "remove evidence of the intrusion" from the various electronics. Id. ¶ 42. Finally, in March 2013, after the forensic examination, plaintiffs' desktop "began malfunctioning and, after several days of it freezing and emitting a burning odor, it shut down." Id. ¶ 50. Plaintiffs have been unable to turn the computer back on. Id. [4] Plaintiffs allege least some of these intrusions were apparently executed "via an IP address owned, controlled, and operated by the" USPS. Id. ¶ 27.

[4]     Attkisson also alleges that a third computer, her personal MacBook Air, was "accessed remotely, controlled, and the data deleted." Compl. ¶ 57. She noticed this problem in September 2013. Id. The Complaint does not indicate that there have been any expert analyses conducted on this device.

In mid–2013, Attkisson and CBS began publicly commenting on the alleged intrusions and Attkisson filed a complaint with the DOJ Inspector General. Id. ¶¶ 51, 53, 55. In response, the FBI and DOJ privately and publicly stated that they had no knowledge of any such intrusions. Id. ¶¶ 52–53. In addition, the DOJ Inspector General requested the ability to examine the affected computers. Id. ¶ 60. CBS refused to release the laptop, but Attkisson gave her desktop to the DOJ. Id. In early 2015, before Attkisson testified in front of a Senate panel, the Inspector General released a "partial report upon Congressional request" that "noted a great deal of advanced mode computer activity not attributable to" plaintiffs but concluded that there was "no evidence of intrusion" into the desktop. Id.

The Complaint alleges a variety of facts to support plaintiffs' belief that Holder, Donahoe, and unknown government employees were involved in the alleged electronic intrusions. [5] First, plaintiffs point to various policy-level initiatives taken by the DOJ in the realm of

electronic surveillance. These include a DOJ and FBI public announcement in 2012 of "a new effort to vastly expand cyber related efforts to address alleged 'national security-related cyber issues' " and, around the same time, the DOJ secretly seizing "personal and phone records belonging to journalists from the Associated Press," including Attkisson. Id. ¶¶ 30, 72(C). [6] This action was reportedly criticized by a variety of news organizations but defended by Deputy Attorney General James Cole, allegedly at Holder's direction. Id. ¶¶ 72(C)–(E). The DOJ also "designated U.S. Attorneys' offices to act as 'force multipliers' in its stepped-up cyber efforts in the name of national security." Id. ¶ 31. In addition, around the same time, "internal emails from a global intelligence company doing business with government agencies" were published by Wikileaks; these emails allegedly referenced White House "witch hunts of investigative journalists" who published negative stories about the White House. Id. ¶ 33 (internal quotation marks omitted). Later that year, in October and November, the DOJ provided "specialized training" for the National Security Cyber Specialists ("NSCS") network and the Computer Crime and Intellectual Property Section of the Criminal Division and Holder "hosted a national training conference" for NSCS. Id. ¶¶ 36, 39. [7] In addition, the USPS reportedly has a "working relationship with the FBI, Department of Homeland Security, and DOJ for domestic surveillance projects." Id. ¶ 63; see also id. ¶ 72(XX) (quoting a New York Times article that reported on the USPS's "mass surveillance program," which involved approving requests from a variety of agencies, including the DOJ, to "monitor the mail ... for use in criminal and national security investigations").

[5]     The Complaint also includes a variety of bare allegations about Holder's and Donahoe's personal involvement. See, e.g., Compl. ¶ 72(G) ("Defendant Holder, through his own conduct, likewise promulgated a policy that required or encouraged the violation of Plaintiffs' rights, and personally gave instruction to employees and agents to violate the constitution, including Plaintiffs' rights, through the use of illegal surveillance and computer intrusions."). Because the Court may not consider such conclusory allegations even at the motion to dismiss stage, see Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009), they are not recounted here.

[6]     The allegations in this paragraph are generally supported in the Complaint either by DOJ press

Case 1:21-cv-00559-CMH-TCB   Document 19-1   Filed 10/29/21   Page 4 of 54 PageID# 103

Attkisson v. Holder, Not Reported in Fed. Supp. (2017)

2017 WL 5013230, 46 Media L. Rep. 1397

releases, all of which appear to have been taken offline since the change in presidential administrations, or by emails published by Wikileaks.

7  The Complaint also alleges, without citation: "On November 13, 2012, the F.B.I. initiated a body of cyber security case investigations that would later relate to the illegal intrusions directed at Ms. Attkisson." Compl. ¶ 39. It is unclear to what this refers, although the Complaint later alleges (also without citation): "In June of 2013, though Plaintiffs were unaware at the time, the FBI had begun conducting inquiries of Ms. Attkisson's computer intrusions under the auspices of a national security issue, but the agency failed to contact or interview Plaintiffs. Ms. Attkisson only discovered the FBI inquiry in December, 2013, when she appealed denial of her Freedom of Information Act request to the FBI and received some documents. The F.B.I. investigation involving Ms. Attkisson's computer intrusions was circulated to the DOJ's national cyber security group and included with a set of cases opened in November, 2012, during the DOJ's expansion of its cyber team and the announcement of its intention to use 'new tools' in its arsenal." Id. ¶¶ 58–59.

*4  With respect to Holder's personal involvement, the Complaint points to a variety of DOJ statements and interviews with Holder as a basis for claiming that Holder had some knowledge of illegal surveillance being carried out by the National Security Agency, including "overcollection" of domestic communications. Id. ¶¶ 72(M)–(O). It also cites a DOJ report that "included an admission of excessive intrusion in that it confirmed that significant revisions to Department policies were being made," id. ¶ 72(P), and a report that Holder was working on "new guidelines on dealing with news media," including "a dictate that records of a journalist w[ould] only be collected if that person is the focus of a criminal investigation and DOJ will forego the opportunity to use search warrants to obtain journalists' emails or other work product," id. ¶ 72(Z). The Complaint describes Holder as personally involved in illegal surveillance conducted on journalist James Rosen in 2010, see id. ¶¶ 72(AA)–(DD), and as " ' signing-off ' on search warrants as far back as 2009–2010, under the false representation that [various] media members were involved as 'possible co-conspirators' in carrying out violations of the Espionage Act," id. ¶ 72(EE).

The Complaint also alleges that Holder was personally involved in discussions that centered on Attkisson's Fast and Furious reporting, that he directed Tracy Schmaler ("Schmaler"), one of his aides, to call CBS anchor Bob Scheiffer "to get a 'handle' on [Attkisson's] reporting," and that Holder and Schmaler "began using the DOJ assets to regularly work with smear machines like Media Matters to attack reporters," including Attkisson. Id. ¶¶ 72(Q)–(T), 72(W). Schmaler is depicted as having "yelled and screamed" at Attkisson over her reporting. Id. ¶ 72(X).

With respect to defendant Donahoe, the Complaint alleges that he was ultimately responsible for the use of the USPS network and that the USPS has participated to varying degrees with the DOJ and FBI in assisting with investigations and in unconstitutionally monitoring mail as part of a mass surveillance program. Id. ¶¶ 72(OO)–(YY).

Based on this alleged misconduct, plaintiffs originally filed suit against Holder, Donahoe, and the John Doe Agents in the Superior Court of the District of Columbia, from which Holder and Donahoe removed the complaint to the United States District Court for the District of Columbia on February 18, 2015. [Dkt. No. 1]. This original action included only the Bivens claims that are now Counts 1 and 2. In September 2015, plaintiffs filed a separate suit against the United States of America, Holder, Donahoe, and the John Doe agents, alleging the statutory and common law claims that are now Counts 3 through 8 and realleging the Bivens claims. In July 2016, the two actions were consolidated into one action, and, in March 2017, the consolidated action was transferred to this district. See Dkt. Nos. 82 & 83.

After defendants filed the present Motion to Dismiss [Dkt. No. 99] and plaintiffs filed a timely Opposition [Dkt. No. 109], the Court ordered plaintiffs to file a single consolidated complaint to clear up inconsistencies created by the previous consolidation of the two actions [Dkt. No. 114]. The revised Complaint was filed on September 15, 2017. [Dkt. No. 117]. Rather than refiling their Motion to Dismiss, defendants elected to proceed with their already-filed motion. See Dkt. No. 118.

The revised Complaint dropped the United States of America as a defendant, leaving five defendants, all of whom are sued in their individual capacities: Eric Holder, Patrick Donahoe, Unknown Named Agents of the DOJ, Unknown Named Agents of the USPS, and Unknown Named Agents of the United States. The Complaint includes eight counts,

2017 WL 5013230, 46 Media L. Rep. 1397

with all counts brought against all defendants. Counts 1 and 2 are brought under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), and allege violations of plaintiffs' First and Fourth Amendment rights, respectively. The remaining counts respectively allege violations of the Electronic Communications Privacy Act ("ECPA") (Count 3), violations of the Stored Communications Act ("SCA") (Count 4), violations of the Computer Fraud and Abuse Act ("CFAA") (Count 5), violations of the Foreign Intelligence Surveillance Act ("FISA") (Count 6), violations of the Virginia Computer Crimes Act ("VCCA") (Count 7), and common law trespass to land and chattel (Count 8). Plaintiffs request compensatory, punitive, and statutory damages; an injunction; a declaration that defendants' actions were illegal; and attorney's fees and costs.

**\*5** Defendants' Motion to Dismiss seeks dismissal of all eight counts with respect to Holder and Donahoe. Because their arguments vary by count, each count will be discussed in turn below.

## II. DISCUSSION

### A. Standard of Review

Under Rule 12(b)(1), a civil action must be dismissed whenever the court lacks subject matter jurisdiction. Although the plaintiff has the burden of establishing subject matter jurisdiction, Demetres v. East West Constr., Inc., 776 F.3d 271, 272 (4th Cir. 2015), a court should accept "as true the jurisdictionally significant facts claimed" by the plaintiff, Motley v. Va. State Bar, 403 F. Supp. 2d 468, 471 (E.D. Va. 2005). After accepting those facts as true, the court must determine "whether those facts are sufficient as a matter of law to establish subject matter jurisdiction." Id.

Under Rule 12(b)(6), a civil action must be dismissed if the complaint does not "contain sufficient facts to state a claim that is 'plausible on its face.' " E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Although the court must assume for the purposes of deciding the motion that all "well-pleaded allegations" are true and must "view the complaint in the light most favorable to the plaintiff," Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009), allegations that are merely

conclusory need not be credited, see Iqbal, 556 U.S. at 678 (2009).

### B. Bivens Claims (Counts 1 and 2)

Defendants' Motion to Dismiss argues that Bivens should not be extended into this new context and that even if Bivens were extended, defendants would be entitled to qualified immunity [8] because plaintiffs have failed to plausibly allege personal involvement on behalf of either Holder or Donahoe in the alleged violations of plaintiffs' rights. Def. Mem. [Dkt. No. 100] 5–14.

[8]     The qualified immunity defense applies to both the Bivens claims and also to the various statutory claims. Def. Mem. 17 (citing Behrens v. Pelletier, 516 U.S. 299, 305 (1996)).

Before examining plaintiffs' factual allegations in more detail, the Court must first determine whether there exists a Bivens cause of action to address the type of misconduct plaintiffs allege. The analytic framework for determining the availability of a Bivens action in a given factual situation was clarified by the Supreme Court earlier this year in Ziglar v. Abbasi, 137 S. Ct. 1843 (2017). In Abbasi, aliens who had been detained in harsh conditions for months after the September 11th attacks brought Bivens claims against former Attorney General John Ashcroft, former FBI Director Robert Mueller, former Immigration and Naturalization Service Commissioner James Ziglar, and the warden and associate warden of the facility in which they were detained. See id. at 1853–54. The detainees argued that the officials had detained them in harsh conditions for a punitive purpose, in violation of their substantive due process rights; had done so because of their race, religion, or national origin, in violation of their equal protection rights; and that the warden and associate warden had subjected them to punitive strip searches, in violation of the Fourth and Fifth Amendments. See id. [9] After the Second Circuit allowed the detainees' claims to proceed under Bivens, the Supreme Court reversed in a 4–2 decision, [10] holding that a Bivens remedy was not available to the detainees. See id. at 1863. In declining to extend Bivens, the Supreme Court clarified that the first step in this analysis is to determine whether the plaintiff seeks to extend Bivens to a "new" or "novel" context. If so, the court must perform a "special factors analysis" to determine whether a Bivens action should be available in that new context. See id. at 1854–63.

Attkisson v. Holder, Not Reported in Fed. Supp. (2017)

2017 WL 5013230, 46 Media L. Rep. 1397

9      The detainees brought additional claims against the warden and associate warden, arguing that those officials allowed guards to abuse them, in violation of their Fifth Amendment rights. See Abbasi, 137 S. Ct. at 1853–54. The Supreme Court's treatment of these claims, which were analyzed separately from the claims brought against the higher-level defendants, is not relevant to the present case.

10     Justices Sotomayor, Kagan, and Gorsuch took no part in considering or deciding the case. See Abbasi, 137 S. Ct. at 1851.

**\*6** Under this direction, the Court must first determine whether plaintiffs' allegations would extend Bivens to a new context. As the Supreme Court has explained, when determining whether a context is new, a court must examine whether the "case is different in a meaningful way from previous Bivens cases decided by [the Supreme] Court." Id. at 1859. Although not an exhaustive list, the Abbasi decision cites as examples of meaningful differences "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous Bivens cases did not consider." Id. at 1860.

To date, the Supreme Court has recognized the availability of Bivens actions in only three discrete factual scenarios. First, in Bivens itself, the Court found an implied cause of action to enforce Fourth Amendment search and seizure rights against line-level FBI officers who searched plaintiff's home and arrested him without a warrant. Bivens, 403 U.S. at 389–90. Second, in Davis v. Passman, the Court found an implied cause of action under the Fifth Amendment's Due Process Clause that allowed an administrative assistant to sue a Congressman for firing her because of her gender. 442 U.S. 228, 248–49 (1979). Finally, in Carlson v. Green, the Court found an implied cause of action under the Eighth Amendment that allowed a federal prisoner's estate to sue prison guards for failing to treat the decedent's asthma. 446 U.S. 14, 19 (1980). [11]

11     Plaintiffs contend that the Supreme Court has also "impliedly confirmed that individuals could seek damages against government officials who retaliated against them for exercising their constitutional right to freedom of speech." Pl. Opp. [Dkt. No. 109] 16 (citing Hartman v. Moore, 547 U.S. 250, 256 (2006)). They are incorrect. In Hartman, the plaintiff attempted to bring a Bivens claim under the First Amendment, claiming that the government had initiated a prosecution against him in retaliation for protected speech. See Hartman, 547 U.S. at 254–55. The Court held only that the absence of probable cause to support the underlying criminal charge is an element of such a retaliation claim. Id. at 265–66. Although it implicitly assumed for the purposes of argument that a First Amendment Bivens claim would be cognizable, it did not hold (or "impliedly confirm[ ]") that such a claim is available. Cf. Abbasi, 137 S. Ct. at 1855 ("These three cases —Bivens, Davis, and Carlson—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself."); Reichle v. Howards, 132 S. Ct. 2088, 2093 n.4 (2012) ("We have never held that Bivens extends to First Amendment claims.").

The claims in plaintiffs' Complaint differ meaningfully from the claims in each of these other cases. As an initial matter, only Bivens itself allowed a claim to proceed under the Fourth Amendment, which makes both Carlson and Davis meaningfully different from either of plaintiffs' constitutional claims and all three cases meaningfully different from plaintiffs' First Amendment claim. Beyond that, Bivens only allowed the plaintiff to sue line-level FBI agents, whereas plaintiffs wish to sue a former Attorney General and Postmaster General. Therefore, the ranks of the officials are a meaningful difference between the two contexts. In addition, plaintiffs' claims involve a significantly different factual setting (electronic surveillance), a different level of generality (broad policy decisions rather than individual unconstitutional actions), and a connection to national security that was not present in any of the previous three cases. [12] As such, it is clear that plaintiffs' claims are meaningfully different from any previously recognized Bivens claim. [13]

12     Indeed, in many ways, this case is to Bivens what Abbasi was to Carlson. Even though the Abbasi plaintiffs, like the Carlson plaintiff, were alleging unconstitutional actions related to

Case 1:21-cv-00559-CMH-TCB   Document 19-1   Filed 10/29/21   Page 7 of 54 PageID# 106

Attkisson v. Holder, Not Reported in Fed. Supp. (2017)
2017 WL 5013230, 46 Media L. Rep. 1397

confinement (although, as preconviction detainees, the Abbasi plaintiffs were proceeding under the Fifth rather than the Eighth Amendment), their claims challenging conditions imposed "pursuant to a high-level executive policy created in the wake of a major terrorist attack on American soil" were against high-ranking officials, Abbasi, 137 S. Ct. at 1860. As such, the Abbasi majority had little trouble holding that the plaintiffs' claims presented a new context, to which Bivens would not be extended.

13    In addition to the Supreme Court cases, plaintiffs cite two Fourth Circuit cases that have also recognized a Bivens claim: Tobey v. Jones, 706 F.3d 379 (4th Cir. 2013), where plaintiffs argue that the court found a First Amendment claim for retaliatory arrest cognizable under Bivens, and Covey v. Assessor of Ohio County, 777 F.3d 186 (4th Cir. 2015), where the court allowed for a Bivens suit in a case where the officers improperly entered the plaintiffs' curtilage without a warrant. But in both cases, the Fourth Circuit did not explicitly address whether the particular Bivens claim was cognizable; instead, it was assumed that Bivens applied. Even assuming plaintiffs correctly characterized these holdings and these decisions survive after the Abbasi decision, this action still presents a new context for all of the reasons described above.

*7    Once a court has recognized that an action presents a new context, it must then determine whether Bivens should be extended into that context. As the Supreme Court has made clear, courts should exercise "caution" before such an extension and, in particular, should not recognize a Bivens remedy if there are "special factors counselling hesitation in the absence of affirmative action by Congress." Abbasi, 137 S. Ct. at 1857 (internal quotation marks omitted). Although the Supreme Court has not provided an exhaustive list of such "special factors," it has identified a few common factors that should make courts hesitate, including if a context involves "a host of considerations that must be weighed and appraised," id. (internal quotation marks omitted), if Congress has "designed its regulatory authority in a guarded way" (e.g., in cases involving the military or federal land), id. at 1858, or if there "is an alternative remedial structure present in a certain case," id.

In Abbasi, the Supreme Court appeared to identify four additional "special factors necessarily implicated" by the claims. Id. at 1860–63. First, the Court observed that the plaintiffs' claims were brought against high-level officials to challenge the "formulation and implementation of a general policy." Id. at 1860. As such, resolving the claims would require discovery "into the whole course of the discussions and deliberations that led to the policies" being challenged, would "require courts to interfere in an intrusive way with sensitive functions of the Executive Branch," and would not serve a particularly acute deterrence function. Id. at 1860–61. The Court also found that the plaintiffs' claims implicated "sensitive issues of national security," an area in which the Congress and the President deserve deference from the courts. Id. at 1861. In addition, the Court found that although Congress's interest in the federal government's response to the September 11th attacks was "frequent and intense," including with respect to the conditions of confinement over which plaintiffs were suing, it had not chosen to extend a federal remedy to the plaintiffs, indicating that it did not intend for there to be such a remedy. Id. at 1862 (internal quotation marks omitted). Finally, the Court pointed to alternative avenues available to the plaintiffs to challenge the conditions of confinement, including a suit for injunctive relief and possibly a habeas action. Id. at 1862–63.

The present action involves many of the same factors identified by the Supreme Court in Abbasi as a basis for declining to extend Bivens. Plaintiffs are attempting to sue high-level officials, including one of the same high-level officials sued in Abbasi, the Attorney General, for what were essentially policy-level decisions. As such, resolving the allegations in the Complaint would require inquiry into sensitive Executive Branch discussions and decisions, overstepping the judiciary's bounds. In addition, the policies in question here implicate potential national security concerns, as plaintiffs' allegations appear to be directed primarily toward policies designed by the federal government to identify employees who were leaking sensitive information. Finally, as plaintiffs' reliance on several statutes in Counts 3 through 6 of their Complaint demonstrates, Congress has already legislated extensively in the areas of electronic surveillance and unauthorized intrusions into electronic communications, as plaintiffs identify no fewer than four federal statutory claims in addition to their constitutional claims. In fact, many of plaintiffs' allegations recognize that Congress was particularly concerned with the federal government's domestic surveillance activities, including those tactics employed by the FBI and DOJ, which

Case 1:21-cv-00559-CMH-TCB  Document 19-1  Filed 10/29/21  Page 8 of 54 PageID# 107

Atkisson v. Holder, Not Reported in Fed. Supp. (2017)
2017 WL 5013230, 46 Media L. Rep. 1397

were overseen by Holder. See, e.g., Compl. ¶¶ 14 n.2, 24, 60, 72(HH) & n.8, 72(JJ). Given Congress's attention to this area, either Congress has provided plaintiffs a federal statutory remedy and it is unnecessary to find an implied Bivens cause of action, or Congress has not provided plaintiffs a federal statutory remedy and this considered inaction weighs against the Court finding an implied Bivens cause of action in this context.

 *8  As explained above, plaintiffs' Bivens claims would require extending the implied right of action described in Bivens into a new context and a large number of special factors counsel hesitation in this area. For these reasons, the Court declines to extend Bivens to the allegations in this litigation and will grant defendants' Motion to Dismiss as to Counts 1 and 2.

### C. Electronic Communications
### Privacy Act Claim (Count 3)

In Count 3, plaintiffs contend that defendants violated the ECPA, 18 U.S.C. §§ 2511, 2520. Section 2511 provides in pertinent part that

> any person who—(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; (b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when [a jurisdictional element that is not in dispute here is met]; [or] (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation

of this subsection [has violated the statute].

18 U.S.C. § 2511. Section 2520 creates the private right of action under which plaintiffs are suing by providing that "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, [14] which engaged in that violation such relief as may be appropriate."

[14]    Defendants also argue (and plaintiffs agree) that this carve-out exempts the United States from liability under this section. Def. Mem. 18; Pl. Opp. 22. This concession appears irrelevant, as plaintiffs have only sued defendants in their individual capacities, but to the extent plaintiffs attempt to assert any claims against the United States or against agencies or officers in their official capacities, those claims would indeed be barred.

According to defendants, § 2520 bars plaintiffs' claims against Holder and Donahoe because the language of the provision only reaches the person or entity that intercepts, discloses, or intentionally uses communications—and not a person or entity that procures others to intercept, disclose, or use communications. Def. Mem. 18. Before a congressional amendment in 1986, § 2520 parroted § 2511 (and included the "procuring" language). [15] As such, under the canon of statutory construction that amendments should be given meaning, the removal of "procuring" should be given significance and the court should not allow an action to proceed under § 2520 on the basis of "procuring" liability. Def. Mem. 18–19.

[15]    Originally, § 2520 provided in pertinent part: "Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications ...." Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90–351, 82 Stat. 197, 223.

Plaintiffs respond that although the 1986 amendment of § 2520 removed the procuring language, it replaced this language with a reference to § 2511, and that the incorporation

Atkisson v. Holder, Not Reported in Fed. Supp. (2017)
2017 WL 5013230, 46 Media L. Rep. 1397

of § 2511 into § 2520 necessarily includes all means of violating § 2511—including "procuring" a violation. Pl. Opp. 23. Plaintiffs argue that this is the more natural reading of the text, as the provision allows recovery against the person who "engaged in" the "violation of this chapter," and somebody who procures an interception has "engaged in a "violation of" § 2511. Id. In addition, they argue that the legislative history does not suggest that Congress intended to eliminate procurer liability. Id.

 *9 Courts have split on whether a plaintiff may bring suit under § 2520 against a "procurer," [16] and the Fourth Circuit has not yet ruled on the issue. [16] See, e.g., Buckingham v. Gailor, No. 00–cv–1568, 2001 WL 34036325, at *6 (D. Md. Mar. 27, 2001) (finding that the 1986 amendments eliminated the availability of a civil action against a procurer), aff'd, 20 Fed.Appx. 243 (4th Cir. 2001) (per curiam); [17] Lonegan v. Hasty, 436 F. Supp. 2d 419, 427–28 (E.D.N.Y. 2006) (determining that a civil action based on procurement is still viable).

[16]    Plaintiffs remark that "the Fourth Circuit has never explicitly overruled its holding in Flowers v. Tandy Corp., 773 F.2d 585 (4th Cir. 1985)." Pl. Opp. 24. To the extent that plaintiffs intend this to be an argument that this Court is bound on the procurement question by Flowers, they are wrong because Flowers was decided before the 1986 amendments, when § 2520 clearly provided for procurer liability. As such, it has nothing to say about whether the amended version of the section supports procurer liability. Moreover, neither party in Flowers argued that procurer liability was improper under § 2520; instead, they argued about what "procures" should mean in the context of the section. See Flowers, 773 F.2d at 590.

[17]    On appeal, the plaintiffs in Buckingham raised three issues, none of which implicated the procurement question. See 20 Fed.Appx. at 244. As such, the Fourth Circuit affirmed the district court's grant of summary judgment to the defendants without discussing the availability of a civil action for procurement, see id., and defendants here do not argue that this affirmance binds this Court on the question of procurer liability.

Based on the plain language of the statute, defendants have the better of the argument. The use of the phrase "that

violation" (plaintiffs may recover from the person who "engaged in that violation") most naturally refers to the violation denoted earlier in the sentence: the interception, disclosure, or use of a communication. Moreover, the statute provides that a plaintiff may recover from "the person" who engaged in the violation—not from a person or from any person—and the use of the word "the" contemplates only a single person or entity engaged in a given violation. If so, then the violator being referred to must be the person who engaged in the actual interception, disclosure, or use of a communication. Given this plain reading, defendants' argument is correct: the 1986 amendments restricted liability in a private action only to those who personally intercept, disclose, or use communications in violation of the ECPA. [18] As such, defendants' Motion to Dismiss Count 3 will be granted.

[18]    Plaintiffs' only other argument on this point—that the legislative history is silent on whether Congress intended to eliminate procurer liability—does not overcome the plain text of the statute.

### D. Stored Communications Act Claim (Count 4)

In Count 4, plaintiffs allege that all defendants violated the SCA, 18 U.S.C. §§ 2701, 2707. The SCA provides in relevant part that whoever "intentionally accesses without authorization a facility through which an electronic communication service is provided ... and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage" has violated the statute. 18 U.S.C. § 2701(a). Section 2707 provides a private right of action against "the person or entity, other than the United States, [19] which engaged in" a violation of § 2701(a). Id. § 2707(a).

[19]    Again, defendants argue that this carve-out exempts the United States from liability under the SCA. Def. Mem. 20. Plaintiffs argue that a different section, 18 U.S.C. § 2712, provides a cause of action against the United States for violations of the SCA, a point that defendants concede in their reply brief (and a point that was in fact suggested by defendants in their opening brief under their obligation of candor). Def. Reply 16. In any event, this discussion is irrelevant because plaintiffs are only suing defendants in their individual capacities.

Atkisson v. Holder, Not Reported in Fed. Supp. (2017)

2017 WL 5013230, 46 Media L. Rep. 1397

**\*10** Preliminarily, defendants claim that the Complaint does not allege that any defendant accessed a "facility through which an electronic communication service is provided." Def. Mem. 21. As the relevant case law explains, the most natural reading of this provision is that it applies to third parties attempting to access "network services providers' own facilities," not "an individual's personal computing device." In re Google Inc. Cookie Placement Consumer Privacy Litig., 806 F.3d 125, 145–46 (3d Cir. 2015) (internal quotation marks omitted); see also United States v. Steiger, 318 F.3d 1039, 1049 (11th Cir. 2003); In re iPhone Application Litig., 844 F. Supp. 2d 1040, 1057–58 (N.D. Cal. 2012). As such, defendants argue that plaintiffs' allegations that defendants intruded on various personal electronic devices, including a laptop, desktop, phone line, television, and house alarm, do not state a claim under the SCA. Def. Mem. 21.

Plaintiffs respond that the breadth of the provision "is the subject of some debate," Pl. Opp. 25, but do not attempt to defend a broad reading of the SCA. Instead, they argue that "[i]n order to access [p]laintiffs' computers and other devices, [d]efendants necessarily went through [p]laintiffs' service provider—Verizon—to access the [p]laintiffs' electronic devices," including making "physical alterations to the Verizon hardware located on [p]laintiffs' property." Id.; see also Compl. ¶¶ 43–44.

These arguments are weak. In all of the cases defendants cite for the proposition that enduser devices are not "facilities" under the SCA, the alleged intrusion would have gone through the service provider and there is no suggestion in this case that the intrusion accessed Verizon's facilities in some special manner.[20] As such, what those cases necessarily hold is that using a service provider's network to access an end-user's device is not a violation of the SCA; instead, the intrusion must be to a facility that the service provider itself uses to store data. In addition, this understanding aligns with the language of the statute, which focuses on facilities used by electronic communication providers to store electronic data—not on the portions of a service provider's network that merely connect the end user to the service provider.[21] Therefore, because plaintiffs do not appropriately allege that defendants accessed a "facility through which an electronic communication service is provided," defendants' Motion to Dismiss will be granted as to Count 4.[22]

[20] Plaintiffs do allege, as discussed above, that one or more of the John Doe defendants

physically accessed their Verizon box by inserting an unauthorized fiber-optic cable. Neither party discusses or cites to case law discussing how such a physical intrusion might be treated under the SCA. But as explained in this section, the SCA is concerned with unauthorized access of data stored by service providers, whereas plaintiffs' allegations about the Verizon box appear to be that there was some physical contact with the box to facilitate the electronic intrusion into plaintiffs' end-user devices, not that defendants somehow accessed data that Verizon had stored in the box. Therefore, the allegations of physical contact with the Verizon box are not sufficient to state a claim under the SCA.

[21] Though not discussed in more depth by either party beyond defendants' citation to the case generally, In re Google Cookie Placement includes a persuasive analysis of the legislative history and enactment context and concludes that the intent of the SCA was to reach individuals who intrude on information stored by third-party service providers, not to reach individuals who intrude on information stored on users' personal devices.

[22] Because the determination that plaintiffs' end-user devices are not "facilities" within the meaning of the SCA applies equally to the SCA claims against the John Doe agents, Count 4 will be dismissed as to all defendants.

**E. Computer Fraud and Abuse Act Claim (Count 5)**

**\*11** In Count 5, plaintiffs allege that defendants violated the CFAA, 18 U.S.C. § 1030, which provides in relevant part[23]:

> Whoever ... (4) knowingly and with intent to defraud, accesses a protected computer[24] without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value ...; [or] (5)(A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without

2017 WL 5013230, 46 Media L. Rep. 1397

authorization, to a protected computer; (B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or (C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss [violates this provision].

18 U.S.C. § 1030(a). Section 1030(g) provides a private right of action for "[a]ny person who suffers damage or loss by reason of a violation of this section," but limits the private right to situations where "the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)" and limits "[d]amages for a violation involving only conduct described in subsection (c)(4)(A)(i) (I)" to economic damages. [25] Id. § 1030(g).

23    Defendants claim that plaintiffs do not specify which subsection(s) of § 1030 apply to their claim and that this "failure alone warrants dismissal." Def. Mem. 22. As plaintiffs correctly argue, their allegations make it clear that only §§ 1030(a) (4) and 1030(a)(5) are potentially applicable. For example, § 1030(a)(3) only encompasses intrusions into computers owned or used by the federal government. As such, defendants had appropriate notice of the nature of the claim in Count 5.

24    A "protected computer" includes, among other devices, any computer "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B). Although not specifically pled, it is a plausible inference that plaintiffs' computers are used in interstate communication and defendants do not argue otherwise.

25    Subsection (c)(4)(A)(i) lists five factors, capturing offenses that caused: "(I) loss to 1 or more persons during any 1–year period ... aggregating at least $5,000 in value; (II) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals; (III) physical injury to any person; (IV) a threat to public health or safety; [or] (V) damage affecting

a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security ...." Of these five factors, only (I) seems potentially applicable, and it is not at all clear that plaintiffs have pled sufficient facts to make out a large enough monetary loss to meet that factor (and, if they had, they would still be limited to economic damages under this Count); however, defendants do not make any argument that plaintiffs' claim is limited by this subsection.

*12    Here, defendants' primary argument [26] is that "there are simply no non-conclusory allegations within the four corners of plaintiffs' complaint that would render plausible the conclusion that either" Holder or Donahoe "had any involvement in actually accessing plaintiffs' personal computing devices." Def. Mem. 23. In response, plaintiffs do not argue that § 1030(a)(5)(A), which reaches any person who "causes" the transmission of programs or code that harms a protected device, should be interpreted to reach individuals who allow or direct subordinates to engage in electronic intrusions without themselves personally accessing the protected device. Instead, plaintiffs' response [27] is, in its entirety, that "the substantive factual allegations clearly support violations of § 1030(a)(4) and (5)." Pl. Opp. 26. Although both parties' arguments are conclusory, defendants are correct: there is no plausible allegation that either Donahoe or Holder personally "accessed" plaintiffs' computers. Therefore, defendants' Motion to Dismiss will be granted as to Count 5.

26    Defendants also argue, and plaintiffs contest, that this section does not waive sovereign immunity. Def. Mem. 22–23; Pl. Opp. 25–26. Again, in the revised Complaint, plaintiffs only sue defendants in their individual capacities, making the sovereign immunity defense irrelevant.

27    This actually appears to be a response to defendants' argument that plaintiffs did not specifically identify which subsection of the statute they were bringing the claim under, but, generously construed, it is also the only statement that could possibly bear on defendants' "plausible claim" argument.

## F. Foreign Intelligence Surveillance Act Claim (Count 6)

Case 1:21-cv-00559-CMH-TCB  Document 19-1  Filed 10/29/21  Page 12 of 54 PageID# 111

*Atkisson v. Holder, Not Reported in Fed. Supp. (2017)*
2017 WL 5013230, 46 Media L. Rep. 1397

An individual violates FISA when he (1) "engages in [unauthorized] electronic surveillance under color of law"; and (2) "discloses or uses information" obtained through that surveillance. 50 U.S.C. § 1809(a). Any "aggrieved person" has a "cause of action against any person who committed" a "violation" of § 1809. Id. § 1810.

Here, again, defendants' primary [28] argument is that the Complaint does not plausibly allege that either Holder or Donahoe actually engaged in the alleged unauthorized surveillance. Def. Mem. 25. Plaintiffs' brief is silent on this point. See Pl. Opp. 26–27 (discussing only sovereign immunity). As discussed above, defendants correctly argue that the Complaint fails to allege sufficient facts to make a plausible claim that either defendant personally engaged in the alleged surveillance and, in the absence of an argument from plaintiffs that "engages in" should be read more broadly, defendants' Motion to Dismiss will be granted as to Count 6. [29]

[28]  As with the previous claims, the parties engage in some skirmishing over whether the United States has waived its sovereign immunity with respect to FISA. As defendants concede in their reply brief after initially suggesting the point in their opening brief, the United States has waived its sovereign immunity against FISA claims. Def. Reply. 18. This is again irrelevant.

[29]  Defendants also correctly point out that the Complaint does not allege that either Holder or Donahoe disclosed or used the information allegedly obtained as a result of the surveillance.

## G. Virginia Computer Crimes Act Claim and Common Law Trespass Claim (Counts 7 and 8)

In Counts 7 and 8, both brought pursuant to the Federal Tort Claims Act, plaintiffs seek damages for violations of the Virginia Computer Crimes Act and for trespass to land and chattel under Virginia common law. Defendants argue that the "exclusive" remedy for damages "arising or resulting from

the negligent or wrongful act or omission of any employee of the Government while acting with the scope of his office or employment" is a civil action against the United States of America (except for constitutional and federal statutory claims). 28 U.S.C. § 2679; see also Def. Mem. 25–28. As such, plaintiffs must sue the United States of America, not Holder and Donahoe in their individual capacities. Plaintiffs have not named the United States of America as a defendant and have not responded to this argument. See Pl. Opp. 27–30. Therefore, Counts 7 and 8 were dismissed during oral argument.

## H. Defendants' Motion for Reconsideration or, in the Alternative, for a Protective Order

**\*13**  On October 27, 2017, defendants filed a motion in which they asked the Court to "reconsider its September 22, 2017 order ... to the extent that it held [defendants'] motion to dismiss—on qualified immunity grounds—'in abeyance' " or, alternatively, to enter a "protective order staying discovery pending the resolution of their motion to dismiss." Dkt. Nos. 128 & 129. Because the Order to be issued with this Memorandum Opinion will fully resolve defendants' Motion to Dismiss, it will also moot defendants' new motion. Accordingly, defendants' Motion for Reconsideration or, in the Alternative, for a Protective Order will be denied as moot.

## III. CONCLUSION

For the reasons stated in this Memorandum Opinion, defendants' Motion to Dismiss will be granted, defendants Donahoe and Holder will be dismissed from this civil action, Count 4 will also be dismissed as to all John Doe defendants, and defendants' Motion for Reconsideration will be denied as moot by an appropriate Order to be issued with this Memorandum Opinion.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 5013230, 46 Media L. Rep. 1397

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 6869351
Only the Westlaw citation is currently available.
United States District Court, S.D. West Virginia,
Bluefield Division.

Lazaro QUINONES-CEDENO, Plaintiff,
v.
Ms. Barbara RICKARD, et al., Defendants.

Civil Action No. 1:19-00064
|
Signed 06/26/2019

**Attorneys and Law Firms**

Lazaro Quinones-Cedeno, Bruceton Mills, WV, pro se.


### PROPOSED FINDINGS AND RECOMMENDATION

Omar J. Aboulhosn, United States Magistrate Judge

**\*1** Pending before the Court is Plaintiff's Application to Proceed Without Prepayment of Fees (Document No. 19), filed on March 29, 2019. Having examined Plaintiff's most recent Amended Complaint, the undersigned has concluded that Plaintiff fails to state a claim for which relief can be granted in this matter and therefore respectfully recommends that Plaintiff's Application to Proceed Without Prepayment of Fees be denied and this matter be dismissed.


### FACTUAL BACKGROUND

On January 25, 2019, the Court filed what it construed as a letter-form Complaint claiming entitlement to relief pursuant to Bivens v. Six Unknown Federal Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). [1] (Document No. 1.) By Order entered on January 29, 2019, the undersigned directed Plaintiff to amend his Complaint to name "persons" as defendants, specifically setting forth his constitutional claims, and stating facts as to how each defendant violated his constitutional rights. (Document No. 3.)

---

[1]   Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

On February 11, 2019, Plaintiff filed his letter-form Motion to Extend Time to Amend Complaint and letter-form Motion for Preliminary Injunction. (Document Nos. 4 and 5.) By Order entered the following day, the undersigned granted Plaintiff's Motion to Extend Time to Amend Complaint. (Document No. 7.) On February 14, 2019, Plaintiff filed his second Motion for Extension of Time to file his Amended Complaint. (Document No. 8.) On February 25, 2019, the undersigned denied Plaintiff's second Motion for Extension of Time as moot based upon the granting of the letter-form Motion to Extend Time filed on February 11, 2019. (Document No. 9.) On February 25, 2019, Plaintiff filed his first Amended Complaint. (Document No. 10.) On February 28, 2019, Plaintiff filed his Motion for Extension of Time to file his Motion to Proceed Without Prepayment of Fees and Costs. (Document No. 11.) By Order entered on March 1, 2019, the undersigned granted Plaintiff's Motion for Extension of Time concerning the filing of his Motion to Proceed Without Prepayment of Fees. (Document No. 12.) On March 4, 2019 and March 6, 2019, Plaintiff filed documentation in support of his Amended Complaint. (Document Nos. 13 and 14.)

On March 29, 2019, Plaintiff filed his Motion to Proceed Without Prepayment of Fees and Costs and second Amended Complaint. (Document Nos. 19 and 20.) As Defendants in his second Amended Complaint, Plaintiff named the following: (1) Ms. Barbara Rickard, Warden; (2) Roldan Randan, SIS Lieutenant; (3) C. Moore, SIA; (4) Paul Munn, Captain; (5) J.A. Keller, S.E.R.O. Director, Atlanta, GA; (6) B.M. Antonelli, FCI Williamsburg Warden; and (7) M. Travis Bragg, FCI Bennettsville Warden. (Id.) Plaintiff indicated that the events concerning his second Amended Complaint took place at the following locations: (1) FCI Beaumont, Texas; (2) FCI Bennettsville, S.C.; (3) FIC Williamsburg, S.C.; and (4) FCI McDowell, WV. (Id.) By Order entered on April 1, 2019, the undersigned noted that upon screening the Court determined that Plaintiff's second Amended Complaint was convoluted and difficult to comprehend. (Document No. 25.) Specifically, the undersigned noted that Plaintiff failed to identify at which location each Defendant's alleged misconduct occurred. (Id.) The undersigned further notified Plaintiff that to the extent Plaintiff was attempting to file an action concerning allegations that occurred at prisons located in Texas or South Carolina, Plaintiff should initiate an action concerning such allegations in the District Court having personal jurisdiction over those defendants. (Id.) The

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

undersigned, therefore, ordered Plaintiff to again amend his Complaint to specifically set forth his constitutional claims and state specific facts as to how each defendant violated his constitutional rights. (Id.) Finally, the undersigned notified Plaintiff that the filing of an Amended Complaint would supersede the original letter-form Complaint and other Amended Complaints, and there must be one integrated document that will provide the defendants with notice of the claims and allegations against them. (Id.)

**\*2** On April 11, 2019, Plaintiff filed an Addendum to his second Amended Complaint. (Document No. 26.) On May 2, 2019, Plaintiff filed his third Amended Complaint and an Addendum to his Amended Complaint. (Document Nos. 27 and 28.) In his third Amended Complaint, Plaintiff named the following as Defendants: (1) Ms. Barbara Rickard, Former Warden; (2) Roldan Randan, SIS Lieutenant; (3) C. Moore, SIA; (4) Paul Munn, Captain; (5) D. Martin, Lieutenant; (6) C. Barker, Foreman Cook; and (7) D. Mayle, SHU Lieutenant. (Document No. 27.) On May 8, 2019, Plaintiff filed a second Addendum to his third Amended Complaint. (Document No. 29.) By Order entered on May 9, 2019, the undersigned again directed Plaintiff to file an Amended Complaint including all of his claims. (Document No. 30.) The undersigned noted that Plaintiff had filed Addendums after the filing of his most recent Amended Complaint. (Id.) The undersigned again notified Plaintiff that his most recent Amended Complaint would supersede the original letter-form Complaint and other Amended Complaints, and there must be one integrated document that will provide the defendants with notice of the claims and allegations against them. (Id.) On May 30, 2019, Plaintiff filed a third Addendum to his third Amended Complaint. (Document No. 31.) By Order entered on May 31, 2019, the undersigned directed Plaintiff to file an Amended Complaint including all of his claims. (Document No. 32.) The undersigned noted that Plaintiff continues to file Addendums to his Amended Complaint even though this Court has notified Plaintiff "multiple times that the Amended Complaint will **supersede** the original letter-form Complaint and other Amended Complaints, and there must be **one integrated document** that will provide the defendants with notice of the claims and allegations against them." (Id.) Despite Plaintiff's continuous failure to comply with the Court's above directions, the undersigned directed that Plaintiff be "allowed one final chance to comply with the Court's Orders." (Id.)

On June 14, 2019, Plaintiff filed his fourth Amended Complaint and two Addendums. (Document Nos. 33 and 33-1.) In his fourth Amended Complaint, Plaintiff named the following as Defendants: (1) Ms. Barbara Rickard, Warden; (2) Roldan Randan, SIS Lieutenant; (3) C. Moore, SIA; (4) K. Rich, Associate Warden; (5) C. Barker, Foreman Cook; (6) D. Mayle, SHU Lieutenant; and (7) D. Martin, Lieutenant. (Document No. 33.) Plaintiff indicates that the events concerning his Complaint occurred at FCI Bennettsville and FCI Williamsburg, which are located in South Carolina. (Id., p. 3.) Plaintiff then states that FCI McDowell staff are "covering" for these facilities. (Id.) In his fourth Amended Complaint and Addendums, Plaintiff appears to explain that he was required to file Addendums due to a delay in receiving the Court's Order directing the filing of an Amended Complaint. (Document Nos. 33 and 33-1.) Plaintiff explains that by the time he received the Court's Order setting forth a deadline for the filing of an Amended Complaint, Plaintiff had only a few days left to file his Amended Complaint. [2] (Id.) First, Plaintiff alleges that Defendants Rickard and Randan violated his Fifth Amendment rights by failing to deliver the administrative remedy rejection notices in a timely manner. (Id., p. 5.) Second, Plaintiff alleges that Defendant Moore "is keeping me held hostage in the Special Housing Unit ["SHU"] since December 20, 2018, in retaliation for [his] filing of grievances and this civil action." (Id.) Third, Plaintiff alleges that Defendants Moore, Rich, Mayle, Martin, Barker, Looney, Hurd, and Handley are retaliating against him. (Id.) Plaintiff states that the "First Amendment prohibits jail officials from retaliating against inmates who report complaints, file grievance, or file lawsuits." (Id.) As relief, Plaintiff requests that he be released from SHU, his good time credit restored, and monetary damages. (Document No. 33, p. 8.)

[2]     The undersigned notes that Plaintiff could have filed a Motion for Extension of Time based upon such circumstances, but Plaintiff continuously failed to do so. Instead, Plaintiff filed his Amended Complaint and numerous Addendums. The record further reveals that Plaintiff had requested a prior extension of time concerning his first Amendment Complaint. Thus, Plaintiff was clearly aware that extensions of time would be granted upon proper circumstances. To the extent Plaintiff is complaining of a delay in receiving his incoming the mail, the undersigned finds that such does not generally constitute a constitutional violation. Prisons have a legitimate interest in screening incoming mail for contraband. Due to the large volume of incoming mail, some delay in receiving

2019 WL 6869351

incoming mail is to be expected. As stated above, such a delay would have been proper circumstances for the granting of a motion for extension of time concerning Plaintiff's legal filings, but Plaintiff choose to forego filing such a Motion.

## THE STANDARD

**\*3** Pursuant to 28 U.S.C. § 1915A, the Court is required to screen each case in which a person seeks redress from a governmental entity or officer or employee of a governmental entity. On screening, the Court must recommend dismissal of the case if the complaint is frivolous, malicious or fails to state a claim upon which relief can be granted. A "frivolous" complaint is one which is based upon an indisputably meritless legal theory. Denton v. Hernandez, 504 U.S. 25, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992). A "frivolous" claim lacks "an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325, 109 S.Ct. 1827, 1831 - 32, 104 L.Ed.2d 338 (1989). A claim lacks an arguable basis in law when it is "based on an indisputably meritless legal theory." Id., 490 U.S. at 327, 109 S.Ct. at 1833. A claim lacks an arguable basis in fact when it describes "fantastic or delusional scenarios." Id., 490 U.S. at 327 - 328, 109 S.Ct. at 1833. A complaint therefore fails to state a claim upon which relief can be granted factually when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. With these standards in mind, the Court will assess Plaintiff's allegations in view of applicable law.

This Court is required to liberally construe *pro se* documents, holding them to a less stringent standard than those drafted by attorneys. Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); Loe v. Armistead, 582 F.2d 1291, 1295 (1978). Liberal construction, however, "does not require courts to construct arguments or theories for a *pro se* plaintiff because this would place a court in the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." Miller v. Jack, 2007 WL 2050409, at * 3 (N.D.W. Va. 2007)(citing Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978)). Further, liberal construction does not require the "courts to conjure up questions never squarely presented to them." Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985). In other words, a court may not construct legal argument for a plaintiff. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Finally, the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to

allege facts which set forth a claim currently cognizable in a federal district court. Weller v. Department of Social Servs., 901 F.2d 387 (4th Cir. 1990). Where a *pro se* Complaint can be remedied by an amendment, however, the District Court may not dismiss the Complaint with prejudice, but must permit the amendment. Denton v. Hernandez, 504 U.S. 25, 34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992); also see Goode v. Central Va. Legal Aide Society, Inc., 807 F.3d 619 (4th Cir. 2015).

## DISCUSSION

**1. Administrative Remedy Process:**
In his fourth Amended Complaint and Addendums, Plaintiff appears to allege that Defendants have violated his constitutional rights by rendering the BOP's Administrative Remedy process unavailable or futile. (Document Nos. 33 and 33-1.) Plaintiff contends that the administrative remedy process is rendered unavailable or futile due to Defendants' alleged delay in providing Plaintiff with his mail, which includes response to his administrative remedies. (Id.) Plaintiff explains that delays in receiving his mail prevents him from timely proceeding with the administrative remedies process. [3] (Id.)

[3]    The undersigned notes that the BOP administrative remedy process provides that inmates may seek an extension of time "[w]hen the inmate demonstrates a valid reason for delay." See 28 C.F.R. §§ 542.14(b) and 542.15(a). To the extent Plaintiff is alleging that he is not receiving timely responses to his administrative remedies, Section 542.18 provides that "[i]f the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level."

**\*4** Federal inmates have no constitutional right to participate in the BOP's administrative grievance proceedings. See Adams v. Rice, 40 F.3d 72, 75 (4th Cir.), cert. denied, 514 U.S. 1022, 115 S.Ct. 1371, 131 L.Ed.2d 227 (1994); also see Booker v. South Carolina Dept. of Corrections, 855 F.3d 533 (4th Cir. 2017)("*Adams* establishes a clear rule: inmates have no constitutional entitlement or due process interest in access to a grievance procedure."); Flick v. Alba, 932 F.2d 728, 729 (8th Cir. 1991)("[T]he federal regulations providing for an administrative remedy procedure do not in and of themselves create a liberty interest in

access to that procedure. When the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance.") A BOP employee's refusal to respond to an inmate's administrative complaint, or conduct that otherwise prevents an inmate from pursuing such complaints through the administrative remedy process, making the process unavailable, is not actionable under Bivens. Rather, the legal consequence of conduct which makes the administrative remedy process unavailable to inmates is that the door to federal Court is open to proceedings on the merits of their claims without requiring their exhaustion of administrative remedies. Accordingly, the undersigned finds that Plaintiff's claim that Defendants violated his constitutional rights by rendering the BOP's Administrative Remedy process unavailable or futile should be dismissed.

## 2. Eighth Amendment:

Liberally construing Plaintiff's fourth Amended Complaint and Addendums, the undersigned views it as setting forth a claim under the Eighth Amendment. (Document Nos. 33 and 33-1.) As a general matter, punishments prohibited under the Eighth Amendment include those that "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)(quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Thus, sentenced prisoners are entitled to reasonable protection from harm at the hands of fellow inmates and prison officials under the Eighth Amendment. See Farmer v. Brennan, 511 U.S. 825, 832-34, 114 S.Ct. 1970, 1976-77, 128 L.Ed.2d 811 (1994); Trop v. Dulles, 356 U.S. 86, 102, 78 S.Ct. 590, 598-99, 2 L.Ed.2d 630 (1958); Woodhous v. Commonwealth of Virginia, 487 F.2d 889, 890 (4th Cir. 1973). Inmates' claims, therefore, that prison officials disregarded specific known risks to their health or safety are analyzed under the deliberate indifference standard of the Eighth Amendment. See Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987); Moore v. Winebrenner, 927 F.2d 1312, 1316 (4th Cir. 1991) cert. denied, 502

U.S. 828, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991)(Stating that supervisory liability may be imposed where prison supervisors "obdurately," "wantonly," or "with deliberate indifference" fail to address a known pervasive risk of harm to an inmate's health or safety). To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission ... result[s] in the denial of 'the minimal civilized measure of life's necessities.' " Id. at 298, 111 S.Ct. 2321 (citing Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.' " Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In Strickler, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.")

**\*5** Plaintiff appears to contend that Defendants are violating his constitutional rights by verbally harassing him. (Document Nos. 33 and 33-1.) Plaintiff, however, fails to set forth any facts supporting such a claim. Assuming Plaintiff's allegations as true, Plaintiff has failed to state a constitutional claim. First, Plaintiff fails to allege facts supporting that he is incarcerated under conditions imposing a substantial risk of serious harm. Plaintiff conclusory claim that he is in "imminent danger of serious physical injury" is insufficient. Second, Plaintiff fails to allege facts sufficient to satisfy the subjective component of deliberate indifference. To satisfy the subjective component, Plaintiff must allege that each Defendant was consciousness of the risk of harm to him. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. Plaintiff, however, fails to allege that each Defendant knew of and disregarded an excessive risk to his health or safety. Furthermore, Plaintiff does not indicate that he suffered any serious injury as a result of Defendants' alleged verbal abuse or harassment. The verbal harassment or abuse of an inmate by prison guards, without more, is insufficient to state a constitutional deprivation. Ivey v. Wilson, 832 F.2d

*Quinones-Cedeno v. Rickard, Slip Copy (2019)*

2019 WL 6869351

950, 954-55 (6th Cir. 1987); also see Lindsey v. O'Connor, 327 Fed.Appx. 319, 321 (3rd Cir. (Pa.) 2009)(holding that "[v]erbal harassment of a prisoner, although distasteful, does not violate the Eighth Amendment"); Purcell v. Coughlin, 790 F.2d 263, 265 (2nd Cir. 1986)(stating that name-calling does not rise to the level of a constitutional violation); Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979)(finding that a sheriff's threats to hang a prisoner were insufficient to state a constitutional deprivation). Based on the foregoing, the undersigned finds that Plaintiff has failed to state a cognizable claim under the Eighth Amendment for which relief can be granted.

**3. No Due Process Violation:**

To determine whether an inmate retains a certain liberty interest, the Court must look to the nature of the claimed interest and determine whether the Due Process Clause applies. See Board of Regents v. Roth, 408 U.S. 564, 570-71, 92 S.Ct. 2701, 2705-06, 33 L.Ed.2d 548 (1972). An inmate holds a protectable right in those interests to which he has a legitimate claim of entitlement. Greenholtz v. Inmates of Nebraska Penal and Corr. Complex, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979)(quoting Roth, 408 U.S. at 577, 92 S.Ct. 2701). In Gaston, the Fourth Circuit determined that an inmate possesses a claim of entitlement in those interests "which were not taken away expressly or by implication, in the original sentence to confinement." Id. at 343, 101 S.Ct. 2392. The Supreme Court held in Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), that in order to show the deprivation of a liberty interest protected by the Due Process Clause, an inmate must show either that: (1) the conditions exceed the sentence imposed in such an unexpected manner as to give rise to protection by the Due Process Clause or (2) the confinement creates an atypical or significant hardship in relation to the ordinary incidents of prison life. Id., 515 U.S. at 484, 115 S.Ct. at 2300 (citations omitted). Absent allegations indicating that there has been a restraint upon the inmate's freedom which imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," the inmate's claims have no merit. Id.

Applying the principles set forth in Sandin, the undersigned finds Plaintiff's placement in segregation is neither a condition which exceeded his sentence in an unexpected manner nor creates an atypical or significant hardship in relation to the ordinary incidents of prison life. Although Plaintiff appears to challenge the appropriateness for his placement in segregation, nothing in the record indicates that Plaintiff's

conditions of confinement in segregation were atypical or resulted in a significant hardship.[4] Segregation, in and of itself, does not deprive an inmate of a liberty interest or create an atypical hardship. See Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997). Furthermore, the Due Process Clause does not give an inmate a liberty interest in a certain prison classification. See Hewitt v. Helms, 459 U.S. 460, 477 n. 9, 103 S.Ct. 864, 874 n. 9, 74 L.Ed.2d 675 (1983)(stating that the "transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence"), overruled in part by Sandin, 515 U.S. 472 -83, 115 S.Ct. 2293, 132 L.Ed.2d 418; Meachum v. Farno, 427 U.S. 215, 225, 96 S.Ct. 2532, 2539, 49 L.Ed.2d 451 (1976)(stating that the transfer of an inmate to a higher security facility does not violate a liberty interest); and Slezak v. Evatt, 21 F.3d 590, 594 (4th Cir. 1994)(citing Montanye v. Haymes, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976))(the federal Constitution "vests no liberty interest in inmates in retaining or receiving any particular security or custody status as long as challenged conditions or degree of confinement is within sentence imposed and is not otherwise violative of Constitution"). Thus, Plaintiff's claim of a liberty interest in remaining free of segregation or in the fact of his confinement in segregation is without merit. Accordingly, the undersigned finds that Plaintiff's claim is without merit.[5]

[4]

> In *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997), the Fourth Circuit determined that the following conditions in administrative segregation did not implicate Plaintiffs' liberty interest:
>
> ... cells were infested with vermin; were smeared with human feces and urine; and were flooded with water from a leak in the toilet on the floor above. And, [the inmates] assert, they were forced to use their clothing and shampoo to clean the cells. In addition, Inmates maintain that their cells were unbearably hot and that the food they received was cold. Furthermore, Van Aelst submitted an affidavit indicating that those assigned to administrative segregation did not receive clean clothing, linen, or bedding as often as required by the regulations governing administrative segregation; that they were permitted to leave their cells three to four times per week, rather than seven, and that no outside recreation was permitted; that there were no educational or religious services available;

and that food was served in considerably smaller portions.

5    To the extent Plaintiff wishes to allege that his due process rights were violated during disciplinary proceedings resulting in a loss of good time credit, Plaintiff should file a Section 2241 Petition. *See Edwards v. Balisok*, 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997)(The Supreme Court applied the *Heck* rule to prison disciplinary proceedings holding that, in the context of prison disciplinary hearings that result in the loss of good-time credits, challenges to prison hearing procedures which necessarily imply the invalidity of the judgment must be pursued in *habeas corpus*, not in a Section 1983 action.) In his letter-form Motion for a Temporary Restraining Order, Plaintiff indicates that an Incident Report was filed against him for threatening staff in violation of Prohibited Code 203. (Document No. 5.) Plaintiff acknowledges that a DOH Hearing was conducted on January 8, 2019, that "threatening staff Code 203 was dropped as meritless and I as found incorrectly guilty of insolent Code 312." (*Id.*)

**4. Retaliation Claim:**

 **\*6** Finally, the undersigned will consider Plaintiff's claim that Defendants have violated his First Amendment rights by retaliating against him. (Document Nos. 33 and 33-1.) A Bivens action is a judicially created damages remedy which is designed to vindicate violations of constitutional rights by federal actors. See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 395 - 97, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Bivens core premise is to deter individual officers' unconstitutional acts. Correctional Services Corp v. Malesko, 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001)(declining to extend Bivens to confer a right of action for damages against private entities acting under the color of federal law). In Bivens, the Supreme Court first recognized that a victim of a Fourth Amendment violation by federal officers may bring suit for money damages against the officers in federal court. Bivens, 403 U.S. at 396, 91 S.Ct. 1999. In the years following the decision in Bivens, the Supreme Court recognized an implied damages remedy under the Due Process Clause of the Fifth Amendment, Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and the Cruel and Unusual Punishments Clause of the Eighth Amendment, Carlson v. Green, 446 U.S. 14, 100, 100 S.Ct. 1468, 64 L.Ed.2d 15, S.Ct.

1468, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). Since Carlson, the Supreme Court has consistently refused to extend Bivens liability to any new context or new category of defendants. See FDIC v. Meyer, 510 U.S. at 484-86, 114 S.Ct. 996 (declined to extend Bivens to permit suit against a federal agency); Holly v. Scott, 434 F.3d 287, 290 (4th Cir. 2006)(declining to extend Bivens to an Eighth Amendment claim against employees of a privately operated prison); Lebron v. Rumsfeld, 670 F.3d 540 (4th Cir. 2012)(declining to extend Bivens in a military context). Recently, the Supreme Court made clear the very limited scope of Bivens actions and that "expanding the Bivens remedy is now a disfavored judicial activity." Ziglar v. Abbasi, —— U.S. ——, ——, 137 S.Ct. 1843, 1857, 198 L.Ed.2d 290 (2017). If the asserted Bivens claim is not one of the three Bivens-type actions previously recognized by the Supreme Court, closer scrutiny is required. Id.

In Abbasi, the Supreme Court set out a framework for determining whether a claim presents a "new Bivens context." Abbasi, 137 S.Ct. at 1860. As stated above, the Supreme Court has recognized a Bivens remedy in only three cases: (1) A Fourth Amendment claim against federal agents for violating the prohibition against unlawful searches and seizures when they handcuffed a man in his home without a warrant; (2) A Fifth Amendment general discrimination claim against a congressman for firing his female administrative assistant; and (3) An Eighth Amendment claim brought by an inmate's estate against prison officials for failure to provide adequate medical care for his asthma. Id. at 1854-55(citations omitted). The Abbasi Court explained that "'[i]f the case is different in a meaningful way from previous Bivens cases decided by this Court, then the context is new." Id. at 1859. Although the Abbasi Court did not provide "an exhaustive list of differences that are meaningful enough to make a given context a new one," the Court did provide the following "instructive" examples:

A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive

intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

Id. at 1859-60. In the instant case, Plaintiff alleges that Defendants retaliated against him for submitting administrative remedies in violation of his First Amendment rights. The mere fact that Plaintiff alleges a violation of a constitutional right does not conclusively establish that Bivens extends to Plaintiff's constitutional claim. Thus, the undersigned must first determine whether Plaintiff's retaliation claim presents "a new Bivens context."

The Supreme Court has "never held that *Bivens* extends to First Amendment claims." Reichle v. Howards, 566 U.S. 658, 132 S.Ct. 2088, n. 4, 182 L.Ed.2d 985 (2012)("We have never held that Bivens extends to First Amendment claims."); also see Correctional Services Corporation v. Malesko, 534 U.S. 61, 67-68, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001)(noting that "we declined to create a *Bivens* remedy against individual Government officials for a First Amendment violation arising in the context of federal employment"); Bush v. Lucas, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983)("we have not found an implied damages remedy under the Free Exercise Clause"); Leibelson v. Collins, 2017 WL 6614102, * 8 (S.D.W. Va. Dec. 27, 2017)(J. Berger)("[I]t is not clear that *Bivens* may be extended to First Amendment claims."). In Ashcroft v. Iqbal, the Supreme Court stressed that "we have declined to extend Bivens to a claim sounding in the First Amendment." Iqbal, 556 U.S. at 676, 129 S.Ct. at 1948. The Iqbal Court, however, noted that it assumed without deciding that respondent's First Amendment claim was actionable under Bivens because petitioners did not assert the above argument. Id.; also see Wood v. Moss, 572 U.S. 744, 134 S.Ct. 2056, 2067, 188 L.Ed.2d 1039 (2014)("[W]e have several times assumed without deciding that *Bivens* extends to First Amendment claims. We do so again in this case.") The undersigned further acknowledges that that just prior to the Supreme Court's decision in Abbasi, the Fourth Circuit clarified that inmates have a clearly established First Amendment right to file prison grievances free from retaliation. See Martin v. Duffy, 858 F.3d 239 (4th Cir. June 1, 2017)("this Court held that an inmate's 'right to file a prison grievance free from retaliation was clearly established under the First Amendment' at least as far back in time as 2010") (citing Booker v. South Carolina Department of Corrections,

855 F.3d 533, 545 (4th Cir. April 28, 2017)). Importantly, both Martin and Booker were Section 1983 actions and the issue of whether Bivens extends to the First Amendment was not addressed by the Fourth Circuit. Id. Subsequently, the Fourth Circuit issued an unpublished opinion in Patton v. Kimble reversing a district court's dismissal of an inmate's Bivens action alleging a First Amendment retaliation claim. Patton v. Kimble, 717 Fed.Appx. 271 (4th Cir. 2018). The Fourth Court determined that the district court erred in finding that the inmate failed to state a First Amendment retaliation claim in light of its decision in Booker. Id. at 271-72. The Fourth Circuit, however, did not address the issue of whether Bivens extends to the First Amendment. Id. Based upon the foregoing, the undersigned find that that Plaintiff's First Amendment retaliation claim presents a new Bivens context.

**\*7** Next, the Court must determine whether Bivens should be extended to the above new context. First, the Court should consider "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new freestanding remedy in damages." Wilkie, 551 U.S. at 550, 127 S.Ct. 2588. "[T]he existence of alternative remedies usually precludes a court from authorizing a *Bivens* action." Abbasi, 137 S.Ct. at 1865("[I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action."); Malesko, 534 U.S. at 69, 122 S.Ct. at 515("So long as the plaintiff had an avenue for some redress," a court may decline to provide a new Bivens remedy). Alternative remedies can include administrative, statutory, equitable, and state law remedies. First, the undersigned finds that Plaintiff had alternative remedies available to him through the BOP administrative remedy program. The BOP administrative remedy program allows inmates to seek formal review of issues relating to any aspect of his or her confinement. Second, to the extent Plaintiff alleges that retaliation resulted in the filing of false incident reports, Plaintiff could have sought review of such incident reports pursuant to 28 C.F.R. § 541.7(i). Third, any retaliation that may have resulted in an extension of Plaintiff's confinement (such as disciplinary action resulting in the loss of good time credit) would be actionable in *habeas corpus* pursuant to 28 U.S.C. 2241. Thus, the undersigned finds that Plaintiff has alternative remedies available to address his allegations of retaliation. See Vega v. United States, 881 F.3d 1146, 1154 (9th Cir. 2018)(finding the inmate had alternative remedies available to address his First Amendment retaliation claim via the BOP's administrative remedy process, review of the incident report pursuant to Section 541.7, and under

2019 WL 6869351

state law); Reid v. United States, 2018 WL 1588264, * 2 (E.D. Cal. April 2, 2018)(finding inmate had alternative remedies available through the BOP's administrative remedy program, under the Federal Tort Claims Act, a Section 2241 petition for writ of *habeas corpus*, and Bivens to the extent that any alleged retaliation took the form of conduct that has already been determined by the Supreme Court to be actionable under Bivens); Muhammad v. Gehrke, 2018 WL 1334936, * 4 (S.D. Ind. March 15, 2018)(finding inmate had alternative remedies available through the BOP's administrative remedy program, *habeas corpus*, and Bivens to the extent that any alleged retaliation took the form of conduct that has already been determined by the Supreme Court to be actionable under Bivens); Gonzalez v. Hasty, 269 F.Supp.3d 45, 60 (E.D.N.Y. Sept. 18, 2017)(finding that inmate had two alternative remedies, the filing of administrative complaints and a petition for writ of *habeas corpus* filed pursuant to 28 U.S.C. § 2241); Andrews v. Miner, 2017 WL 7688266, * 4, 301 F.Supp.3d 1128 (N.D. Ala. Aug. 25, 2017)(finding that the inmate had alternative remedies via the filing of a Bivens claim for excessive force, the BOP's administrative remedy process, and under the Federal Tort Claims Act).

Irrespective of whether an alternative remedy exists, a Bivens remedy should not be extended where "there are 'special factors counselling hesitation in the absence of affirmative action by Congress.' " Abbasi, 137 S.Ct. at 1857(quoting Carlson, 446 U.S. at 18, 100 S.Ct. 1468). Although the Supreme Court has not defined what constitutes "special factors counselling hesitation," the Court has observed that "[t]he necessary inference ... is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." Id. at 1857-58. Put simply, "a factor must cause a court to hesitate before answering that question in the affirmative." Id. at 1858. "[L]egislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation." Id. at 1865. The Abbasi Court explained that since Congress did not provide for a standalone damages remedy against federal jailers when it passed the Prison Litigation Reform Act ["PLRA"], "[i]t could be argued that this suggest Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." Id. The Supreme Court explained as follows:

> Some 15 years after *Carlson* was decided, Congress passed the [PLRA]

of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court. *See* 42 U.S.C. § 1997e. So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs.

Id. The PLRA's exhaustion requirement clearly applies to Bivens actions. Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). The Supreme Court has further recognized that in enacting the PLRA, Congress intended to "reduce the quantity and improve the quality of prisoner suits." Jones v. Bock, 549 U.S. 199, 203-04, 127 S.Ct. 910, 1666, 166 L.Ed.2d 798 L.Ed.2d 798 (2007) (citing Porter v. Nussle, 534 U.S. at 524, 122 S.Ct. at 983). Additionally, the Supreme Court has stated that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." Turner v. Safely, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987)(citation omitted). The Supreme Court explained that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." Id. Since prison administration is a task that has been committed to the responsibility of the legislative and executive branches of government, the Supreme Court has stated that "separation of powers concerns counsel a policy of judicial restraint." Id., 482 U.S. at 85, 107 S.Ct. at 2259. Thus, the foregoing supports a finding that Congress has been active in creating legislation regarding prisoner litigation and such causes the undersigned hesitation as to expanding Bivens to Plaintiff's First Amendment retaliation claim. See Reid, 2018 WL 1588264 at * 3(finding Congress has been active in the area of prisoners' rights, and its actions do not support the creation of a new *Bivens* claim); Gehrke, 2018 WL 1334936 at * 4(same); Gonzalez, 269 F.Supp.3d at 61(same).

**\*8** Furthermore, the Abbasi Court explained that "the decision to recognize a damage remedy requires an assessment of its impact on governmental operations systemwide." Abbasi, 137 U.S. at 1858. The impact on governmental operations systemwide include "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal

systems are used to bring about the proper formulation and implementation of public policies." Id. The Supreme Court has emphasized that " 'Congress is in a far better position than a court to evaluate the impact of a new species of litigation' against those who act on the public's behalf." Wilkie, 551 U.S. at 562, 127 S.Ct. 2588(quoting Bush, 462 U.S. at 389, 103 S.Ct. 2404). In Abbasi, the Supreme Court further explained as follows:

> Claims against federal officials often create substantial costs, in the form of defense and indemnification. Congress, then, has a substantial responsibility to determine whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government. In addition, the time and administrative costs attendant upon intrusions resulting from the discovery and trial process are significant factors to be considered.

Abbasi, 137 U.S. at 1856. The undersigned notes that expanding Bivens to allow a First Amendment retaliation claim by inmates would clearly result in an increase of suits by inmates. This increase in suits would result in increased litigation costs to the Government and impose a burden upon individual employees to defend such claims. A First Amendment retaliation claim requires an inquiry into a defendant's subjective state of mind, which often results in an issue of material fact that cannot be resolved at the dispositive motion stage. See Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996)(en banc)(citations omitted)(An inmate's claim of retaliation must be treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct."). The consequence of the existence of an issue of material fact is the need for a trial, which results in further litigation costs to the Government. See Gonzalez v. Bendet, 2018 WL 1524752, * 4 (S.D.S.D. March 28, 2018)(finding "that the cost, time, and energy associated with defending a Bivens action brought by an inmate for an action based on retaliation under the First Amendment against a federal employee are significant" and constitute a special factor counselling hesitation); Andrews, 2017 WL

7688266, * 4 – 5, 301 F.Supp.3d 1128(same). Accordingly, the undersigned finds there are special factors counselling hesitation as to the expansion of Bivens to a First Amendment retaliation claim. Based upon the foregoing, the undersigned respectfully recommends that the District Court dismiss Plaintiff's First Amendment retaliation claim.

**5. Plaintiff's Motion for Temporary Restraining Order and Injunctive Relief:**

In his letter-form Motion for Preliminary Injunction, Plaintiff appears to request that Defendants be required to release him from segregation. (Document No. 5.) Plaintiff contends that he is being held "hostage" due to false disciplinary charges. (Id.) Plaintiff further requests that this Court "stop any retaliatory prison transfer." (Id.)

Rule 65(b) of the Federal Rules of Civil Procedure sets forth the limited circumstances under which a temporary restraining order can be granted as follows:

> A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

**\*9** Fed.R. Civ. P. 65(b). Rule 65(a) provides that a court may issue a preliminary injunction only on notice to the adverse party. Fed. R. Civ. P. 65(a). The Fourth Circuit explained the different functions of temporary restraining orders and preliminary injunctions in Hoechst Diafoil Company v. Nan Ya Plastics Corporation, 174 F.3d 411, 422 (4th Cir. 1999), as follows:

While a preliminary injunction preserves the status quo pending a final trial on the merits, a temporary restraining order is intended to preserve the status quo only until a preliminary injunction hearing can be held: '[U]nder federal law [temporary restraining orders] should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer.' Granny Goose, 415 U.S. at 439, 94 S.Ct. 1113.

"A plaintiff seeking a preliminary injunction *must* establish that [1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008)(emphasis added). "[A]ll four requirements must be satisfied." The Real Truth About Obama, Inc. v. Federal Election Commission, 575 F.3d 342, 346 (4th Cir. 2009), *judgment vacated on other grounds*, 559 U.S. 1089, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010).[6] The Fourth Circuit has explains that "[b]ecause a preliminary injunction affords, on a temporary basis, the relief that can be granted permanently after trial, the party seeking the preliminary injunction must demonstrate by 'a clear showing' that, among other things, it is likely to succeed on the merits at trial." Id. Furthermore, the Supreme Court "rejected a standard that allowed the plaintiff to demonstrate only a 'possibility' of irreparable harm because that standard was 'inconsistent with our characterization of injunctive relief as an extraordinary remedy that may be awarded upon a clear showing that the plaintiff is entitled to such relief.' " Id.(citing Winters, 555 U.S., 129 S.Ct. at 375-76.) Thus, a Court may not issue a preliminary injunction or temporary restraining order "simply to eliminate a possibility of a remote future injury." Kates v. Packer, 2014 WL 1218905, * 3 (M.D. Pa. March 24, 2014)(quoting Holiday Inns of America, Inc. v. B&B Corp., 409 F.2d 614, 618 (3rd Cir. 1969)("The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury,' or a 'presently existing actual threat.' "). The irreparable harm alleged by movant must be "neither remote nor speculative, but actual and imminent." Direx Israel, Ltd. v. Breakthrough Medical Corp., 952 F.2d 802, 812 (4th Cir. 1991), *abrogation recognized on other grounds*, Sarsour v. Trump, 245 F.Supp.3d 719, n. 6 (4th Cir. 2017); *also see* Kates, 2014 WL 1218905 at * 3(The irreparable harm must be "actual and imminent, not merely speculative.") As the Fourth Circuit has explained, the Court is no longer required to balance the irreparable

harm to the respective parties. Real Truth, 575 F.3d at 347. Rather the movant must make a clear showing that he is likely to be irreparably harmed, and the Court must "pay *particular regard* for the public consequences in employing the extraordinary remedies of an injunction." Id.(citations omitted).

6    The United States Supreme Court vacated the original decision in *Real Truth* for further consideration in light of *Citizens United v. Federal Election Commission*, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). *The Real Truth About Obama, Inc. v. Federal Election Commission*, 559 U.S. 1089, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010). The Fourth Circuit, however, reissued its opinion on Parts I and II of its opinion. *The Real Truth About Obama, Inc. v. Federal Election Commission*, 607 F.3d 355 (4th Cir. 2010).

**\*10**  For the reasons fully explained above, the undersigned has recommended that Plaintiff's Amended Complaint and Addendums be dismissed as to all Defendants. Accordingly, the undersigned finds that Plaintiff's request for injunctive relief should be denied as he cannot establish that he is likely to succeed on the merits.

## PROPOSAL AND RECOMMENDATION

The undersigned therefore respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **DENY** Plaintiff's Application to Proceed Without Prepayment of Fees and Costs (Document No. 19) and letter-form Motion for Preliminary Injunction (Document No. 5), and **DISMISS** Plaintiff's Amended Complaint (Document Nos. 33 and 33-1), and remove this matter from the Court's docket.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge David A. Faber. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the Plaintiff shall have fourteen (14) days (filing of objections) and three (3) days (if received by mail) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is

2019 WL 6869351

made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, District Judge Faber and this Magistrate Judge.

**All Citations**

Slip Copy, 2019 WL 6869351

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 694811

2021 WL 694811
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Richmond Division.

Dustin DYER, Plaintiff,
v.
Shirrellia SMITH, et al., Defendants.

Civil Action No. 3:19-cv-921
|
Signed 02/23/2021

**Attorneys and Law Firms**

Dustin Wallace Dyer, Dyer Immigration Law Group PC, Glen Allen VA, Jonathan Corbett, Pro Hac Vice, Hollywood CA, for Plaintiff.

Jonathan Holland Hambrick, Office of the U.S. Attorney, William Daniel Prince, IV, John Paul O'Herron, ThompsonMcMullan, P.C., Richmond VA, for Defendants.

**OPINION**

John A. Gibney, Jr., United States District Judge

 **\*1** The plaintiff, Dustin Dyer, alleges that the defendants, both TSA agents, violated his First and Fourth Amendment rights when they stopped him from recording a pat-down search of his husband and ordered him to delete the video he had already taken. The defendants, Shirrellia Smith and Natalie Staton, argue that Dyer's claims fail because he lacks an implied right of action under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The defendants also say that qualified immunity protects them from Dyer's First Amendment claim.

Assuming the truth of the factual allegations in the complaint and drawing all inferences in favor of the plaintiff, the Court finds that no special factors counsel against recognizing implied damages remedies for either of Dyer's claims. Further, because Dyer has a clearly established right to record government officials performing their duties, qualified immunity does not protect the defendants at this stage of litigation. The Court, therefore, will deny the defendants' motion to dismiss as to both of Dyer's claims. The Court will

also deny the defendants' motion as to the plaintiff's request for attorneys' fees and costs.

**I. BACKGROUND**

On June 8, 2019, Dustin Dyer, his husband, and their children traveled through the airport in Richmond, Virginia. When the family entered the TSA checkpoint, TSA agents quickly cleared Dyer and the children. The agents did not, however, clear Dyer's husband. They told Dyer's husband that, per TSA policy, they must perform a pat-down search because he carried infant formula that they could not open for testing.

As the pat-down search began, Dyer turned on his cell phone camera and began recording the search. Dyer stood about ten feet away from the pat-down. After about one minute, TSA Agent Natalie Staton noticed Dyer recording and asked him to stop, saying that his recording impeded the ability of the agent performing the pat-down "to do his job." (ECF No. 1 ¶ 23.) Dyer did not stop recording and asked Staton, "What are you talking about?" (*Id.* ¶ 28.) Staton then left and returned with her supervisor, Shirrellia Smith.

Dyer asked Smith if he could record and Smith responded, "No, no recording." (*Id.* ¶ 31.) Dyer stopped recording. Staton then asked Smith to "order Dyer to delete the recording that he had made so far." (*Id.* ¶ 35.) Smith ordered Dyer to delete the video while Staton watched. "Dyer deleted the recording from his phone while [Staton] looked at the screen of his cell phone ...." (*Id.* ¶ 38.)

TSA agents then allowed Dyer, his husband, and their children to leave the checkpoint for their flight. Dyer later recovered a copy of the deleted video from his cell phone.

**II. DISCUSSION** [1]

[1] The defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion gauges a complaint's sufficiency without resolving any factual discrepancies or testing the claims. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering the motion, a court must accept all allegations in the complaint as true and must draw all reasonable inferences

Dyer v. Smith, Slip Copy (2021)

2021 WL 694811

in the plaintiff's favor. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009).

The principle that a court must accept all allegations as true, however, does not apply to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a Rule 12(b)(6) motion to dismiss, a complaint must state facts that, when accepted as true, state a facially plausible claim to relief. *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

### A. Dyer's Allegations

**\*2**  Dyer brings two claims against the defendants. He says that the defendants violated his Fourth Amendment and First Amendment rights when they ordered him to stop recording the pat-down search and delete the video from his cell phone.

According to the defendants, Dyer may not pursue these claims because he has no right of action under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and because qualified immunity protects the defendants from his First Amendment claim. The defendants do not accuse Dyer of inadequately pleading violations of his First and Fourth Amendment rights.

### B. Availability of a Bivens *Remedy*

When state officials violate the constitutional rights of Americans, the victims sue under 42 U.S.C. § 1983. "But § 1983 does not provide a cause of action against federal officials, and there is no analogous statute imposing damages liability on federal officials." *Tun-Cos v. Perrotte*, 922 F.3d 514, 520 (4th Cir. 2019). In 1971, however, the Supreme Court decided *Bivens*, and "held that, even absent statutory authorization, it would enforce a damages remedy to compensate persons injured by federal officials who violated the prohibition against unreasonable search and seizures." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017).

In the decade following *Bivens*, the Supreme Court recognized two additional situations in which one can sue federal officials for violating the constitutional rights of Americans. *See Davis v. Passman*, 442 U.S. 228 (1979)

(allowing an administrative assistant to sue a congressman for firing her because of her gender, thereby violating the Fifth Amendment Due Process Clause); *Carlson v. Green*, 446 U.S. 14 (1980) (allowing a prisoner's estate to sue federal jailers for failing to treat the prisoner's asthma, thereby violating the Eighth Amendment). "These three cases—*Bivens, Davis,* and *Carlson* —represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Ziglar*, 137 S. Ct. at 1855.

Although "expanding the *Bivens* remedy" beyond the contexts presented in these three cases "is a 'disfavored' judicial activity," *id.* at 1857, the Supreme Court has preserved a narrow path to expand *Bivens*. This Court chooses to walk this narrow way and finds, for the reasons detailed below, that Dyer may pursue *Bivens* actions against the defendants for the alleged violations of his rights under the First and Fourth Amendments.

### 1. Legal Standard

**\*3**  Courts apply a two-step test to determine the availability of a *Bivens* remedy against federal officials.

First, courts must inquire whether a given case presents a "new *Bivens* context." If the context is not new – *i.e.*, if the case is not "different in [any] meaningful way" from the three cases in which the Court has recognized a *Bivens* remedy – then a *Bivens* remedy continues to be available. But if the context is new, then courts must, before extending *Bivens* liability, evaluate whether there are "special factors counselling hesitation in the absence of affirmative action by Congress."

*Tun-Cos*, 922 F.3d at 522–23 (internal citations omitted) (quoting *Ziglar*, 137 S. Ct. at 1857–59). "[A] radical difference is not required" to make a case meaningfully different from the three cases in which the Court has recognized a *Bivens* remedy. *Id.* at 523.

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency

Dyer v. Smith, Slip Copy (2021)

2021 WL 694811

to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Ziglar*, 137 S. Ct. at 1860.

As for the "special factors" that might counsel hesitation against expanding *Bivens* into a new context, courts consider "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1858. Courts also look to whether "there is an alternative remedial structure present in a certain case." *Id.* The presence of an alternative remedy-even if less effective than the damages available under *Bivens* and not expressly identified by Congress as an alternative remedy-weighs against recognizing a *Bivens* claim in a new context. *See Schweiker v. Chilicky*, 487 U.S. 412, 422-23 (1988); *Bush v. Lucas*, 462 U.S. 367, 378 (1983). Other "special factors" include national security, *Ziglar*, 137 S. Ct. at 1861–62, the difficulty of devising a workable standard for courts to apply, and worries that recognizing a *Bivens* action will "invite an onslaught" of lawsuits. *Wilkie v. Robbins*, 551 U.S. 537, 561–62 (2007).

### 2. Dyer's Fourth Amendment Claim

Dyer alleges that the defendants violated the Fourth Amendment by unreasonably seizing his person and unreasonably searching and seizing his cell phone. Because the defendants serve as TSA agents—federal government officers—the Court must decide whether *Bivens* provides a remedy for Dyer's Fourth Amendment claim.

### a. New Context

First, the Court must decide whether Dyer's Fourth Amendment claim presents a "new *Bivens* context." *Ziglar*, 137 S. Ct. at 1859. Dyer, just like Bivens, "seeks to hold accountable line-level agents ... for violations of the Fourth Amendment." *Hicks v. Ferreyra*, 965 F.3d 302, 311 (4th Cir.

2020). But Dyer's Fourth Amendment claim differs "in a meaningful way" from Bivens's for several reasons, including that TSA agents operate under a different statutory mandate from other law enforcement officers. *See* 29 U.S.C. § 114; *Ziglar*, 137 S. Ct. at 1859–60 (listing "the statutory or other legal mandate under which the officer was operating" as a "meaningful difference"). Thus, Dyer's Fourth Amendment claim presents a "new context" under *Bivens*. *Ziglar*, 137 S. Ct. at 1859; *see Linlor v. Polson*, 263 F. Supp. 3d 613, 620 (E.D. Va. 2017) (finding a Fourth Amendment claim against TSA agent for excessive force presented a "new 'context' for purposes of the *Bivens* analysis").

### b. No Special Factors

As Dyer's Fourth Amendment claim arises in a new context, the Court must next consider whether any special factors counsel against implying a *Bivens* remedy in this case. *Ziglar*, 137 S. Ct. at 1859. The defendants argue that several special factors exist, including national security concerns; Congress's refusal to provide a statutory damages remedy against TSA agents; the impracticality of enforcing a *Bivens* claim; and the existence of a congressionally provided alternative remedy. (ECF No. 19, at 7-10.) None of these factors, however, counsel against implying a damages remedy for Dyer's Fourth Amendment claim.

### i. National Security

**\*4**  TSA agents conduct passenger screenings and enforce airport restrictions. These tasks do not affect diplomacy, foreign policy, or the national security interests that have precluded a *Bivens* remedy in other cases. *Tun-Cos*, 922 F.3d at 526. In *Tun-Cos*, the plaintiffs sued Immigration and Customs Enforcement agents under *Bivens* for violating their Fourth Amendment rights. *Id.* The Fourth Circuit determined that

> because immigration enforcement is, at bottom, about ensuring that only those foreign nationals who are legally authorized to be in the United States remain present here, such enforcement has 'the natural tendency to affect diplomacy, foreign policy, and the security of the nation, which ... counsel hesitation in extending *Bivens*.

*Id.* (citing *Mirmehdi v. United States*, 689 F.3d 975, 983 (9th Cir. 2012)). Enforcement of commercial flight regulations

*Dyer v. Smith*, Slip Copy (2021)

2021 WL 694811

do not implicate the same diplomacy and foreign policy concerns. TSA agents screen all passengers in the same manner, regardless of immigration or diplomatic status. And TSA agents manage the safety of our country's air transportation system, a mission that necessarily captures international travelers but maintains a domestic focus.

Further, this case does not implicate the national security concerns that have counselled against implying a damages remedy in other cases. Determining whether a TSA agent violated Dyer's Fourth Amendment rights would not involve "an inquiry into sensitive issues of national security." *Ziglar*, 137 S. Ct. 1861–62 (declining to extend *Bivens* to a claim against high-ranking executive officials challenging detention policies). Allowing damages in this case would not hamper TSA's efficacy; permitting individuals to record, from a distance, TSA agents performing their duties does not limit TSA agents' ability to screen passengers. Indeed, TSA policy allows individuals to record if they do not interfere with the screening process or record sensitive information.

National security concerns, therefore, do not counsel against implying a *Bivens* remedy in this case.

### ii. Absence of a Statutory Damages Remedy

The defendants argue that repeated amendment to the statutes governing air transportation security, coupled with the lack of a statutory damages cause of action, indicate a congressional refusal to supply a damages action against TSA agents for constitutional violations. The defendants contend that this implicit congressional refusal counsels hesitation. (ECF No. 19, at 8-9). The Court, however, declines to adopt the defendants' view that congressional inaction amounts to an intentional omission of a damages remedy. Although congressional inaction could indicate an implicit rejection of the viability of constitutional claims against TSA agents, it just as likely indicates implicit permission for such actions. [2] Further, if congressional failure to enact a statutory damages remedy alone constituted a special factor that counselled hesitation, that would preclude all expansions of *Bivens* and would undermine the implied rights of action the Supreme Court recognized in *Bivens, Carlson,* and *Davis.* Thus, the absence of a statutory damages remedy for alleged constitutional violations by TSA agents does not counsel against extending a *Bivens* remedy here.

[2] Indeed, federal air transportation law does not *shield* TSA agents from liability for constitutional violations. And Congress has limited liability for damages within the air security context. *See* 49 U.S.C. § 44903(k); *id* § 44921(h). Thus, Congress has enacted provisions expressly prohibiting damages actions in certain air travel situations, but has not done so for TSA agents accused of constitutional violations. From this, the Court could infer that Congress intended for TSA agents to remain subject to lawsuits for alleged constitutional violations.

### iii. Practicality

**\*5** The defendants imply that TSA agents do not receive training on the constitutional dimensions of their role and contend that Congress would require training on such issues before imposing liability. (ECF No. 19, at 9-10). At this stage of the litigation, however, it remains unclear whether TSA agents receive constitutional training. And even if they do not receive this training, advising TSA agents of those bounds would have a negligible "impact on governmental operations systemwide," especially considering the importance of the constitutional right at issue. *Ziglar*, 137 S. Ct. at 1858. Federal officials should not evade liability for constitutional violations because their employer has not provided adequate training. Concerns about the practicality of enforcing a *Bivens* remedy in this case, therefore, do not counsel against extending such a remedy.

### iv. Alternative Remedy

The defendants argue that the Travelers Redress Inquiry Program (TRIP), created pursuant to 49 U.S.C. § 44926, offers Dyer an alternative remedy. [3] (ECF No. 19, at 10.) [4] In determining whether a remedy counts as an alternative, "the relevant question 'is not what remedy the court should provide for a wrong that would otherwise go unredressed' but instead 'whether an elaborate remedial system ... should be augmented by the creation of a new judicial remedy.' " *Tun-Cos*, 922 F.3d at 527 (citing *Bush*, 462 U.S. at 388). The defendants argue TRIP satisfies this test.

[3] Section 44926(a) provides that the "Secretary of Homeland Security shall establish a timely and fair process for individuals who believe they

have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat under the regimes utilized by the Transportation Security Administration." The Department of Homeland Security ("DHS") established TRIP to comply with this statutory mandate. (ECF No. 19, at 10).

4   The defendants do not identify any other provisions in federal law or regulations that offer Dyer an alternative remedy.

Although DHS guidance suggests that travelers use TRIP to resolve travel-related issues, including denied or delayed boarding, the authorizing statute says that only those who TSA wrongly identified as a "threat" can use pursue a remedy through TRIP. *See id.* § 44926 ("process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft *because they were wrongly identified as a threat*") (emphasis added); *Step 1: Should I Use DHS TRIP?*, Dep't of Homeland Sec. (May 29, 2020), https://www.dhs.gov/step-1-should-i-use-dhs-trip. Here, the plaintiff does not allege that TSA agents delayed him from boarding his flight because they wrongly identified him as a threat. Thus, TRIP does not provide Dyer an alternative remedy or counsel against extending *Bivens* here. [5]

5   Even if TRIP provided Dyer with an alternative remedy, it would not counsel against extending a *Bivens* remedy in this case because TRIP does not amount to an "elaborate remedial system." *Tun-Cos*, 922 F.3d at 527 (citing *Bush*, 462 U.S. at 388).

### 3. Dyer's First Amendment Claim

Dyer alleges that the defendants violated the First Amendment by prohibiting him from recording the pat-down search of his husband and ordering that he delete the video from his cell phone. Because the defendants serve as federal officers, the Court must decide whether *Bivens* provides a remedy for Dyer's First Amendment claim.

### a. New Context

The Supreme Court has "never held that *Bivens* extends to First Amendment claims." *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012). Thus, Dyer's First Amendment claim presents a new context under *Bivens*. *See Doe v. Meron*, 929 F.3d 153, 169 (4th Cir. 2019) (finding that the plaintiff's First Amendment claim "presents a new *Bivens* context" "since it involves a new constitutional right").

### a. No Special Factors

**\*6**  As Dyer's First Amendment claim arises in a new context, the Court must determine whether any special factors counsel against implying a *Bivens* remedy here. *Ziglar*, 137 S. Ct. at 1859. The defendants do not separate their special factors arguments against extending *Bivens* to Dyer's Fourth and First Amendment claims. For the same reasons discussed in Section II.B.2.b, special factors do not counsel against implying a damages remedy for Dyer's First Amendment claim.

### C. Qualified Immunity

"Qualified immunity protects officials 'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.' " *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 537-38 (4th Cir. 2017) (quoting *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)). "In conducting the qualified immunity analysis, '[the] first task is to identify the specific right that the plaintiff asserts was infringed by the challenged conduct.' " *Id.* at 538 (quoting *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc)). "[Courts] then engage in a two-step inquiry, asking 'whether a constitutional violation occurred' and 'whether the right violated was clearly established' at the time of the official's conduct." *Id.* (quoting *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010)).

"To be clearly established, a right must be sufficiently clear 'that every reasonable official would have understood that what he is doing violates that right.' " *Covey v. Assessor of Ohio Cty.*, 777 F.3d 186, 195–96 (4th Cir. 2015) (quoting *Reichle*, 566 U.S. at 664). Even "[i]n the absence of controlling authority that specifically adjudicates the right in question," however, "a right may still be clearly established in one of two ways." *Booker*, 855 F.3d at 543. First, "[a] right may be clearly established if 'a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question.' " *Id.* (alterations omitted) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Second, "[a] right may ... be clearly established based on a

" 'consensus of cases" of persuasive authority' from other jurisdictions." *Id.* (quoting *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004)); *see also Haze v. Harrison*, 961 F.3d 654, 660 n.4 (4th Cir. 2020) (emphasis omitted). Precedent may "clearly establish[ ]" a right even if a court has not recognized that right in the "specific context before." *Meyers v. Baltimore County*, 713 F.3d 723, 734 (4th Cir. 2013); *Hope*, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

### 1. First Amendment Violation

The Court first considers "whether a constitutional violation occurred." *Booker*, 855 F.3d at 538 (quoting *Greene*, 593 F.3d at 353). For the reasons below, the Court finds that Dyer adequately alleges that the defendants violated his First Amendment rights.

"The First Amendment guarantees that 'Congress shall make no law ... abridging the freedom of speech.' " *Billups v. City of Charleston*, 961 F.3d 673, 682 (4th Cir. 2020) (quoting U.S. Const. amend. I). "As the Supreme Court has observed, 'the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw.' " *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (quoting *First Natl Bank v. Bellotti*, 435 U.S. 765, 783 (1978)). "An important corollary to this interest in protecting the stock of public information is that '[t]here is an undoubted right to gather news "from any source by means within the law." ' " *Id.* (alteration in original) (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978)).

**\*7** Courts across the country agree that incident to the "right to gather news," citizens have some right to record government officials performing their jobs. The Eleventh and Ninth Circuits recognize a broad right to record matters of public interest. [6] The First Circuit acknowledges a right to record government officials engaged in their duties. [7] Four other circuits recognize a narrower right to record a subset of government officials: law enforcement officers. [8] Considering this growing consensus, this Court finds that the First Amendment protects the right to record government officials performing their duties. [9]

[6]   *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (finding "a right to record matters of public interest"); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (finding a "right to film matters of public interest").

[7]   See *Glik*, 655 F.3d at 83 (finding the right to film "government officials in public spaces").

[8]   See *Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020) (implying a recognized right to record police activity); *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017) (finding a right to record "police activity"); *Turner v. Driver*, 848 F.3d 678, 690 (5th Cir. 2017) (finding a "right to record the police"); *ACLU of Ill v. Alvarez*, 679 F.3d 583, 600 (7th Cir. 2012) (implying a right to record the police).

District courts in the Fourth, Second, and Sixth Circuits have also recognized a right to record law enforcement. *See, e.g.,* *J.A. v. Miranda*, No. PX 16-3953, 2017 WL 3840026, at *6 (D. Md. Sept. 1, 2017) (finding a "right to record police activity in public"); *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 380 (S.D.N.Y. 2015) (finding "the right to record police activity in public" clearly established in the Second Circuit); *Crawford v. Geiger*, 131 F. Supp. 3d 703, 715 (N.D. Ohio 2015), *aff'd in part, rev'd in part on other grounds* 656 F. App'x 190 (6th Cir. 2016) (finding "that there is a First Amendment right openly to film police officers carrying out their duties in public"); *Garcia v. Montgomery County*, 145 F. Supp. 3d 492, 508 (D. Md. 2015) (finding the right to record "police activity, if done peacefully and without interfering with the performance of police duties"); *Szymecki v. City of Norfolk*, No. 2:08cv142, 2008 WL 11441862, at *4 (E.D. Va. Oct. 21, 2008) (finding "the First Amendment protects the video recording of the actions of police officers").

Of course, the Fourth Circuit's decisions guide this Court's interpretations of the First Amendment. The Fourth Circuit, however, has not addressed whether the First Amendment protects the right to record public officials. "The closest the Fourth Circuit has come is *Szymecki v. Houck*, 353 F. App'x 852 (4th Cir. 2009) where it affirmed, in an unpublished opinion, the district court's determination that the 'asserted First Amendment

right to record police activities on public property was not clearly established in this circuit at the time of the alleged conduct.' " *Miranda,* 2017 WL 3840026, at *6 (quoting *Szymecki,* 353 F. App'x at 853).

9   Recognizing that the First Amendment protects the right to record government officials performing their duties enables "a foremost purpose of the Constitution's guarantee of speech": "to enable every citizen at any time to bring the government and any person in authority to the bar of public opinion by any just criticism upon their conduct in the exercise of the authority which the people have conferred upon them." *Alvarez,* 679 F.3d at 600 (quoting Thomas M. Cooley, A Treatise on the Constitutional Limitations 421–22 (1868)).

In addition, when we protect the right to record public officials, we protect against the degradation of various other constitutional rights. This country's racial unrest highlights this principle. Because a cell phone video captured George Floyd's death, the world watched. The world's reaction to this video—and others—sent millions into the streets in protest. Although the racial reckoning continues, this video and the protests it sparked bent "the arc of the moral universe ... towards justice." Dr. Martin Luther King Jr., Remaining Awake Through a Great Revolution (Mar. 31, 1968). What if the officers had ordered the video that captured George Floyd's death deleted?

*8   The First Amendment, however, does not offer absolute protection; the government can regulate activity protected by the First Amendment. The extent to which the government can impose such regulation depends on the type of forum in which the protected activity occurs. In a nonpublic forum —the forum at issue in this case [10] —the government may impose "reasonable" regulations that do not arise from "an effort to suppress the speaker's activity due to disagreement with the speaker's views." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 679, 683 (1992) (holding that the government can impose reasonable restrictions on speech in an airport operated by a public authority). Thus, the government can impose reasonable regulations on the right to record government officials performing their duties in Richmond's airport.

10   *Capital Region Airport Commission,* Richmond Int'l Airport, https://flyrichmond.com/capital-

region-airport-commission (last visited Feb. 16, 2021) ("Established in 1975 by an act of the Virginia General Assembly, the Capital Region Airport Commission owns and operates Richmond International Airport (RIC).").

Dyer accuses the defendants of prohibiting him from recording the pat-down search of his husband from about ten feet away and ordering him to delete the video from his cell phone. Dyer says that his recording did not interfere with the screening procedure. (ECF No. 1 ¶ 26.) Accepting the facts asserted by the plaintiff as true, the defendants' demand that Dyer stop recording and delete the captured video plausibly constitutes an unreasonable restriction on the plaintiff's First Amendment right to record government officials performing their duties. In making these allegations, Dyer sufficiently pleads a First Amendment violation.

### b. Clearly Established Right

Next, the Court turns to the second step of the qualified immunity analysis: " 'whether the right violated was clearly established' at the time of the official's conduct." *Booker,* 855 F.3d at 538 (quoting *Greene,* 593 F.3d at 353). Although neither the Supreme Court nor the Fourth Circuit has recognized a right to record government officials performing their duties, both the general constitutional rule and a consensus of cases clearly establish this right.

According to the Fourth Circuit, "it is crystal clear that the First Amendment protects peaceful nondisruptive speech in an airport, and that such speech cannot be suppressed solely because the government disagrees with it." *Tobey v. Jones,* 706 F.3d 397, 391 (2013). Here, Dyer sought to record, from about ten feet away, the TSA conducting a pat-down search of his husband. The TSA agents directed him to stop. Dyer's allegations fall squarely within this "crystal clear" right. *See Glik,* 655 F.3d at 85 (explaining "the brevity of the First Amendment discussion" in many "circuit court opinions that have recognized a right to film government officials or matters of public interest in public space" as evidence of "the fundamental and virtually self-evident nature of the First Amendment's protections in this area"); *see also Sorrell v. IMS Health Inc.,* 564 U.S. 552, 568 (2011) ("An individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated."). Thus, because "a general constitutional rule" "applies with obvious clarity" to the First Amendment violations that Dyer alleges, the

right he asserts was "clearly established" at the time of the alleged conduct. *Booker*, 855 F.3d at 543 (alterations omitted) (quoting *Hope*, 536 U.S. at 741). [11]

[11]     The Court also finds that a " 'consensus of cases' of persuasive authority from other jurisdictions" clearly establishes Dyer's right to record in this case. *Booker*, 855 F.3d at 543 (quoting *Owens*, 372 F.3d at 279); *see* Doori Song, *Qualified Immunity and the Clear, but Unclear First Amendment Right to Film Police*, 33 Notre Dame J.L. Ethics & Pub. Pol'y 337, 342–44 (2019) ("With the exception of the Tenth Circuit, courts in every circuit have held that there is a general First Amendment right to film police activities in public, subject to reasonable time, manner, and place restrictions."); *Frasier v. Evans*, No. 119 Civ. 15cv01759, 2018 WL 6102828 (D. Colo. Nov. 21, 2018) ("There exists a First Amendment right to record the police in the public performance of their official duties"), *appeal filed*, No. 19-1015 (10th Cir. 2019).

### D. Attorneys' Fees

**\*9** Along with damages, Dyer asks the Court to award him "reasonable attorney's fees." (ECF No. 1, at 8.) The defendants argue that Dyer has no grounds for such a request. (ECF No. 19, at 14.)

"The American Rule denies a litigant's claim to attorney's fees by requiring 'each litigant [to pay] his own attorney's fees, win or lose, unless a statute or contract provides otherwise.' " *Consulting Eng'rs, Corp. v. Martin/Martin, Inc.*, No. 1:16cv535, 2016 WL 9223927, at \*6 (E.D. Va. Nov. 15, 2016) (quoting *Baker Botts L.L.P. v. ASARCO LLC*, 135 S.

Ct. 2158, 2164 (2015)). "As a general rule, federal courts apply this principle consistently and have done so except where 'specific and explicit provisions for the allowance of attorneys' fees under selected statutes' exists." *Id.* (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 260 (1975)). "Consequently, unless a statute provides specific and explicit provision for attorney's fees then the American Rule governs, and each party is responsible for their own attorney's fees as a matter of law." *Id.*

Here, Dyer asserts constitutional claims against federal agents through *Bivens*. *Bivens* actions do not provide for attorneys' fees, and Dyer does not cite any other statutory authority for his request. "It therefore does not appear at present that [Dyer] will be eligible for fees at the conclusion of this litigation. "[B]ecause this litigation is in its early stages," however, the Court withholds judgment on this issue and will deny the defendants' motion to dismiss Dyer's request for fees and costs. *Nurse v. United States*, 226 F.3d 996, 1004 (9th Cir. 2000); *see Alyeska Pipeline Serv. Co.*, 421 U.S. at 258–59 (noting that fee awards may depend on the parties' conduct during the litigation).

### III. CONCLUSION

For the foregoing reasons, the Court will deny the defendants' motion to dismiss the plaintiff's First Amendment and Fourth Amendment claims (Counts One and Two) and the plaintiff's request for fees and costs. (ECF No. 18.)

The Court will issue an appropriate Order.

### All Citations

Slip Copy, 2021 WL 694811

---

End of Document                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Sharpe v. Ellis, Slip Copy (2021)

2021 WL 2907883

KeyCite Blue Flag – Appeal Notification

Appeal Filed by DIJON SHARPE v. WINTERVILLE POLICE DEPARTMENT, 4th Cir., July 29, 2021

2021 WL 2907883
Only the Westlaw citation is currently available.
United States District Court, E.D. North Carolina,
Eastern Division.

Dijon SHARPE, Plaintiff,

v.

Officer William Blake ELLIS, in his official capacity, and Officer Myles Parker Helms IV, in his official capacity, Defendants.

No. 4:19-CV-157-D
|
Signed 07/09/2021

**Attorneys and Law Firms**

Thomas Gregory Doucette, The Law Offices of T. Greg Doucette, PLLC, Durham, NC, for Plaintiff.

Dan McCord Hartzog, Jr., Katherine Barber-Jones, Hartzog Law Group LLP, Cary, NC, for Defendants William Blake Ellis, Myers Parker Helms, IV.

**ORDER**

JAMES C. DEVER III, United States District Judge

*1 On October 9, 2018, Dijon Sharpe ("Sharpe" or "plaintiff") was a passenger in a car that Town of Winterville police officers William Blake Ellis ("Ellis" or "defendant") and Myers Parker Helms IV ("Helms" or "defendant") properly stopped for a traffic violation. As the police officers approached the car, Sharpe began recording and livestreaming the traffic stop from inside the car. Officer Helms told Sharpe that he could record the traffic stop from inside the car during the traffic stop but not livestream the traffic stop from inside the car during the traffic stop. Sharpe now seeks damages from the officers and the Town of Winterville and contends that the officers and the Town of Winterville violated 42 U.S.C. § 1983 and the First Amendment by only allowing Sharpe to record the traffic stop from inside the car during the traffic stop.

As explained below, assuming without deciding that the First Amendment entitled Sharpe to record the traffic stop from inside the car during the traffic stop, the First Amendment did not entitle Sharpe to livestream the traffic stop from inside the car during the traffic stop. Thus, defendants did not violate the First Amendment, and the court grants defendants' motion for judgment on the pleadings. The court also denies as moot Sharpe's motion for entry of judgment.

I.

Sharpe resides in Pitt County, North Carolina. See Compl. [D.E. 1] ¶ 7. On October 9, 2018, Helms and Ellis, as officers of Winterville Police Department ("WPD"), properly stopped a car for a traffic violation. Sharpe was riding in the front passenger seat of the car. See id. ¶¶ 19–20. While still in the car and during the traffic stop, Sharpe "turned on the video recording function of his smartphone and began livestreaming—broadcasting in real-time—via Facebook Live to his Facebook account." Id. ¶ 22. During the traffic stop, Helms approached the car and asked Sharpe his name, which Sharpe declined to provide. See id. ¶ 24. Helms and Ellis then returned to their patrol car. See id. ¶ 25. When Helms returned to Sharpe's car, he asked Sharpe, "What have we got? Facebook Live, cous?" Id. ¶ 27 (alteration omitted); see Pl.'s Ex. A [D.E. 1-2] 17. Sharpe responded: "Yeah." Pl.'s Ex. A [D.E. 1-2] 17; see Compl. ¶ 28. Helms reached into the car through the open window and attempted to grab Sharpe's phone, pulling on his seatbelt and shirt in the process. See Compl. ¶ 28. Helms stated, "We ain't gonna do Facebook Live, because that's an officer safety issue." Pl.'s Ex. A [D.E. 1-2] 17. Later, Ellis remarked: "Facebook Live ... we're not gonna have, okay, because that lets everybody y'all follow on Facebook [know] that we're out here. There might be just one me next time [sic] ... It lets everybody know where y'all are at. We're not gonna have that." Id. at 19–20. [1] Ellis continued: "If you were recording, that is just fine.... We record, too. So in the future, if you're on Facebook Live, your phone is gonna be taken from you[ ] ... [a]nd if you don't want to give up your phone, you'll go to jail." Id. at 20. Towards the end of the stop, Ellis stated, "But to let you know, you can record on your phone ... but Facebook Live is not gonna happen." Id. at 21.

[1]      Ellis was correct. See Compl. ¶ 23; https://www.facebook.com/d.r.sharpe/videos/2251012878304654/ (last visited Aug. 14, 2020) (listing "Realtime Comments" including,

inter alia, "Keep your live on," "It keep pausing," "Where ya'll at," "What kind of bull is going on now," "Did he just grab your phone!???," and "Handle it once it's off"). Sharpe has since deleted the video.

**\*2** In his complaint, Sharpe makes two claims. First, Sharpe alleges a violation of 42 U.S.C. § 1983 and the First Amendment against Helms and Ellis, in their official capacities, and WPD. See Compl. ¶¶ 37–43. As for Helms and Ellis, Sharpe contends that they "physically attacked" him and "threatened to deprive" him of his First Amendment right to record and real-time broadcast his interactions with law enforcement. Id. ¶ 40. As for WPD, Sharpe cites Monell v. Department of Social Services of New York, 436 U.S. 658 (1978), and alleges "an unconstitutional policy, custom, or practice of preventing citizens from recording and livestreaming their interactions with police officers in the public performance of their duties." Id. ¶ 41. Second, Sharpe alleges a violation of section 1983 and the First Amendment against Helms in his individual capacity. See id. ¶¶ 44–48. Specifically, Sharpe asserts that "[t]he physical attack by Officer Helms on Mr. Sharpe" violated the First Amendment. Id. ¶ 47; see [D.E. 19] 6–8.

On February 3, 2020, the defendants moved to dismiss the claims against WPD and against Helms in his individual capacity. See [D.E. 15]. On August 20, 2020, after briefing and oral argument, the court dismissed with prejudice Sharpe's claims against WPD and Helms in his individual capacity, holding that WPD is not an entity that may be sued under North Carolina law and that qualified immunity barred Sharpe's claim against Helms. See [D.E. 33] 4–6, 12–13.

Sharpe's remaining claims are against Helms and Myers in their official capacities (which really means the claims are against the Town of Winterville). Sharpe seeks nominal damages, reasonable attorney's fees, costs, and a declaratory judgment concerning whether during the traffic stop and from inside the stopped car Sharpe "has the right, protected by the First Amendment ... to both (a) record police officers in the public performance of their duties and (b) broadcast such recording in real-time." Compl. at 8. Defendants seek judgment on the pleadings on Sharpe's remaining claims. See [D.E. 36].

## II.

### A.

A party may move for judgment on the pleadings at any time "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A court should grant the motion if "the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, 442 F.3d 1239, 1244 (10th Cir. 2006) (quotation omitted), abrogated on other grounds by Magnus, Inc. v. Diamond State Ins. Co., 545 F. App'x 750 (10th Cir. 2013) (unpublished); see Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 375 (4th Cir. 2012); Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 405–06 (4th Cir. 2002). A court may consider the pleadings and any materials referenced in or attached to the pleadings, which are incorporated by reference. See Fed. R. Civ. P. 10(c); Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). A court also may consider "matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007).

The same standard applies under Rule 12(c) and Rule 12(b)(6). See Mayfield, 674 F.3d at 375; Burbach Broad. Co., 278 F.3d at 405–06. Thus, a motion under Rule 12(c) tests the legal and factual sufficiency of the claim. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 677–80, 684 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(c) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences in the "light most favorable to the [nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 347, 352–53 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015); Burbach Broad. Co., 278 F.3d at 406. A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's allegations must "nudge[ ] [his] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

B.

**\*3** Sharpe's remaining claims are section 1983 claims against Helms and Myers in their official capacities. To prevail on a section 1983 claim, a plaintiff must show that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49–50 (1999); see Thomas v. Salvation Army S. Territory, 841 F.3d 632, 637 (4th Cir. 2016); Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003).

Sharpe's claims against Helms and Myers in their official capacities are really claims against the Town of Winterville. See Kentucky v. Graham, 473 U.S. 159, 165–66 (1985); Santos v. Frederick Cnty. Bd. of Comm'rs, 725 F.3d 451, 469 (4th Cir. 2013); Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 307 n.13 (4th Cir. 2006); Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004). Accordingly, Sharpe must plausibly allege that a "policy or custom" attributable to the Town of Winterville caused the violation of his federally protected rights. See Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997); Hafer v. Melo, 502 U.S. 21, 25 (1991); Graham, 473 U.S. at 166; Monell, 436 U.S. at 690–94; King v. Rubenstein, 825 F.3d 206, 223 (4th Cir. 2016); Santos, 725 F.3d at 469–70.

The court assumes without deciding that Sharpe has plausibly alleged a policy or custom attributable to the Town of Winterville under Monell that prohibited a person during a traffic stop and from inside the stopped car to livestream the traffic stop. Cf. Lytle, 326 F.3d at 471 (detailing the four ways in which liability for a policy or custom may arise). Sharpe, however, still must demonstrate that the alleged policy deprived Sharpe of a right secured by the Constitution or laws of the United States on October 9, 2018. See, e.g., Sullivan, 526 U.S. at 49–50.

Sharpe claims that the Town of Winterville's alleged policy or custom deprived him of his First Amendment right on October 9, 2018. According to Sharpe, during the traffic stop and from inside the stopped car, he possessed a First Amendment right to "record police in the public performance of their duties and to broadcast such recordings in real-time." Compl. ¶ 35 (emphasis added); cf. Pl.'s Ex. A [D.E. 1-2] 20–21 (recounting that Helms and Meyers told Sharpe he could record, but was not allowed to livestream).

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech, or of the press." U.S. Const. amend. I. The First Amendment's protections extend beyond the text's proscriptions on laws abridging freedom of speech or of the press and encompass "a range of conduct related to the gathering and dissemination of information." Glik v. Cunniffe, 655 F.3d 78, 82 (1st Cir. 2011); see First Nat'l Bank v. Bellotti, 435 U.S. 765, 783 (1978); Stanley v. Georgia, 394 U.S. 557, 564 (1969); Turner v. Lieutenant Driver, 848 F.3d 678, 688–89 (5th Cir. 2017). The First Amendment generally "prohibit[s] the government from limiting the stock of information from which members of the public may draw." First Nat'l Bank, 435 U.S. at 783; see Turner, 848 F.3d at 688. The First Amendment protects a right to gather information "from any source by means within the law." Houchins v. KQED, Inc., 438 U.S. 1, 11 (1978) (quotation omitted); see Glik, 655 F.3d at 82. Gathering information about government officials in a form that can be readily disseminated "serves a cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs." Gericke v. Begin, 753 F.3d 1, 7 (1st Cir. 2014) (quotation omitted); see Mills v. Alabama, 384 U.S. 214, 218–19 (1966); cf. Tobey v. Jones, 706 F.3d 379, 391 (4th Cir. 2013). "Protecting that right of information gathering not only aids in the uncovering of abuses, but also may have a salutary effect on the functioning of government more generally." Gericke, 753 F.3d at 7; see Project Veritas Action Fund v. Rollins, 982 F.3d 813, 831 (1st Cir. 2020), petition for cert. filed, (U.S. May 17, 2020) (No. 20-1598).

**\*4** Several federal circuit courts have held that the First Amendment generally protects the right to record the police in performing their public duties. See Fields v. City of Phila., 862 F.3d 353, 355–56, 358–60 (3d Cir. 2017) (taking pictures with a camera and iPhone camera); Turner, 848 F.3d at 683-84, 690 (videotaping); Gericke, 753 F.3d at 3–4, 7–9 ("audio-video record[ing]" with a camera); Am. Civ. Liberties Union of Ill. v. Alvarez, 679 F.3d 583, 595–97 (7th Cir. 2012) ("[a]udio recording"); Glik, 655 F.3d at 79–80, 82–83 (video recording on cell phone); Smith v. City of Cumming, 212 F.3d 1332, 1332–33 (11th Cir. 2000) (videotaping); Fordyce v. City of Seattle, 55 F.3d 436, 438 (9th Cir. 1995) (same). This court agrees with that general principle and assumes without deciding that on October 9, 2018, the First Amendment entitled Sharpe to record the traffic stop from inside the car during the traffic stop. However, the United States Court of Appeals for the Fourth Circuit has not yet addressed whether the First Amendment protects the right to record the

2021 WL 2907883

police in performing their public duties, let alone whether the First Amendment protects the right of a person from inside a stopped car to livestream the police performing a traffic stop. See Szymecki v. Houck, 353 F. App'x 852, 852 (4th Cir. 2009) (per curiam) (unpublished); Hulbert v. Pope, No. SAG-18-00461, 2021 WL 1599219, at *8 (D. Md. Apr. 22, 2021) (unpublished), appeal docketed, No. 21-1608 (4th Cir. May 24, 2021).

Sharpe contends that the cases from other federal circuit courts holding that the First Amendment includes a right to record the police performing their public duties established his right to livestream the traffic stop from inside the stopped car on October 9, 2018. See Compl. ¶¶ 35–36; [D.E. 39] 6–10. These cases, however, do not address, much less resolve Sharpe's claim. Recording a traffic stop for publication after the traffic stop versus livestreaming an ongoing traffic stop from inside the stopped car during the traffic stop are significantly different. See [D.E. 33] 9–11 (describing the significant differences between recording and livestreaming). Indeed, during the traffic stop, Ellis made precisely this distinction. Ellis told Sharpe he could record the traffic stop from inside the stopped car during the traffic stop, but that he could not livestream it. See Pl.'s Ex. A [D.E. 1-2] 19–20. Notably, recording a public interaction with the police preserves that interaction for the recorder's later use. In contrast, livestreaming the interaction from inside the stopped car during the traffic stop contemporaneously broadcasts the interaction to another recipient. Moreover, broadcasting the interaction from inside the stopped car during the traffic stop in real-time with contemporaneous geolocation information conveys both the interaction and the location where it is occurring. Furthermore, contemporaneous messaging allows the individual livestreaming, and those watching, to know the location of the interaction, to comment on and discuss in real-time the interaction, and to provide the perspective from inside the stopped car. The perspective from inside the stopped car, for example, would allow a viewer to see weapons from inside the stopped car that an officer might not be able to see and thereby embolden a coordinated attack on the police. Although Sharpe cites cases recognizing a First Amendment right to record the police performing their public duties, Sharpe cites no authority to support his contention that on October 9, 2018, the First Amendment provided a right to livestream a traffic stop from inside the stopped car during the traffic stop. Cf. [D.E. 39] 6–7.

As mentioned, the Fourth Circuit has not yet recognized a First Amendment right to record police performing their

public duties, much less to livestream a traffic stop from inside the stopped car during the traffic stop. Cf. Szymecki, 353 F. App'x at 852. Telling, even the federal circuit courts that have recognized a right to record the police performing their public duties have explicitly declined to address "the limits of this constitutional right." Fields, 862 F.3d at 360; see Turner, 848 F.3d at 690; Gericke, 753 F.3d at 7–9. For example, the Third Circuit opined that an activity "interfer[ing] with police activity" such that the recording "put[s] a life at stake" might not be protected. Fields, 862 F.3d at 360. Likewise, the United States District Court for the District of Maryland recognized the First Amendment right to record police performing their public duties, but held that such recording is subject to time, place, and manner restrictions. See Hulbert, 2021 WL 1599219, at *8. In light of existing precedent and the differences between recording and livestreaming from inside the stopped car during the traffic stop, the court rejects Sharpe's argument that the First Amendment provided him a right to livestream a traffic stop from inside the stopped car on October 9, 2018. Accordingly, the court holds that Sharpe has failed to allege a deprivation of a right secured by the Constitution or laws of the United States on October 9, 2018. Thus, the court grants defendants' motion for judgment on the pleadings.

**\*5** Alternatively, Sharpe's claim fails because the alleged policy survives intermediate scrutiny. The validity of Sharpe's section 1983 claim hinges on his allegations that the Town of Winterville has an unconstitutional policy that prohibited Sharpe from livestreaming his encounter with the police officer during the traffic stop from inside the stopped car on October 9, 2018. See Compl. ¶ 41. As alleged, this policy restricted protected speech in public fora, and the court applies the "time, place, and manner doctrine" to determine whether the policy violates the First Amendment. Ross v. Early, 746 F.3d 546, 552 (4th Cir. 2014); see Fields, 862 F.3d at 360; Turner, 848 F.3d at 690; Gericke, 753 F.3d at 7-9; Alvarez, 679 F.3d at 605; Glik, 655 F.3d at 84; Smith, 212 F.3d at 1333. The policy is content-neutral because it is "justified without reference to the content of the regulated speech." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quotation omitted); see Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984). Accordingly, the court analyzes whether the policy is "narrowly tailored to serve a significant governmental interest, and ... leave[s] open ample alternative channels for communication of the information." Ward, 491 U.S. at 791 (1989) (quotation omitted); see Clark, 468 U.S. at 293; Ross, 746 F.3d at 552. A policy is narrowly tailored if it "promotes a substantial government interest" and

Sharpe v. Ellis, Slip Copy (2021)

2021 WL 2907883

"does not burden substantially more speech than is necessary to further the government's legitimate interests." Ross, 746 F.3d at 552-53; see Ward, 491 U.S. at 791, 799; United States v. Albertini, 472 U.S. 675, 689 (1985).

The court first determines whether the alleged policy promotes "a substantial government interest" Here, the alleged purpose of the policy is officer and public safety. See Pl.'s Ex. A [D.E. 1-2] 17, 19–20 (Helms and Meyers told Sharpe that he could not livestream from inside the car during the traffic stop because livestreaming threatens officer and public safety).[2] The public has a "paramount interest in officer safety" and public safety. United States v. Stanfield, 109 F.3d 976, 979–80 (4th Cir. 1997); see Wilson, 519 U.S. at 412 (stating that the public interest in officer safety is "both legitimate and weighty" (quotation omitted)); Mahoney v. Sessions, 871 F.3d 873, 882 (9th Cir. 2017). Indeed, this substantial interest in officer and public safety is more pronounced during traffic stops where the Supreme Court repeatedly has recognized that police officers face unique dangers and that those dangers carry over to the public. See Rodriguez v. United States, 575 U.S. 348, 356–57 (2015); Johnson, 555 U.S. at 330-32; Wilson, 519 U.S. at 413–14; Michigan v. Long, 463 U.S. 1032, 1047–48 (1983).

2      "[W]hen it is obvious that a challenged law serves a significant governmental interest, ... the government [is not required] to produce evidence" demonstrating that the law serves a substantial government interest. Billups v. City of Charleston, 961 F.3d 673, 685 (4th Cir. 2020). Rather, the government may demonstrate a significant interest "by reference to case law." Reynolds v. Middleton, 779 F.3d 222, 228 & n.4 (4th Cir. 2015). Here, the pleadings and case law demonstrate that the Town of Winterville's policy serves its substantial interest in officer and public safety. A review of Sharpe's video indicates that Sharpe's livestreaming from inside the stopped car permitted live broadcast from inside the car of the officers' movements, the perspective from within the stopped car, real-time comments from viewers, and geolocation data. See https://www.facebook.com/ d.r.sharpe/videos/2251012878304654/ (last visited Aug. 14, 2020). These features undermine an officer's ability to exercise "command of the" traffic stop, thereby increasing the risks to officers and the public. Arizona v. Johnson, 555 U.S. 323, 330 (2009); see Maryland v. Wilson, 519 U.S. 408,

414 (1997); Michigan v. Summers, 452 U.S. 692, 702–03 (1981); see also United States v. Fager, 811 F.3d 381, 388–89 (10th Cir. 2016) (describing the increased threat of "coordinated attack[s]" on officers in the context of traffic stops); Bureau of Justice Assistance, Developing a Policy on the Use of Social Media in Intelligence and Investigative Activities: Guidance and Recommendations 1 (2013), https://bja.ojp.gov/sites/g/files/xyckuhl86/ files/media/document/ developing_a_policy_on_the_use_of_social_media_in_intelligence (last visited July 9, 2021) ("Social media sites are increasingly being used to instigate or conduct criminal activity[.]"). Accordingly, the alleged policy serves the substantial government interest of protecting officer and public safety because the policy eliminates a form of individual conduct from inside the stopped car that increases risks to officer and public safety. See Ross, 746 F.3d at 555–56.

*6   Next, the court determines whether the policy "burdens substantially more speech than is necessary to further the government's legitimate interests." Ross, 746 F.3d at 557 (alteration and quotation omitted). To satisfy this standard, the alleged policy need not be "the least restrictive or least intrusive means." Ward, 491 U.S. at 798; see Turner, 848 F.3d at 690; Reynolds, 779 F.3d at 226. "So long as the means chosen are not substantially broader than necessary to achieve the government's interest ... the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Ward, 491 U.S. at 800; see Am. Entertainers, L.L.C. v. City of Rocky Mount, 888 F.3d 707, 717 (4th Cir. 2018); Ross, 746 F.3d at 557. Moreover, a policy is not "invalid simply because there is some imaginable alternative that might be less burdensome on speech." Albertini, 472 U.S. at 689.

Viewing the pleadings in the light most favorable to Sharpe, the alleged policy prohibited livestreaming a police encounter from inside the stopped car during the traffic stop. As such, the policy is limited in scope and duration in that it only prohibited livestreaming from inside the stopped car during the traffic stop. Notably, the policy does not ban recording police officers from inside the stopped car during the traffic stop. See Pl.'s Ex. A [D.E. 1-2] 20-21 ("If you were recording, that is just fine.... We record, too."). The policy also does not prohibit a person who is not the subject of the traffic stop and who is not inside the stopped car from recording and livestreaming the traffic stop. Accordingly, "[o]n its face,

2021 WL 2907883

the [p]olicy does no more than target and eliminate the exact source of the evil it seeks to remedy." Ross, 746 F.3d at 557 (alterations and quotations omitted); see Frisby v. Schultz, 487 U.S. 474, 485 (1988). Given the substantial officer and public safety interest, the policy achieves the government's substantial interest by increasing officers' command of those inside the stopped car during the traffic stop by removing features such as live video, real-time commenting, and geolocation data, from being used from inside the stopped car to coordinate an attack on the officers and the public. "[T]herefore, it is apparent that the [policy] directly furthers the [Town's] legitimate governmental interests and that those interests would have been less well served in the absence of the [policy preventing livestreaming]." Ward, 491 U.S. at 801; see Albertini, 472 U.S. at 688–89. [3] Accordingly, the alleged policy is not "substantially broader than necessary to achieve the government's interest." Am. Entertainers, 88 F.3d at 717 (quotation omitted). Thus, the court holds that the Town of Winterville's alleged policy is narrowly tailored to serve a substantial government interest.

[3]      Sharpe does not argue that there are less intrusive ways for the Town to achieve its officer and public safety interests. Cf. [D.E. 39] 6–10. Moreover, in light of the concerns associated with livestreaming from inside the stopped car during the traffic stop, there appear to be no less intrusive ways of achieving the public interest in officer and public safety short of barring the use of livestreaming from inside the stopped car during the traffic stop. Accordingly, the court concludes that defendants are not required to present proof that the Town tried other methods to address its officer and public safety concerns in order to demonstrate narrow tailoring. Cf. McCullen v. Coakley, 573 U.S. 464, 494–97 (2014) (requiring the government to present proof that it tried less intrusive methods where less intrusive means were actually available); Reynolds, 779 F.3d at 231–32 (same).

**\*7** Finally, the court analyzes whether the policy leaves open "ample alternative channels for communication of the information." Ward, 491 U.S. at 791; see Ross, 746 F.3d at 559. To satisfy this standard, the available alternatives need not "be the speaker's first or best choice or provide the same audience or impact for the speech." Ross, 746 F.3d at 559 (alteration and quotation omitted); Gresham v. Peterson, 225 F.3d 899, 906 (7th Cir. 2000). Instead, the relevant inquiry

focuses on whether the challenged policy "provides avenues for the more general dissemination of a message." Ross, 746 F.3d at 559 (quotation omitted); see Green v. City of Raleigh, 523 F.3d 293, 305 (4th Cir. 2008).

The alleged policy allows Sharpe to record the police encounters from inside the stopped car for later use, such as posting to Facebook a video recorded from inside the stopped car during the traffic stop or submitting the video to media outlets for broadcast. See Pl.'s Ex. A. [D.E. 1-2] 20-21 ("If you were recording, that is just fine.... We record, too."). As such, the policy does not "hinder [Sharpe's] ability to disseminate [his] message." Ross, 746 F.3d at 559. The policy also does not prohibit any person not inside the stopped car from recording and livestreaming the traffic stop. Thus, the policy leaves open ample alternatives of communication. Accordingly, the court holds that the alleged policy survives intermediate scrutiny and that the defendants are entitled to judgment as a matter of law.

### C.

Sharpe also moves for entry of final judgment concerning this court's August 20, 2020 order dismissing Sharpe's section 1983 claim against Helms in his individual capacity. See [D.E. 34]; Fed. R. Civ. P. 54(b). In cases involving multiple claims or multiple parties, a "court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). All claims between the parties have been resolved, and the court's judgment is now final. Thus, the court dismisses as moot Sharpe's Rule 54(b) motion.

### III.

In sum, the court GRANTS defendants' motion for judgment on the pleadings [D.E. 36] and DISMISSES AS MOOT plaintiff's motion for entry of final judgment [D.E. 34]. The clerk shall close the case.

SO ORDERED. This 9th day of July 2021.

**All Citations**

Slip Copy, 2021 WL 2907883

2021 WL 2907883

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

2020 WL 3439558

2020 WL 3439558
Only the Westlaw citation is currently available.
United States District Court, W.D. North Carolina,
Statesville Division.

Charles BENZING, Plaintiff,
v.
State of NORTH CAROLINA, North Carolina
Department of Public Safety (NCDPS),
Anne L. Precythe, Karey Scott Treadway,
Amy Runyan Sweatt, Leslie Deane Ewald,
Tasha Deshawn Lockridge, Defendants.

CIVIL ACTION NO. 3:17-CV-000619-KDB-DCK
|
Signed 06/23/2020

**Attorneys and Law Firms**

Charles Benzing, Charlotte, NC, pro se.

Alex R. Williams, NC Department of Justice Public Safety
Section, Shannon John Cassell, Yvonne Bulluck Ricci, North
Carolina Department of Justice, Raleigh, NC, for Defendants.

**ORDER**

Kenneth D. Bell, United States District Judge

**\*1 THIS MATTER** is before the Court on both Plaintiff and
Defendants' Motions for Summary Judgment on all claims
(Docs. No. 58 and 59). The Court has carefully considered
these motions and the parties' briefs and exhibits. For the
reasons discussed below, the Court will **GRANT** summary
judgment to the Defendants and **DENY** the Plaintiff's motion.

Plaintiff Charles Benzing ("Benzing") alleges various
constitutional violations based on his arrest, state conviction
and sentence for criminal contempt and subsequent probation
restrictions. The Defendants are the State of North Carolina
("State"), North Carolina Department of Public Safety
("NCDPS") and a number of NCDPS employees, including
Anne L. Precythe ("Precythe") (former Director), Karey Scott
Treadway ("Treadway") (District Manager), Amy Runyan
Sweatt ("Sweatt") (Chief Probation Officer), Leslie Deane
Ewald ("Ewald") (Probation Officer) and Tasha Deshawn
Lockridge ("Lockridge") (Probation Officer). The Court finds
that there is no dispute as to any material facts and Defendants

are entitled to judgment as a matter of law because Plaintiff
is not entitled to collaterally attack his criminal sentences
or otherwise have this Court second guess the decisions of
the state courts. Further, he cannot maintain his claims under
42 U.S.C. § 1983 or 42 U.S.C. § 1985 because none of the
actions allegedly taken by Defendants constitute a violation
of his constitutional rights. Finally, even if a violation had
occurred, Defendants would be entitled to qualified immunity
or Plaintiff's claims would be barred under the Eleventh
Amendment as discussed below. Accordingly, summary
judgment will be awarded to Defendants on all of Plaintiff's
claims.

**I. LEGAL STANDARD**

Summary judgment must be granted "if the movant shows
that there is no genuine dispute as to any material fact and
the movant is entitled to judgment as a matter of law." Fed.
R. Civ. P. 56. A factual dispute is considered genuine "if the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 248 (1986). "A fact is material if it might affect
the outcome of the suit under the governing law." *Vannoy v.
Federal Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th
Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d
308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden
of demonstrating the absence of a genuine issue of material
fact through citations to the pleadings, depositions, answers
to interrogatories, admissions or affidavits in the record. *See
Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bouchat
v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522
(4th Cir. 2003). "The burden on the moving party may be
discharged by 'showing' ... an absence of evidence to support
the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once
this initial burden is met, the burden shifts to the nonmoving
party. The nonmoving party "must set forth specific facts
showing that there is a genuine issue for trial," *Id.* at 322 n.3.
The nonmoving party may not rely upon mere allegations or
denials of allegations in his pleadings to defeat a motion for
summary judgment. *Id.* at 324.

**\*2** When ruling on a summary judgment motion, a court
must view the evidence and any inferences from the evidence
in the light most favorable to the nonmoving party. *Tolan v.
Cotton*, 572 U.S. 650, 657 (2014); *see also Anderson*, 477
U.S. at 255. "Summary judgment cannot be granted merely
because the court believes that the movant will prevail if
the action is tried on the merits." *Jacobs v. N.C. Admin.*

*Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)). "The court therefore cannot weigh the evidence or make credibility determinations." *Id.* at 569 (citing *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 352 (4th Cir. 2007)).

However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Also, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Id.* If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.* at 249-50.

In the end, the question posed by a summary judgment motion is whether the evidence as applied to the governing legal rules "is so one-sided that one party must prevail as a matter of law." *Id.* at 252.

Finally, in reviewing Defendant's filing, the Court is mindful that *pro se* filings are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). However, Defendant's *pro se* status does not "give this Court license to serve as *de facto* counsel for him or to rewrite otherwise deficient pleadings on his behalf in order to sustain an action." *Dexter v. Alabama*, No. 08-0427, 2008 WL 2941156, at * 1 n.1 (S.D. Ala. July 24, 2008).

## II. FACTS AND PROCEDURAL HISTORY

On January 27, 2014, Plaintiff Charles Benzing was sentenced to thirty-six months of supervised probation in Wake County Superior Court in North Carolina as a result of criminal contempt violations related to his conduct in connection with domestic disputes. Benzing appealed his conviction to the North Carolina Court of Appeals, where his appeal and request for further review was denied. The "Regular Conditions of Probation" imposed by the state court included that he must remain within the jurisdiction of the Court unless granted written permission to leave by the Court or probation officer, that he must report to the probation office at reasonable times, places and in a reasonable manner, and that he was not allowed to obtain a firearm.

On March 23, 2015, Defendant Lockridge met with Benzing in the Mecklenburg County probation office in Charlotte for his initial office visit. In that meeting, they reviewed the conditions of Benzing's probation and the conditions of probation were provided to Plaintiff in writing, which he acknowledged. Benzing was told that he was expected to comply with the conditions in the court's judgment, which could not be changed by the probation office. Defendant Lockridge and the other probation officers testified that they always believed that the court judgment against Benzing was valid, and there is no evidence suggesting otherwise.

**\*3** Plaintiff was, however, unhappy with several of the conditions of probation, including requirements that he report to the probation office, that he could not leave the state without permission from the probation officer, and that home visits were necessary. Indeed, Benzing alleges that Defendants Lockridge's required home visits were done with the intent to "embarrass and/or humiliate" him. Benzing also made other complaints against the Mecklenburg County probation staff during the course of his supervised probation; however, no action was taken as the staff believed the claims to be baseless.

The Mecklenburg County probation office in Charlotte prohibits the use of cell phones in the office. At all relevant times, the probation office had signage posted stating, "Please turn off cell phones before entering. Thank you." Further, Benzing was instructed on several occasions by Defendants Lockridge, Sweatt and Treadway that video and audio recordings were prohibited at the probation office and that he would need to turn off his cell phone upon entering the office due to security and confidentiality reasons. On July 29, 2015, Benzing was in the lobby of the probation office recording with his cell phone and was asked to stop recording. Benzing refused to stop recording and began yelling and screaming that he had the right to use his cell phone to record in the office. As a result, Benzing was taken into custody for failure to report in a reasonable manner and for the failure to turn off his cellphone as requested. On October 27, 2015, Benzing appeared in court with counsel and admitted to the violations of his probation. Together with an order requiring Benzing to apologize for his behavior, the state court then ended Benzing's term of probation.

On October 24, 2017, Plaintiff filed this action, *pro se*, alleging violations of his constitutional rights. The Defendants in Plaintiff's original Complaint were NCDPS,

2020 WL 3439558

Treadway, Sweatt, and Lockridge. On October 30, 2017, Plaintiff filed a First Amended Complaint, adding the State as a defendant. On April 19, 2018, Plaintiff filed a Second Amended Complaint, adding Defendant Ewald. After answers were filed denying the allegations, the case proceeded until on December 3, 2018, Plaintiff and Defendants filed their first separate Motions for Summary Judgment.

On July 27, 2018, Plaintiff filed a second action entitled *Benzing v. State*, 3:18-cv-00414-KDB-DSC, in which he alleged claims against Mike Slagel, NCDPS, and Anne Precythe. On January 29, 2019, the Court consolidated the two cases and ordered Plaintiff to file an Amended Complaint consolidating all the claims and defendants. On November 11, 2019, Plaintiff filed his Third Amended Complaint, which did not include claims against prior defendant Slagel, but reprised his statutory claims against the other Defendants under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 based on numerous alleged violations of his "civil rights" and "civil liberties" related to his arrests, criminal sentences, probation conditions and the prohibited use of his cell phone in the probation office. Defendants answered this consolidated Complaint, denying its allegations. On May 4 and 6, 2020, the parties filed cross motions for summary judgment, which are now ripe for decision.

### III. DISCUSSION

Plaintiff describes his alleged unconstitutional and illegal treatment by the State of North Carolina from 2009 to 2015 and the alleged ongoing effect of that conduct on his life in a wide-ranging narrative; however, his legal claims are all asserted under 42 U.S.C. § 1983 and 42 U.S.C. § 1985, federal statutes which provide a civil remedy in appropriate circumstances for the violation of constitutional rights by the state or public officials.

**\*4** Plaintiff's Section 1985 claims need be addressed only briefly. In order to prove a conspiracy in violation of 42 U.S.C. § 1985(3), a plaintiff must show, among other things, that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68 (1993). Plaintiff's Complaint makes no allegations about racial or class discrimination nor has any sworn record evidence of such discrimination been proffered to the Court. Therefore, Defendants are entitled to summary judgment on Plaintiff's Section 1985 claims.

A claim under 42 U.S.C. § 1983 requires proof that: 1) a person has been deprived of a federal right; and 2) the person who deprived him of the federal right acted under the color of state or territorial law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Thus, liability under Section 1983 "attaches only to those wrongdoers 'who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it.' " *National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988) (quoting *Monroe v. Pape*, 365 U.S. 167, 172 (1961)). Defendants do not contend that their allegedly wrongful conduct was not pursued under color of state law; rather, as discussed below, they argue that they are entitled to at least qualified immunity for acting within the bounds of their state authority. Therefore, the issue before the Court with respect to Plaintiff's Section 1983 claim is whether Plaintiff has raised a triable issue on whether he has been deprived of his constitutional rights. As discussed below, [1] he has not.

[1]    In addition to the defenses discussed below, Defendants argue that Plaintiff's claims against Defendant Precythe are barred by the statute of limitations and the claims against the State, NCDPS, Treadway and Precythe cannot proceed because the claims are all related to their supervisory roles. *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691(1978) (Defendants cannot be held liable under Section 1983 on a *respondeat superior* theory). For the reasons discussed below, there are ample other grounds supporting summary judgment for the Defendants so the Court need not reach these alternate arguments for summary judgment.

With respect to the Defendants' alleged violations of his "civil rights," Plaintiff alleges that Defendants are liable for his arrests, the imposition of his criminal sentences and probation restrictions and taking action against him for using his cell phone in the probation office. With respect to the violation of his "civil liberties," Plaintiff claims that various Defendants have violated the First, Second, Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution as follows:

First Amendment – Plaintiff alleges that Defendant Lockridge forcing Plaintiff to turn off his cell phone while at the probation office violates the First Amendment.

Second Amendment - Plaintiff contends that his cell phone is an "arm" under the Second Amendment's "right to bear

2020 WL 3439558

arms" so Defendant Lockridge's refusal to allow Plaintiff to carry his cell phone violates the Second Amendment. Plaintiff alleges a violation of his Second Amendment rights by Judges Croom and Collins in sentencing him to probation because this prevented him from being able to purchase a handgun.

Fourth Amendment - Plaintiff alleges three searches of his belongings by Defendant Lockridge were unlawful. Also, Plaintiff asserts that his arrest at the probation office for continued recording with his cell phone was in violation of his Fourth Amendment rights.

**\*5** Fifth Amendment – Plaintiff alleges that his Fifth Amendment rights were violated when Judge Collins proceeded with a hearing while his other case was still in the appeals process and when Judge Collins and Judge Croom sentenced Plaintiff for the same crime.

Eighth Amendment – Plaintiff claims that Judge Croom resentencing him to unsupervised probation and requiring that he take parenting classes and Judge Collins sentencing him to supervised probation violates the Eighth Amendment.

Fourteenth Amendment – Defendants allegedly violated the Fourteenth Amendment by restricting his ability to travel and requiring him to appear at the probation office. Also, Defendants Lockridge, Sweatt, and Ewald allegedly perjured themselves in their accounts on the Probation Violation Reports when he was arrested.

Each of these claims will be discussed in turn.

### Claims Related to Arrests, Criminal Sentences and Probation Restrictions

Plaintiff asserts numerous claims relating to his arrest, conviction and the sentences imposed by Judges Croom and Collins. However, recovery of damages is not allowed under Section 1983 for an unconstitutional conviction, imprisonment, or other harm caused by actions whose unlawfulness would render the conviction or sentence unlawful, unless he can "prove that the underlying conviction has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus". *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994).

Neither of the underlying convictions for criminal contempt nor Plaintiff's conviction for probation violations have been reversed, expunged, declared invalid, or questioned on habeas review, and therefore these claims must be dismissed in accordance with *Heck*; to hold otherwise would allow an impermissible collateral attack on Plaintiff's convictions through a Section 1983 claim. *Heck*, 512 U.S. at 486-87. Further, "it is always true of probationers ... that they do not enjoy 'the absolute liberty to which every citizen is entitled, but only ... conditional liberty properly dependent on observance of special [probation] restrictions.' " *Griffin v. Wisconsin* 483 U.S. 868, 874 (1987) (citing *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)); *see also United States v. Dotson*, 324 F.3d 256, 260 (4th Cir. 2003) (stating that district courts have broad discretion in fashioning terms of supervised release as long as the condition is "reasonably related" to the statutory factors in § 3583(d)). Therefore, the imposition of the "Regular Conditions of Probation" on Plaintiff cannot give rise to liability under Section 1983 where, as here, the validity of the underlying conviction is not subject to collateral challenge.

### Claims Related to the First and Second Amendment

Plaintiff claims that the requirement by Defendant Lockridge to turn off his cell phone while attending his meetings in the probation office is a violation of his First Amendment right to free speech. While the Fourth Circuit has not decided this issue in a published decision,[2] other courts have ruled that there is no absolute First Amendment right to record public officials conducting their duty, *see Mocek v. City of Alburquerque*, 813 F.3d 912, 931 (10th Cir. 2017) (compiling cases and declining to find a "First Amendment right to record law enforcement officers in public") and those that do recognize a right to record the conduct of public officials (usually in the context of an encounter with the police in a public place) still subject the right to reasonable time, manner and place restrictions, *see Gilk v. Cunniffee*, 655 F.3d 78, 84 (1st Cir. 2011) citing *Smith v. City of Cumming*, 212 F.3d 1332, 1332 (11th Cir. 2000) (finding that there is a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct).

[2]     In an unpublished decision, *Szymecki v. Houck*, 353 Fed. App'x. 852 (4th Cir. 2009), the Fourth Circuit held that as of the filing of that decision there was not a clearly established constitutional right in this circuit to record law enforcement activities.

**\*6** More specific to the facts and limited issue presented here, courts have upheld restrictions on the use of cell phones in government buildings. *See Hodge v. Bd. of Cty. Comm'rs,*

No. CIV.A. RWT-10-2396, 2010 WL 4068793 (D. Md. Oct. 15, 2010), aff'd, 414 F. App'x 567 (4th Cir. 2011) ("[t]his court takes notice that cell phones can be used to photograph and/or record closed or sensitive proceedings for unlawful purposes, and prohibition of cell phones in courts and public buildings is a common precaution.... there is no First Amendment "right to communication" that guarantees a right to carry cellular phones in government buildings."); *Sheets v. City of Punta Gorda, Fla.*, 415 F. Supp. 3d 1115 (M.D. Fla. 2019) (citizen failed to demonstrate that city ordinance, which precluded video and sound recording without consent in city hall and city hall annex, limited public forums, was unreasonable restriction on speech in violation of the First Amendment); *Rouzan v. Dorta*, No. EDCV 12-1361-BRO JPR, 2014 WL 1716094 (C.D. Cal. Mar. 12, 2014), report and recommendation adopted, No. EDCV 12-1361-BRO JPR, 2014 WL 1725783 (C.D. Cal. May 1, 2014) (holding that defendant did not have a First Amendment right to record officials in a courthouse walkway, noting the absence of a right to record more important judicial proceedings and distinguishing the restriction from a First Amendment right to record police officers carrying out their duties in a public place). Indeed, this Court restricts the possession and usage of cell phones in the courthouse. *See* LCvR 83.3.

Accordingly, the Court declines to find that Plaintiff had an absolute First Amendment right to carry and use a cell phone in the Mecklenburg County probation office. [3] The state's "viewpoint neutral" and generally applicable restriction on the use of cell phones in the probation office did not limit Plaintiff's right to speak and was "reasonable in light of the purpose served by the forum." *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 806 (1985). Therefore, Defendants did not violate Plaintiff's First Amendment rights in enforcing the challenged restriction on cell phones.

[3]     The broader issue of the full scope of First Amendment's protection for the recording of the conduct of police and other officials in a public place is not before the Court and the Court need not and does not express any opinion on that issue.

Plaintiff bases his claim under the Second Amendment on his contention that his cell phone is a weapon which he contends is an "arm" for purposes of the Second Amendment because he uses its recording capability to "defend" himself. The Supreme Court has defined the "arms" protected by the Second Amendment as "weapons of offence, or armour of defence" or "anything that a man wears for his defence, or

takes into his hands, or useth in wrath to cast at or strike another." *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008). *Heller* defined the term "to keep arms" to mean "to have weapons" and "to bear arms" as to "carr[y] weapons." *Id.* at 582. Based on the Court's definition of "arms," the Plaintiff has failed to show that his right to use and keep his cell phone qualifies as an "arm" protected under the Second Amendment because even though a cell phone can be used to summon help or record a crime it is not a "weapon" of either offense or defense. Indeed, Plaintiff has not cited, nor has the Court found, any authority to support Plaintiff's argument that a cell phone can qualify as a weapon under the Second Amendment.

Plaintiff's last argument under the Second Amendment is that the State court violated the amendment by restricting him from possessing a firearm as a condition of probation. The Court finds that this is a reasonable restriction in connection with Plaintiff's criminal contempt conviction relating to an angry domestic dispute. Indeed, probation restrictions related to firearms are part of both the federal and state statutes related to conditions of probation. *See* 18 U.S.C. § 1563(b)(8); N.C. Gen.Stat. § 15A-1343(b)(5).

Thus, summary judgement will be granted in favor of the Defendants on Plaintiff's claims that the First and Second Amendment protect his use of his cell phone or right to possess a firearm under the particular facts presented in this action.

Claims Related to the Fourth Amendment

**\*7** Plaintiff alleges three different occasions when Defendant Lockridge performed a search of his belongings in violation of his Fourth Amendment rights. The Fourth Circuit has held that North Carolina's probation conditions allowing for warrantless searches are valid and enforceable. *United States v. Midgette*, 478 F.3d 616, 623 (4th Cir. 2007). Further, the Fourth Circuit has held that searches conducted in conformity with N.C. Gen. Stat. § 15A—1343(b)(7) are reasonable under the Fourth Amendment. *Midgette*, 478 F.3d at 624. Therefore, Plaintiff has not established that there was a violation of his Fourth Amendment rights based on Defendant Lockridge's searches.

In addition, Plaintiff alleges that in arresting him, Defendant Lockridge violated his Fourth Amendment rights by arresting him and seizing his cell phone when he refused to stop recording in the probation office. As discussed above, the State's policy of prohibiting use of cell phones in the probation

office is not unlawful. Therefore, Plaintiff's arrest for, *inter alia*, [4] refusing to turn off his cell phone did not violate his rights under the Fourth Amendment.

[4]   Plaintiff was arrested for failure to turn off his cellphone as instructed and for failure to report in a reasonable manner. North Carolina law allows courts to require probationers to report to his/her probation officer at "reasonable times and place and in a reasonable manner." *See State v. Lewis*, 188 N.C. App. 633 (2008); *State v. Coffey*, 74 N.C. App. 137 (1985). Additionally, Benzing was taken into custody for failure to report to probation as instructed and for failure to enroll in and complete the Safe Child program, both of which were valid conditions of his supervised release.

Claims Related to the Fifth Amendment
Plaintiff alleges that his Fifth Amendment rights were violated by the timing of his state court hearing before Judge Collins and his sentencings by Judge Collins and Judge Croom. However, as discussed above, Plaintiff cannot challenge that hearing or his State court sentencings in this Court because none of the alleged unlawful conduct has been reversed on direct appeal or otherwise called into question as discussed above. *See Heck*, 512 U.S. at 486-87. Therefore, Plaintiff cannot support his Section 1983 claim with his allegations of a violation of the Fifth Amendment.

Claims Related to the Eighth Amendment
As with Plaintiff's claims under the Fifth Amendment, Plaintiff's claims under the Eighth Amendment relate to the probationary sentence that the State court imposed. Again, those sentences were not successfully challenged on direct appeal and have not otherwise been overturned or called into question. *See Heck*, 512 U.S. at 486-87. Therefore, Plaintiff's claims based on the Eighth Amendment cannot survive summary judgment.

Claims Related to the Fourteenth Amendment
Finally, Plaintiff contends that Defendants violated the Fourteenth Amendment by restricting his ability to travel and requiring him to appear at the probation office. Invocation of the Fourteenth Amendment's due process guarantees requires a showing that the State deprived Plaintiff of a protected liberty or property. *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972). Plaintiff alleges that Defendants Lockridge and

Sweatt restricted his travel in violation of his Fourteenth Amendment rights. However, one of Plaintiff's conditions of supervised release was that he was not to travel outside of the state without written permission from his probation officer. As stated above, probationers do not enjoy unlimited freedom and this condition of probation has been upheld by the Fourth Circuit. *See Griffin* 483 U.S. at 874; *Midgett*, 478 F.3d at 620. Accordingly, restricting Plaintiff's ability to travel does not violate his right to due process under the Fourteenth Amendment. *See Donoghue v. N.C. Dept. of Corr.*, 166 N.C. App. 612, 617 (2004) (requiring a probationer to "remain within the jurisdiction of the court" was a regular condition of probation); *State v. Sigmon*, 157 N.C. App. 143 (2003) (same); *Midgette*, 478 F.3d at 620 (same).

**\*8** Further, the home visits that Plaintiff alleges were intended to "embarrass and/or humiliate" him are, according to Defendants, simply an even-handed standard policy requirement and, in any event, are a valid probation policy and restriction. Because there is no genuine issue of material fact concerning the lawfulness of the "home visits" related to Plaintiff's probation, this condition similarly does not give rise to potential liability under Section 1983.

Finally, Plaintiff claims that Defendants Lockridge, Sweatt and Ewald perjured themselves. First, it is clear from the Orders on Violation of Probation that there was no perjury because the North Carolina Superior Court made a finding of fact that Plaintiff violated his probation. Second, Defendant Lockridge would be entitled to immunity for her testimony in a judicial proceeding. *See Wiley v. Mission Hosp.*, 2011 WL 6440562 at \*1-2 (W.D.N.C. Dec. 21, 2011) (citing *Briscoe v. LaHue*, 460 U.S. 325 (1983)). And, third, the North Carolina Supreme Court held that "criminal sanctions for perjury are available, and therefore, no tort recovery for perjury is allowable." *Henry v. Deen*, 310 N.C. 75, 88 (1984) (citing *Gilliken v. Springle*, 254 N.C. 240 (1961)). Therefore, Plaintiff's claims of perjury are not actionable under Section 1983, and instead, should have been raised during the criminal proceeding.

Qualified Immunity and the Eleventh Amendment
The Court does not find that there has been a violation of Plaintiff's federal rights. However, the Defendants allege that even if any of Plaintiff's claims gave rise to a cause of action, they are shielded from a claim under Section 1983 because of qualified immunity and/or the Eleventh Amendment. The Court agrees.

Benzing v. North Carolina, Slip Copy (2020)

2020 WL 3439558

The doctrine of qualified immunity protects government officials from actions for civil damages as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When a defendant moves for summary judgment on the ground that he enjoys qualified immunity from a claim under 42 U.S.C. § 1983, a court "must first ask the legal question of whether the plaintiff has alleged a violation of clearly established law of which a reasonable official would have known." *Lopez v. Robinson*, 914 F.2d 486 (4th Cir. 1990). The Supreme Court has established a two-pronged test for qualified immunity: "1) whether a constitutional right has been violated on the facts alleged, and 2) whether the right was clearly established at the time so that it would be clear to an objectively reasonable officer that his conduct violated that right." *Saucier v. Katz*, 533 U.S. 194, 200-02 (2001).

Qualified immunity is structured to "reflect the concern that civil damages awards against public officials for every judicially determined violation of constitutional rights would prove too expensive to the public, discourage public service employment, and impair governmental decision-making." *Tarantino v. Baker*, 825 F.2d 772, 774 (4th Cir. 1987). As discussed above, Plaintiff has not proven that Defendants violated Plaintiff's rights, much less that Defendants violated any well-established rights secured to Plaintiff under North Carolina or federal law. Therefore, Defendants are entitled to summary judgment on the alternate ground of qualified immunity.

Finally, Section 1983 "does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivation of civil liberties." *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 66 (1989). The Eleventh Amendment "bars such suits unless the State has waived its immunity ... or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity." *Id.* Accordingly, NCDPS is routinely dismissed from lawsuits brought under Section 1983. *See, e.g., Wood v. Dept. of Pub. Safety*, 2019 WL 2502786 at *2 (W.D.N.C. June 17, 2019) (dismissing NCDPS under frivolity review); *Maldonado-Reynolds v. N.C. Dept. of Pub. Safety*, 2017 WL 1067796 at *1-2 (E.D.N.C. Jan. 3, 2017) (same).

*9 Although the Eleventh Amendment does not bar official capacity claims for injunctive relief against state officials,

claims for injunctions are moot unless there is a continuing issue between the parties. The Fourth Circuit has held had claims for injunctive relief are moot once a criminal defendant has served his sentence. *Clay v. Miller*, 626 F.2d 345, 347 (4th Cir. 1980); *see also Brinson v. Providence Comm. Corr.*, 703 Fed Appx. 874, 877 (11th Cir. 2017) (claim moot because probation terminated); *Daniels v. Brown*, 349 F. Supp. 1288, 1290 (E.D. Va. 1972) (same). Thus, any claim for injunctive relief by Plaintiff would be moot because his probation has been terminated.

The Eleventh Amendment is also applicable to state officers sued in their official capacity. *See Ford Motor Co. v. Dept. of Treasury*, 323 U.S. 459 (1945). "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office. As such, it is no different from a suit against the State itself." *Will*, 491 U.S. at 71. "State officials acting in their official capacity are therefore not 'persons' for the purposes of § 1983 and are not proper defendants to a § 1983 lawsuit." *Diggs v. Balogun*, 2017 WL 4921690 at *4 (D. Md. Oct. 31, 2017) (citing *Will*, 491 U.S. at 71). Therefore, Defendants are entitled to summary judgment for all of Plaintiff's official capacity claims under the Eleventh Amendment.

## IV. ORDER
**NOW THEREFORE IT IS ORDERED THAT:**

1. Plaintiff's Motion for Summary Judgment (Doc. No. 58) is hereby **DENIED**;

2. Defendants' Motion for Summary Judgment (Doc. No. 59) is hereby **GRANTED;**

3. Summary Judgment in favor of Defendants is entered on all of Plaintiff's claims; and

4. The Clerk is directed to close this matter in accordance with this Order.

**SO ORDERED ADJUDGED AND DECREED.**

## All Citations

Slip Copy, 2020 WL 3439558

---

          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   7

Case 1:21-cv-00559-CMH-TCB Document 19-1 Filed 10/29/21 Page 46 of 54 PageID# 145
Maliki v. City of Parkersburg, Slip Copy (2020)

2020 WL 4929025

2020 WL 4929025
Only the Westlaw citation is currently available.
United States District Court, S.D. West Virginia,
Charleston Division.

Majed Abdullah MALIKI, Plaintiff,
v.
CITY OF PARKERSBURG, et al., Defendants.

CIVIL ACTION NO.:19-cv-00520
|
Signed 06/29/2020

**Attorneys and Law Firms**

Majed Abdullah Maliki, Parkersburg, WV, pro se.

Duane J. Ruggier, II, Evan Shawn Olds, Pullin Fowler
Flanagan Brown & Poe, Charleston, WV, for Defendants.

**PROPOSED FINDINGS & RECOMMENDATION**

Dwane L. Tinsley, United States Magistrate Judge

**\*1** This matter is assigned to the Honorable Thomas
E. Johnston, Chief United States District Judge, and it is
referred to the undersigned United States Magistrate Judge
for submission of proposed findings and recommendations
for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF
No. 2.) Before this Court is the motion to dismiss filed
by Defendants City of Parkersburg (the "City"), Tom
Joyce ("Joyce"), Joseph Martin ("Martin"), Joshua Thrasher
("Thrasher"), Sergeant Powers ("Powers"), Officer Miller,
and John Doe officers #2 and #5 (collectively, "Defendants").
(ECF No. 20.) For the reasons explained more fully herein,
it is respectfully **RECOMMENDED** that the motion be
**GRANTED IN PART** and **DENIED IN PART**.

*I. BACKGROUND*

Plaintiff Majed Abdullah Maliki ("Plaintiff") brings this
action pursuant to 42 U.S.C. § 1983 and West Virginia state
law, alleging that Defendants "subjected [him] to unfair and
racially motivated acts of unlawful and unjust bigotry" by
removing him from city property, threatening him with arrest
or physical harm, and "issuing unjust citations" against him.
(ECF No. 18 at 3.) He avers that on June 2, 2018, A.C. Schaad

("Schaad"), a police officer for the City, was dispatched
to "an altercation" in an intersection involving a firearm.
(*Id.* at 7.) According to Plaintiff, Schaad remained in his
police cruiser without securing the firearm or detaining the
white male "pedestrian" who had the firearm. (*Id.*) However,
Plaintiff alleges that as he approached Schaad's cruiser and
announced that he intended to take out his cellphone to record
the incident, Schaad exited his cruiser and held Plaintiff at
gunpoint. (*Id.* at 7–8.) Then, according to Plaintiff, Thrasher
and John Doe #1, another police officer employed by the City,
arrived at the scene to arrest Plaintiff and "threatened [him]
with extremely graphic sexual physical violence." (*Id.* at 8.)
Plaintiff avers that his "body fluids" were unlawfully seized
without a warrant and that Thrasher obtained a search warrant
to seize Plaintiff's cellphone in retaliation for Plaintiff's
having recorded the incident. (*Id.*)

Plaintiff further alleges that on December 20, 2018, while he
was awaiting trial on the charges stemming from the June 2,
2018 incident, he was sitting in a chair reading paperwork—
presumably in a public building housing City offices—when
Powers and fellow City police officers John Doe #3 and John
Doe #4 approached him. (*Id.* at 10.) According to Plaintiff,
Powers "informed [Plaintiff] that this was his building and
that [Plaintiff] was disturbing his day" and "repeatedly tried to
belittle ... and intimidate [Plaintiff] while adamantly insisting
that [he] must be guilty of something." (*Id.*) Plaintiff alleges
that he asked Powers several times to leave him alone, but
Powers refused to do so and became "confrontational" and
"aggressive" and threatened to remove Plaintiff from the
property. (*Id.*)

In addition, Plaintiff avers that on January 17 and 21, 2019, he
received harassing messages on social media from Thrasher
and a woman who identified herself as Thrasher's sister.
(*Id.* at 8–9.) He alleges that the messages informed him
that he was being watched or recorded and made racially
and ethnically charged, threatening statements. (*Id.* at 9.)
He further alleges that he took the messages to a county
magistrate on January 22, 2019, in an attempt to obtain an
order of protection from Thrasher and his sister, but that the
magistrate "informed [Plaintiff] that he was unable to grant
[Plaintiff's] request because there had been no directly worded
threats to guarantee physical harm, but that [the messages]
were definitely unlawful harassment." (*Id.*) According to
Plaintiff, the magistrate directed him to report the messages
to Martin, the City's chief of police. (*Id.*)

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 4929025

**\*2** But Plaintiff avers that when he entered the city building housing the police department, he "was met with a completely adverse atmosphere" and subjected to "bigoted fear mongering[,] finger pointing and whispers from" Martin, Joyce—the City's mayor—and "several" City police officers. (*Id.*) He alleges that a United States senator was preparing to make a speech in the lobby, and Martin, Joyce, and the officers "were looking [Plaintiff's] direction in short frantic nods making comments regarding 'terrorist Maliki' and 'for everybodies [sic] safety.' " (*Id.*) According to Plaintiff, Joyce and members of the media who were gathered in the lobby then moved "to a closed off room with 'locking doors for their safety.' " (*Id.* at 10.) Plaintiff avers that Martin refused to look at the messages Thrasher and his sister allegedly sent to Plaintiff and had City police officer John Doe #2 escort Plaintiff from the building "with the threat of incarceration and more fraudulent criminal charges." (*Id.*)

Plaintiff further alleges that on February 7, 2019, he stepped out of an office inside the City building and saw Joyce and a group of City police officers "waiting for [Plaintiff]." (*Id.* at 11.) He avers that Joyce and John Doe #5, a police officer employed by the City, harassed and threatened him and told him that his "presence makes them and other employees within the building feel uncomfortable." (*Id.*) According to Plaintiff, he was banned from City property and informed that he "would be arrested and criminally charged if [he] ever returned." (*Id.*) Plaintiff avers that Joyce and John Doe #5 then directed Williams, another City police officer, to issue Plaintiff a citation requiring him to appear at the building from which he had been banned. (*Id.* at 11–12.)

Finally, Plaintiff alleges that during the third week of June 2019, he received a notice from the Division of Motor Vehicles informing him that his license would be suspended beginning on June 28 for an unpaid citation issued by the City and requiring him to first pay the citation and then pay a $50 license reinstatement fee. (*Id.* at 12.) According to Plaintiff, he paid the citation on June 27, 2019, but because he could not enter the City building, he waited outside while a man took his payment and returned with a receipt. (*Id.* at 12–13.) Plaintiff alleges that while he was waiting, police officers looked out the window and laughed at him. (*Id.* at 13.)

Defendants filed their motion to dismiss on March 4, 2020. (ECF No. 20.) On March 5, 2020, the undersigned entered an Order directing Plaintiff to file any response to the motion on or before March 26, 2020, and notifying him "that a failure to do so may constitute an abandonment of his claims

and result in the dismissal of this action." (ECF No. 24.) On March 25, 2020, Plaintiff's deadline to respond to the motion to dismiss was extended until April 27, 2020, pursuant to this Court's General Order #3 entered in In re *Court Operations in Light of the Exigent Circumstances Presented by the COVID-19 Pandemic*, No. 2:20-mc-00052. (ECF No. 25.) Plaintiff did not file a response. Instead, on April 30, 2020, he filed a "Request for Assistance" (ECF No. 27), which the undersigned has denied for the reasons explained in the Order entered contemporaneously herewith (ECF No. 30). Defendants filed two replies—one on April 2, 2020 (ECF No. 26), and one on May 5, 2020 (ECF No. 29)—arguing that their motion to dismiss should be granted because Plaintiff failed to oppose it. Indeed, this Court is authorized, after allowing Plaintiff an opportunity to respond, to "rule on [Defendants'] motion and dismiss [the] suit on the uncontroverted bases asserted therein." *Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004). However, in light of the "Request for Assistance," and out of fairness to Plaintiff, who proceeds *pro se*, the undersigned has nonetheless considered the merits of Defendants' motion to dismiss.

## II. LEGAL STANDARD

In general, a pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015) (stating that this requirement exists "to give the defendant fair notice of what the ... claim is and the grounds upon which it rests" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))). However, to withstand a motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must plead enough facts "to state a claim to relief that is plausible on its face." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Stated another way, the factual allegations in the complaint "must be sufficient 'to raise a right to relief above the speculative level.' " *Woods v. City of Greensboro*, 855 F.3d 639, 647 (4th Cir. 2017) (quoting *Twombly*, 550 U.S. at 555). A complaint that alleges enough facts "to satisfy the elements of a cause of action created by [the relevant] statute" will survive a motion to dismiss. *Id.* at 648 (quoting *McCleary-Evans*, 780 F.3d at 585).

2020 WL 4929025

**\*3** In evaluating the sufficiency of a complaint, this Court first "identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. This Court then "assume[s] the[ ] veracity" of the complaint's "well-pleaded factual allegations" and "determine[s] whether they plausibly give rise to an entitlement to relief." *Id.* Review of the complaint is "a context-specific task that requires [this Court] to draw on its judicial experience and common sense." *Id.* "[T]o satisfy the plausibility standard, a plaintiff is not required to plead factual allegations in great detail, but the allegations must contain sufficient factual heft to allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of that which is alleged." *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 452 (4th Cir. 2017) (internal quotation marks omitted). This Court construes a *pro se* plaintiff's allegations "liberally," but the complaint must nonetheless "contain enough facts to state a claim for relief that is plausible on its face." *Thomas v. Salvation Army S. Territory*, 841 F.3d 632, 637 (4th Cir. 2016) (internal quotation marks omitted).

### III. ANALYSIS

Defendants move to dismiss Plaintiff's claims against them because the complaint fails to allege facts establishing a constitutional violation or other unlawful conduct and because Defendants are entitled to immunity from suit. (ECF No. 23 at 8–30.)

#### A. *42 U.S.C. § 1983 Claims*

In order to state a claim under § 1983, the complaint "must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Loftus v. Bobzien*, 848 F.3d 278, 284–85 (4th Cir. 2017) (quoting *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011)). Liberally construed, Plaintiff's complaint purports to allege a number of violations of the Fourteenth Amendment's equal protection guarantee, as well as violations of the First and Fourth Amendments—as applied to the States through the Fourteenth Amendment—committed by the City's police force and its mayor. (*See* ECF No. 18 at 7–13.) Defendants contend that none of these claims have merit. (ECF No. 23 at 8–20.)

#### 1. First Amendment Claim

Defendants argue that Plaintiff's First Amendment claim, which is based on the allegedly retaliatory seizure of the cellphone Plaintiff used to record the June 2, 2018 incident (ECF No. 18 at 8), fails because Thrasher had probable cause to seize the cellphone and because he is entitled to qualified immunity with respect to any First Amendment violation caused by the seizure. (ECF No. 23 at 8–11.) "Qualified immunity protects officials who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 537–38 (4th Cir. 2017) (internal quotation marks omitted). To determine whether an official is entitled to qualified immunity, this Court first "identif[ies] the specific right that the plaintiff asserts was infringed by the challenged conduct." *Id.* at 538 (quoting *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc)). This Court then considers, in either order, "whether a constitutional violation occurred and whether the right violated was clearly established at the time of the official's conduct." *Id.* (internal quotation marks omitted). If this Court's conclusion is dispositive with respect to one prong, it "need not reach" the other prong. *Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 242 (2009)).

Here, even if Thrasher violated Plaintiff's First Amendment rights by securing a warrant for the cellphone Plaintiff used to record the June 2, 2018 incident in retaliation for his recording it, *see Garcia v. Montgomery Cty.*, 145 F. Supp. 3d 492, 510–11 (D. Md. 2015) (finding First Amendment violation where officer seized, without warrant, video card used to record police encounter to prevent dissemination), those rights were not clearly established at that time. "A right is clearly established only if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Booker*, 855 F.3d at 538 (internal quotation marks omitted). In short, there must be "a case where an officer acting under similar circumstances ... was held to have violated the [constitutional provision at issue]." *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *Safar v. Tingle*, 859 F.3d 241, 247 (4th Cir. 2017). Although the case need not be "directly on point for a right to be clearly established, existing precedent must have placed the ... constitutional question beyond debate." *White*, 137 S. Ct. at 551 (internal quotation marks omitted).

**\*4** Only cases from the United States Supreme Court, the Fourth Circuit Court of Appeals, or the West Virginia Supreme Court of Appeals are relevant to that determination in this case. *Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017) ("To determine if the right in question was clearly established, we first look to cases from the Supreme Court, this Court of Appeals, or the highest court of the state in which the action arose." (citing *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004))). However, no case law from any of those courts outlines even a general First Amendment right to record police activity. In the only case to address it, the Fourth Circuit held, without deciding whether such a right existed, that it was not clearly established at the time of the officer's conduct. *Szymecki v. Houck*, 353 F. App'x 852, 853 (4th Cir. 2009). The state of the law, at least according to the three courts whose opinions govern this case, did not change between then and June 2, 2018. And if recording the police is not First Amendment "protected speech," it cannot serve as the basis for a First Amendment retaliation claim like the one Plaintiff seeks to bring here. *See Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (listing elements of First Amendment retaliation claim). Therefore, the undersigned **FINDS** that Plaintiff's § 1983 claim based on Thrasher's allegedly obtaining a warrant for Plaintiff's cellphone in retaliation for his recording the June 2, 2018 incident fails and **RECOMMENDS** that Defendants' motion to dismiss that claim (ECF No. 20) be **GRANTED**.

### 2. Fourth Amendment Claims

Plaintiff's complaint also appears to allege Fourth Amendment violations against Thrasher for "illegally obtain[ing] without warrant" Plaintiff's "body fluids" and for securing a warrant for Plaintiff's cellphone "without just cause." (*See* ECF No. 18 at 8.) Although Defendants' motion to dismiss does not address these claims, the undersigned nonetheless evaluates their merits because the motion to dismiss advocates for the dismissal of the complaint in its entirety for failure to state a claim. (*See* ECF No. 20 at 1.)

The Fourth Amendment generally requires that the police obtain a warrant supported by probable cause prior to conducting a search or seizure. *United States v. Doyle*, 650 F.3d 460, 466 (4th Cir. 2011) (citing U.S. Const. amend. IV). Turning first to Plaintiff's allegations that Thrasher obtained his "body fluids" without a warrant, such an intrusion generally constitutes a search within the Fourth Amendment's purview. *Maryland v. King*, 569 U.S. 435, 446 (2013).

However, a warrantless sampling of a person's bodily fluids is not a *per se* Fourth Amendment violation. *See Birchfield v. North Dakota*, 136 S. Ct. 2160, 2173 (2016) ("This [warrant] requirement ... is subject to a number of exceptions."); *id.* at 2177 (detailing prior cases that "upheld warrantless searches involving physical intrusions"). The complaint is devoid of facts about the circumstances of the sampling in this case, leaving the undersigned to impermissibly speculate that a constitutional violation occurred. (*See* ECF No. 18 at 8.) Plaintiff's allegation that his "body fluids [were] illegally obtained without warrant" (*id.*) is nothing more than a "legal conclusion[ ] pleaded as [a] factual allegation[ ]" that is "not entitled to the presumption of truth" when up against a motion to dismiss. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)). Without more facts, Plaintiff's claim cannot surpass the plausibility threshold required by Rule 8(a)(2). As such, the undersigned **FINDS** that the complaint fails to allege a Fourth Amendment violation stemming from Thrasher's obtaining Plaintiff's "body fluids" and **RECOMMENDS** that Defendants' motion to dismiss (ECF No. 20) be **GRANTED** as to that claim.

Plaintiff's claim based on Thrasher's securing of a warrant for Plaintiff's cellphone in retaliation for his recording the June 2, 2018 incident suffers from the same pleading deficiencies. Plaintiff alleges, without further factual elaboration, that the "warrant was made possible through deceit, dishonesty, and without just cause therefore rendering it unlawfully obtained." (ECF No. 18 at 8.) But that the warrant was issued in the first place suggests that probable cause existed to seize Plaintiff's cellphone. *See Doyle*, 650 F.3d at 467 ("Usually, a warrant issued by a magistrate suffices to establish that a law enforcement officer has acted in good faith in conducting the search." (alteration and internal quotation marks omitted)). To the extent Plaintiff implies that Thrasher offered false information to secure the warrant, he alleges no facts to support that assertion. (*See* ECF No. 18 at 8.) *See Wilkinson v. Hallsten*, No. 5:06-cv-2, 2006 WL 2224293, at \*6 (W.D.N.C. Aug. 2, 2006) (refusing to "infer constitutional violations" where complaint did not plead facts about which statements in affidavit were false and how they were material to issuance of warrant); *see also Manship v. Trodden*, No. 1:07-cv-772 (TSE/TCB), 2007 WL 3143559, at \*5 (E.D. Va. Oct. 22, 2007) (dismissing false-arrest claim based on allegedly false statements in criminal complaint where plaintiff's "complaint contains no facts establishing that [defendant] acted with 'reckless

2020 WL 4929025

disregard' or made 'deliberate' misstatements requisite for a showing for a Fourth Amendment violation"). Therefore, the undersigned **FINDS** that Plaintiff's complaint fails to allege a Fourth Amendment violation based on Thrasher's allegedly retaliatory securing of a warrant for Plaintiff's cellphone and **RECOMMENDS** that Defendants' motion to dismiss (ECF No. 20) be **GRANTED** as to that claim.

### 3. Equal Protection Claims

**\*5** Defendants contend that Plaintiff's equal protection claims should be dismissed because Plaintiff fails to allege the existence of a similarly situated comparator whom Defendants treated differently and because Defendants are entitled to qualified immunity. (ECF No. 23 at 11–15.) "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Martin*, 858 F.3d at 252 (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). Although the complaint need not specifically identify the comparator, it must nonetheless allege facts demonstrating that one exists. *Ruttenberg v. Jones*, 283 F. App'x 121, 131 (4th Cir. 2008) (per curiam) (affirming dismissal of equal protection claim that "fails to allege the existence of similarly situated individuals"); *Foster v. U.S. EPA*, No. 2:14-cv-16744, 2016 WL 4473453, at \*9 (S.D.W. Va. Aug. 22, 2016) (dismissing equal protection claim because allegations contained "no information from which the court may determine that [other "regulated entities or properties"] were similarly situated to plaintiffs").

With the exception of the allegations about the June 2, 2018 incident, Plaintiff's complaint fails to even mention another individual who could potentially be similarly situated to Plaintiff. (ECF No. 18 at 8–13.) Regarding the June 2, 2018 incident, Plaintiff alleges that Schaad, who is not named as a defendant in this action, was dispatched to "an altercation" between Plaintiff and a white male "pedestrian" with a firearm. (*Id.* at 7.) However, according to Plaintiff, Schaad let the white male "stand and speak freely" without detaining him or securing his firearm but exited his patrol car and held Plaintiff at gunpoint when Plaintiff approached. (*Id.*) Plaintiff further alleges that when Thrasher and John Doe #1 arrived at the scene, they likewise failed to detain the white male or secure his firearm—referring to him as "the victim"— and instead arrested Plaintiff and charged him with a crime.

(*Id.* at 8.) He alleges that the officers' conduct was "racially motivated." (*Id.*) In short, Plaintiff alleges that he was treated differently from an individual of a different race who was also involved in the "altercation" in the intersection, and even had a firearm when Plaintiff did not. (*Id.* at 7–8.) These allegations are sufficient, at the motion-to-dismiss stage, to demonstrate the existence of a comparator.

If the complaint pleads facts to establish that the plaintiff was subject to unequal treatment based on intentional discrimination, this Court next "proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Martin*, 858 F.3d at 252 (quoting *Morrison*, 239 F.3d at 654). The "ethnically biased" policing Plaintiff alleges here (ECF No. 18 at 8) cannot survive the strict scrutiny applied to racially based classifications because such classifications "are 'seldom relevant to the achievement of any legitimate state interest.' " *Lee v. City of S. Charleston*, 668 F. Supp. 2d 763, 776 (S.D.W. Va. 2009) (quoting *Morrison*, 239 F.3d at 654). Accepting Plaintiff's allegations as true, when Thrasher arrived at the scene, he assumed, based on his own racial bias, that the white male was "the victim" in the "altercation" involving Plaintiff and arrested Plaintiff. Clearly, no legitimate state interest exists under those facts. And Plaintiff's Fourteenth Amendment right to be free from an arrest based on racial profiling by the police was clearly established on June 2, 2018. *See Green v. Maroules*, 211 F. App'x 159, 162 (4th Cir. 2006) (concluding that plaintiff stated equal protection claim based on false arrest "resulting from intentional discrimination in the form of racial profiling").

In sum, the undersigned **FINDS** that the complaint alleges an equal protection violation stemming from the June 2, 2018 incident but fails to state a claim with respect to any of the other incidents because Plaintiff has not identified a similarly situated individual who was treated differently. The undersigned thus **RECOMMENDS** that Defendants' motion to dismiss be **DENIED** as to the June 2, 2018 incident and **GRANTED** as to the December 20, 2018, January 22, 2019, February 7, 2019, and June 27, 2019 incidents.

### 4. Conspiracy Claims

**\*6** Defendants argue that Plaintiff's conspiracy claims should be dismissed because the complaint fails to allege an underlying constitutional violation or any facts establishing the conspiracy. (ECF No. 23 at 18–20.) As an initial matter,

it is unclear whether Plaintiff seeks to bring his conspiracy claims pursuant to 42 U.S.C. § 1983 or 42 U.S.C. § 1985(3). [1] (*See* ECF No. 18 at 5.) Regardless, to state a claim under either statute, there must be a corresponding deprivation of the plaintiff's constitutional rights. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996) (stating that § 1983 conspiracy must "result[ ] in [the] deprivation of a constitutional right"); *Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (stating that § 1985(3) conspiracy requires "an agreement or a meeting of the minds by [the] defendants to violate the [plaintiff's] constitutional rights" (quoting *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995))). As the undersigned has explained, by and large, Plaintiff has not alleged a cognizable constitutional violation.

[1]    Neither § 1985(1), which governs conspiracies to prevent a federal officer from performing his or her duties, nor § 1985(2), which governs conspiracies to interfere with court proceedings, applies to the facts alleged in the complaint. (*See* ECF No. 18.)

With respect to the equal protection claim against Thrasher for his conduct on June 2, 2018, Plaintiff has not alleged facts demonstrating an agreement between Thrasher and either Schaad or John Doe #1—neither of whom is a named defendant in this action—to violate Plaintiff's constitutional rights as a result of shared discriminatory animus. The allegations supporting a § 1985(3) claim "must, at least, reasonably lead to the inference that the defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Patterson v. Yeager*, No. 2:12-cv-01964, 2016 WL 589881, at *18 (S.D.W. Va. Feb. 11, 2016). Merely stating that the defendants engaged in a conspiracy or were part of a conspiracy is insufficient. *Soc'y Without a Name*, 655 F.3d at 347. Similarly, a § 1983 conspiracy claim requires allegations "that the [defendants] acted jointly in concert." *Hinkle*, 81 F.3d at 421. Here, the complaint generally alleges that Defendants "did on several occasions[ ] knowingly and intentionally **CONSPIRE**, directly and indirectly, for the sole purpose of **DEPRIVING** the PLAINTIFF of his **CIVIL RIGHTS** and privileges." (ECF No. 18 at 6 (emphasis in original).) But those allegations are not enough, as they are merely a restatement of the elements of a § 1983 or § 1985(3) civil conspiracy cause of action. *Mayfield v. NASCAR, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012) (stating that "a mere recitation of the legal standard" will not survive a motion to dismiss). The complaint lacks further factual detail about Thrasher's involvement in any agreement to deprive Plaintiff of his

constitutional rights prior to the June 2, 2018 incident. (ECF No. 18 at 7–8.) Plaintiff has thus not adequately alleged a conspiracy in relation to that incident.

Accordingly, the undersigned **FINDS** that the complaint fails to allege a civil conspiracy claim under either § 1983 or § 1985(3) and **RECOMMENDS** that Defendants' motion to dismiss (ECF No. 20) be **GRANTED** as to the conspiracy claims.

### 5. Claims Against the City

Liberally construed, the complaint also seems to allege the above claims against the City. (ECF No. 18 at 2–4, 5–6.) [2] Defendants do not address those claims beyond a cursory statement that the City cannot be held liable for conspiracy based on a respondeat superior theory. (ECF No. 23 at 19.) Again, however, the undersigned considers the merits of Plaintiff's claims against the City because Defendants urge this Court to dismiss Plaintiff's complaint in its entirety. (*See* ECF No. 20 at 1.)

[2]    To the extent Plaintiff brings his claims against the individual Defendants in their official capacities, those claims are claims against the City. *Andrews v. Daw*, 201 F.3d 521, 525 (4th Cir. 2000) ("[O]fficial-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent' and in essence are 'suit[s] against the entity.' " (quoting *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985))).

**\*7** As an initial matter, Defendants correctly argue that "a municipality cannot be held liable [under § 1983] solely because it employs a tortfeasor." *Hunter v. Town of Mocksville*, 897 F.3d 538, 553 (4th Cir. 2018) (emphasis deleted) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). Instead, "a municipality is subject to [§] 1983 liability only when its policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the plaintiff's injury." *Davison v. Randall*, 912 F.3d 666, 689 (4th Cir. 2019) (internal quotation marks omitted); *King v. Rubenstein*, 825 F.3d 206, 223 (4th Cir. 2016) ("[T]he entity's policy or custom must have played a part in the violation of federal law." (internal quotation marks omitted)). But when "there are no underlying constitutional violations by any individual, there can be no municipal liability." *Grayson v. Peed*, 195 F.3d

692, 697 (4th Cir. 1999) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

The only constitutional violation sufficiently alleged in Plaintiff's complaint is an equal protection claim against Thrasher based on his detention and arrest of Plaintiff, as opposed to the white male who had a firearm, during the June 2, 2018 altercation. (*See* ECF No. 18 at 8.) Although Plaintiff avers generally that the City's police engaged in "racially motivated departmental practices," the complaint lacks factual detail about those practices and how they resulted in Thrasher's conduct. (*Id.*) In other words, Plaintiff has not shown that the City had notice of racial bias in the police force and condoned it such that it "is 'fairly attributable to the [City] as its own, and is the moving force behind the [equal protection] violation' " stemming from the June 2, 2018 incident. *Hackett v. Lusk*, No. 3:10-cv-00781, 2012 WL 13024067, at *3 (S.D.W. Va. Feb. 28, 2012) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987)). This is fatal to any claim against the City arising from that incident.

Accordingly, the undersigned **FINDS** that the complaint fails to state a § 1983 claim against the City and **RECOMMENDS** that Defendants' motion to dismiss (ECF No. 20) be **GRANTED** as to those claims.

### B. State-Law Claims

Defendants argue that the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29-12A-1, *et seq.*, shields the City [3] from liability for Plaintiff's state-law claims. (ECF No. 23 at 20–30.) The Act provides that "a political subdivision" such as the City "is not liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function" except as set forth in the Act. W. Va. Code § 29-12A-4(b)(1). That is, "[o]nly claims of negligence specified in [§ 29-12A-4(c)] can survive immunity from liability under the general grant of immunity in [§ 29-12A-4(b)(1)]." *Zirkle v. Elkins Road Pub. Serv. Dist.*, 655 S.E.2d 155, 160 (W. Va. 2007) (per curiam). However, if the alleged negligent act or omission stems from a scenario enumerated in § 29-12A-5(a), the political subdivision is entitled to immunity regardless of whether it falls into a category listed in § 29-12A-4(c). *Bowden v. Monroe Cty. Comm'n*, 750 S.E.2d 263, 267 (W. Va. 2013) (per curiam); *see* W. Va. Code § 29-12A-4(c).

[3]    Plaintiff brings his state-law claims only against the City. (ECF No. 18 at 4–7, 13.)

#### 1. Negligent Infliction of Emotional Distress

Defendants argue that Plaintiff's negligent infliction of emotional distress claim against the City should be dismissed because the facts in the complaint are not analogous to a situation to which the West Virginia Supreme Court of Appeals has applied that cause of action. (ECF No. 23 at 22.) Under West Virginia law, "[a] claim for emotional distress without an accompanying physical injury can only be successfully maintained upon a showing by the plaintiff[ ] in such an action of facts sufficient to guarantee that the claim is not spurious and upon a showing that the emotional distress is undoubtedly real and serious." Syl. Pt. 11, *Marlin v. Bill Rich Constr., Inc.*, 482 S.E.2d 620 (W. Va. 1996). Such a claim was found to lie where the plaintiff's close relative suffered serious injury or death as a result of the defendant's negligence—otherwise known as a "bystander" claim; where the defendant's negligent conduct resulted in the plaintiff's exposure to disease; and where the defendant negligently mishandled the corpse of a close relative of the plaintiff. *Mays v. Bd. of Governors*, No. 14-0788, 2015 WL 6181508, at *3 (W. Va. Oct. 20, 2015) (per curiam) (citing Syl. Pt. 1, *Heldreth v. Marrs*, 425 S.E.2d 157 (1992); Syl. Pt. 12, *Marlin*, 482 S.E.2d 620; *Ricotilli v. Summersville Mem'l Hosp.*, 425 S.E.2d 629 (1992)).

**\*8** Since then, the West Virginia Supreme Court of Appeals has effectively limited claims for negligent infliction of emotional distress not involving physical injury to the plaintiff to those precise factual scenarios. *See id.* at *10 (Davis, J., dissenting) ("[T]he majority espouses the view that claims for negligent infliction of emotional distress are limited to only the type of facts set forth in *Heldreth, Ricotilli,* and *Marlin*...."); *see also* Syl. Pt. 4, *State ex rel. Maxxim Shared Servs., LLC v. McGraw*, 835 S.E.2d 590 (W. Va. 2019) ("In West Virginia, an employee cannot recover damages for emotional distress after witnessing an injury to an unrelated co-worker under a claim of negligent infliction of emotional distress."). Plaintiff does not allege that he was physically injured as a result of some negligent act or omission by the City, nor do the incidents described in his complaint fit within one of the three factual scenarios previously found to be negligent infliction of emotional distress. (*See* ECF No. 18.) As such, the undersigned **FINDS** that the complaint fails to

*Maliki v. City of Parkersburg, Slip Copy (2020)*

2020 WL 4929025

allege a negligent infliction of emotional distress claim and **RECOMMENDS** that Defendants' motion to dismiss (ECF No. 20) be **GRANTED** as to that claim.

### 2. *Intentional Infliction of Emotional Distress/Tort of Outrage*

Defendants contend that the City is entitled to statutory immunity as to Plaintiff's claims against it for intentional infliction of emotional distress and outrage. (ECF No. 23 at 25–27.)[4] Indeed, "claims of intentional and malicious acts are included in the general grant of immunity in [*West Virginia Code § 29-12A-4(b)(1)*]." *Zirkle*, 655 S.E.2d at 160; *see Cochran v. River Road Pub. Serv. Dist.*, No. 18-0302, 2019 WL 5849372, at *4 (W. Va. Nov. 7, 2019) (per curiam) ("Each of [the] provisions [in *§ 29-12A-4(c)*] imposes liability upon political subdivisions for negligent acts, not intentional ones."). The City is thus statutorily immune from claims for intentional torts such as intentional infliction of emotional distress and outrage. *Helms v. Carpenter*, No. 16-1070, 2017 WL 5513618, at *7 (W. Va. Nov. 17, 2017) ("Petitioner's intentional tort claims (intentional infliction of emotional distress; outrage; and battery) cannot stand because a political subdivision cannot be held liable for intentional torts."). Accordingly, the undersigned **FINDS** that Plaintiff's intentional infliction of emotional distress and outrage claims are barred by *West Virginia Code § 29-12A-4(b)(1)* and **RECOMMENDS** that Defendants' motion to dismiss (ECF No. 20) be **GRANTED** as to those claims.

[4] "[T]he tort of outrage is synonymous with intentional or reckless infliction of emotional distress." *Williamson v. Harden*, 585 S.E.2d 369, 373 (W. Va. 2003).

### 3. *Negligent Supervision/Training*

Defendants argue that Plaintiff's negligent supervision and training claims against the City should be dismissed because the complaint fails to allege facts to support such claims. (ECF No. 23 at 23–25.) In West Virginia, a cause of action for negligent failure to supervise or train sounds in basic principles of negligence. *See W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 766 S.E.2d 751, 772 (W. Va. 2014); *Taylor v. Cabell Huntington Hosp., Inc.*, 538 S.E.2d 719, 725 (W. Va. 2000) (per curiam). To demonstrate negligence under West Virginia law, the plaintiff must show that the defendant owed

him a duty and breached that duty, causing injury to the plaintiff. *Wheeling Park Comm'n v. Dattoli*, 787 S.E.2d 546, 551 (W. Va. 2016) (quoting *Webb v. Brown & Williamson Tobacco Co.*, 2 S.E.2d 898, 899 (1939)).

The complaint in this case lacks factual detail about the circumstances of the allegedly negligent supervision or training. (ECF No. 18.) Rather, Plaintiff seems to rely on the mere fact of the occurrence of the events alleged in the complaint, which Plaintiff alleges are the result of City employees' racially discriminatory animus, to support this claim. (*See id.* at 5–6.) But "the general rule [is] that negligence cannot be presumed" in this manner. *Kyle v. Dana Transp., Inc.*, 649 S.E.2d 287, 290 (W. Va. 2007) (citing *Foster v. City of Keyser*, 501 S.E.2d 165, 178 (1997)). To the extent that the doctrine of res ipsa loquitur applies to claims for negligent supervision or training under West Virginia law, it "cannot be invoked where the existence of negligence is wholly a matter of conjecture and the circumstances are not proved, but must themselves be presumed," as here. *Id.* at 291 (quoting Syl. Pt. 2, *Farley v. Meadows*, 404 S.E.2d 537 (1991)). Without further allegations to merit a reasonable inference of failure to supervise or failure to train, Plaintiff's negligent supervision and training claim cannot go forth. As such, the undersigned **FINDS** that the complaint fails to state a claim for negligent supervision and training and **RECOMMENDS** that Defendants' motion to dismiss (ECF No. 20) be **GRANTED** as to that claim.

### IV. *RECOMMENDATION*

***9** For these reasons, it is respectfully **RECOMMENDED** that Defendants' motion to dismiss (ECF No. 20) be **GRANTED IN PART** and **DENIED IN PART**.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, Chief United States District Judge. Pursuant to the provisions of *28 U.S.C. § 636(b)(1)(B)* and *Federal Rule of Civil Procedure 72(b)*, the parties shall have fourteen (14) days (filing of objections) and three (3) days (mailing) from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Copies

**Maliki v. City of Parkersburg, Slip Copy (2020)**

2020 WL 4929025

of any objections shall be provided to the opposing party or, if it is represented by counsel, to its counsel, and to Chief Judge Johnston.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn,* 474 U.S. 140, 155 (1985); *Snyder v. Ridenour,* 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins,* 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce,* 727 F.2d 91, 94 (4th Cir. 1984).

**All Citations**

Slip Copy, 2020 WL 4929025

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.